# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Noala Fritz, Individually, and as the                         :
Personal Representative of the Estate                         :
of Jacob Fritz, and as the Personal Representative            :
of the Estate of Lyle Fritz,                                  :
                                                              :
Daniel Fritz,                                                 :
                                                              :
Ethan Fritz,                                                  :
                                                              :                **FIRST AMENDED COMPLAINT**
                                                              :                CA NO.:15-456 (RDM)
                                                              :
Russell J. Falter, Individually and as the Personal          :
Representative of the Estate of Shawn Falter,                 :
                                                              :
Linda Braun Falter,                                           :
                                                              :
Marjorie Falter,                                              :
                                                              :
Russell C. Falter,                                            :
                                                              :
John Sackett,                                                 :
                                                              :
Jason Sackett,                                                :
                                                              :
Marsha Novak,                                                 :
                                                              :
David Lucas,                                                  :
                                                              :
Tim Lucas,                                                    :
                                                              :
Andrew Lucas,                                                 :
                                                              :
Elizabeth Chism, Individually                                 :
and as the Independent Administratix of the Estate           :
or Succession of Johnathan Bryan Chism,                       :
                                                              :
Danny Chism,                                                  :
                                                              :
Vanessa Chism,                                                :
                                                              :
Julie Chism,                                                  :
                                                              :
Kousay Al-Taie, Individually, and as the                      :

Personal Representative of the Estate          :
of Ahmed Al-Taie,                              :
                                               :
Nawal Al-Taie,                                 :
                                               :
Bashar Al-Taie, and                            :
                                               :
Hathal K. Taie,                                :
                                               :
                                               :
                              Plaintiffs,      :
                                               :
v.                                             :
                                               :
Islamic Republic of Iran,                      :
                                               :
Iranian Revolutionary Guard Corps              :
Armed Forces Headquarters Iran                 :
Tehran - Zone 7 – Shariati                     :
Ghoddoosi Square (Ghaar)                       :
Tehran, Iran, and                              :
                                               :
John Does #1-5,                                :
                                               :
                              Defendants.      :
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ........:

# FIRST AMENDED COMPLAINT

Plaintiffs bring this action pursuant to the provisions of the Foreign Sovereign Immunities

Act, 28 U.S.C. § 1602, *et seq*. (hereinafter "FSIA").

## Introduction

1.      This action arises out of the January 20, 2007 murder of Jacob Fritz, Johnathan

Chism, and Shawn Falter after their abduction in Karbala, Iraq, and the murder of Ahmed Al-Taie

after his abduction on October 23, 2006 in Baghdad, Iraq.  Jacob Fritz, Johnathan Chism, and

Shawn Falter were murdered while they were held as prisoners by agents of the Iranian

Revolutionary Guard Corps (hereinafter "IRGC"), Hezbollah (an Iranian agent and proxy), and

members of Asaib Ahl al-Haq, also known as the Khazali Network (hereinafter the "Khazali Network") (an Iranian agent and proxy). The Khazali Network abducted Al-Taie in October 2006 while he was visiting his wife in the Karrada neighborhood of Baghdad. In February 2007, an affiliate of the Khazali Network, Ahl al-Bayt Brigades, posted a video of Ahmed Al-Taie in captivity. Members of the Khazali Network murdered Al-Taie while he was held as a prisoner sometime prior to February 22, 2012 when they released his remains to the Iraqi government as part of a prisoner exchange.[1]

2.     The Khazali Network is an Iranian-funded Shiite militant organization that was officially founded in January 2006 by Qais al-Khazali as a splinter group from the Mahdi Army. It is often referred to as one of the Special Groups, a term used by the U.S. military to denote the Iranian government-controlled Shiite militias operating in Iraq. Since its inception, the Khazali Network has relied heavily on Iranian funding, training, and logistical support, and in return has acted as an Iranian proxy in Iraq, carrying out its agenda and promoting its interests.[2]

3.     Jacob Fritz, Shawn Falter, and Johnathan Chism were the victims of "torture" and acts of "extrajudicial killing" as defined in the Torture Victim Protection Act ("TVPA"), codified at 28 U.S.C. § 1350, Note, and suffered "personal injury" and "death" which are compensable under 28 U.S.C. § 1605A.

---

[1] Associated Press, "Missing U.S. soldier killed by Shiite group," (February 27, 2012), available at http://usatoday30.usatoday.com/news/military/story/2012-02-27/iraq-us-soldier-shiite/53267618/1. ("Shiite lawmaker Sami al-Askari, a close ally of Prime Minister Nouri al-Maliki, said the remains of Staff Sgt. Ahmed al-Taie were turned over last week as part of a prisoner exchange agreement between the Iraqi government and the militant group Asaib Ahl al-Haq.").

[2] Wyer, Sam. "The Resurgence of Asa'ib Ahl al-Haq." *Middle East Security Report 7*, Institute for the Study of War, available at http://www.understandingwar.org/report/resurgence-asaib-ahl-al-haq; Cochrane, Marisa. "Asaib Ahl al-Haq and the Khazali Special Groups Network." Institute for the Study of War, (January 13, 2008), available at http://www.understandingwar.org/sites/default/files/reports/Asaib%20Ahl%20al%20Haq%20and%20the%20Khazali%20Special%20Groups%20Network.pdf.

4.     Ahmed Al-Taie was a victim of "torture" and an act of "extrajudicial killing" as defined in the Torture Victim Protection Act, codified at 28 U.S.C. § 1350, Note, and suffered "personal injury" and "death" which are compensable under 28 U.S.C. § 1605A.

5.     Jacob Fritz, loving son and older brother, had always wanted to serve his country as a member of the United States Armed Forces.  He graduated from the United States Military Academy at West Point in 2005.  Jacob was an inspiration to his brothers, who wanted to follow in his footsteps and join the military.  Jacob was fiercely loyal to his family and had a critical role in helping with the family farm, even while he was on active duty.  After his tour in Iraq, Jacob planned to take over the farm from his father, Lyle Fritz, who was gravely ill and later died.  At the time of his abduction and murder in January 2007, Jacob Fritz was 25 years old and a First Lieutenant in the United States Army.  He was a "national of the United States" and "a member of the armed forces," within the meaning of 28 U.S.C. § 1605A(a)(2)(A)(ii).  Jacob Fritz was posthumously awarded, among other honors, a Prisoner of War Medal.

6.     Shawn Falter, loving son and brother, had a reputation for quiet diligence and an easygoing spirit.  Shawn knew how to lighten a moment just when it was needed most.  In 2005, Shawn enlisted in the Army, following in the footsteps of his older brothers.  At the time of his abduction and murder, U.S. Army Private First Class Shawn Falter was 25 years old.  He was a "national of the United States" and "a member of the armed forces," within the meaning of 28 U.S.C. § 1605A(a)(2)(A)(ii).  Shawn Falter was posthumously awarded, among other honors, a Prisoner of War Medal.

7.     Johnathan Chism, loving son and brother, was a gregarious Boy Scout who enjoyed skydiving and rock climbing.  The Louisiana native was a big fan of LSU football, known for his great sense of humor, and "liked anybody and everybody."  He frequently told his friends how

incredibly proud he was to serve his country in the U.S. Army.  At the time of his abduction and murder, Chism was scheduled to return home to Louisiana the following month for two weeks of rest and recuperation with his family.  U.S. Army Specialist Johnathan Chism was 22 years old when he died.  He was a "national of the United States" and "a member of the armed forces," within the meaning of 28 U.S.C. § 1605A(a)(2)(A)(ii).   Johnathan Chism was posthumously awarded, among other honors, a Prisoner of War Medal.

8.     Ahmed Al-Taie, loving son, brother, and husband, left Iraq in 1980 with his family when he was a teenager and later moved to Michigan.  He studied engineering and earned his private pilot's license in 1988.  Al-Taie was fluent in Arabic and could have soughtlucrative contractor jobs as a private translator in Iraq.  Instead, out of pride for his adopted country, Mr. Al-Taie decided to support the United States' mission in Iraq and enlisted in the Army Reserves in 2004.  He was deployed to Baghdad in 2005 as part of a Provincial Reconstruction Team in Iraq and served as a translator.  At the time of his abduction, Ahmed Al-Taie was 41 years old. Staff Sergeant Ahmed Al-Taie was naturalized as a United States citizen on May 15, 2006 and was therefore a "national of the United States" and "a member of the armed forces," within the meaning of 28 U.S.C. § 1605A(a)(2)(A)(ii) from the time of his abduction until the release of his remains. Ahmed Al-Taie was awarded, among other honors, a Prisoner of War Medal.

9.     The kidnapping and murder of these four brave servicemen by agents of the Government of Iran form the factual basis for this action.

Plaintiffs state the following in support of their Complaint:

## The Parties

### A.    The Plaintiffs

10.    This action is brought by the Plaintiffs, by and through their counsel, in the individual capacity of each Plaintiff and, as appropriate, in the capacity of each as Personal Representative of the estates more particularly described in the caption of this action, for their own benefit, for the benefit of each particular estate, and for the benefit and on behalf of all those legally entitled to assert a claim under the FSIA, state common law, and statutory law.

11.    Plaintiff Noala Fritz at all times relevant hereto was and is the mother of Jacob Fritz. Plaintiff Noala Fritz is a citizen of the United States of America who resides in the state of Nebraska.  Plaintiff Noala Fritz can sue and be sued in this Court.  Noala Fritz brings this suit in her own capacity and in her capacity as Personal Representative of the Estate of Jacob Fritz and the estate of Lyle Fritz, who was, at all times relevant hereto, the father of Jacob Fritz.

12.    Plaintiff Daniel Fritz at all times relevant hereto was and is the brother of Jacob Fritz.  Plaintiff Daniel Fritz is a citizen of the United States of America who resides in the state of Kansas.  Plaintiff Daniel Fritz can sue and be sued in this Court.

13.    Plaintiff Ethan Fritz at all times relevant hereto was and is the brother of Jacob Fritz.  Plaintiff Ethan Fritz is a citizen of the United States of America who resides in the state of Nebraska.  Plaintiff Ethan Fritz can sue and be sued in this Court.

14.    Plaintiff Russell J. Falter at all times relevant hereto was and is the father of Shawn Falter.  Plaintiff Russell J. Falter is a citizen of the United States of America who resides in the state of New York.  Plaintiff Russell J. Falter can sue and be sued in this Court.  Plaintiff Russell J. Falter brings this suit in his personal capacity and in his capacity as personal representative of the Estate of Shawn Falter.

15.     Plaintiff Linda Braun Falter at all times relevant hereto was and is the stepmother of Shawn Falter.  Plaintiff Linda Braun Falter is a citizen of the United States of America who resides in the state of New York.  Plaintiff Linda Braun Falter, married to Russell J. Falter, raised Shawn as her own son.  He spent his childhood with her acting as his mother in all respects.  Plaintiff Linda Braun Falter can sue and be sued in this Court.

16.     Plaintiff Marjorie Falter at all times relevant hereto was and is the paternal half-sister of Shawn Falter.  Plaintiff Marjorie Falter is a citizen of the United States of America who resides in the state of New York.  Plaintiff Marjorie Falter can sue and be sued in this Court.

17.     Plaintiff Russell C. Falter at all times relevant hereto was and is the paternal half-brother of Shawn Falter.  Plaintiff Russell C. Falter is a citizen of the United States of America who resides in the state of New York.  Plaintiff Russell C. Falter can sue and be sued in this Court.

18.     Plaintiff John Sackett at all times relevant hereto was and is the maternal half-brother of Shawn Falter.  Plaintiff John Sackett is a citizen of the United States of America who resides in the state of North Carolina.  Plaintiff John Sackett can sue and be sued in this Court.

19.     Plaintiff Jason Sackett at all times relevant hereto was and is the maternal half-brother of Shawn Falter.  Plaintiff Jason Sackett is a citizen of the United States of America who resides in the state of New York.  Plaintiff Jason Sackett can sue and be sued in this Court

20.     Plaintiff Marsha Novak née Lucas at all times relevant hereto was and is the stepsister of Shawn Falter.  Plaintiff Marsha Novak is a citizen of the United States of America who resides in the state of California.  Plaintiff Marsha Novak can sue and be sued in this Court.  Plaintiff Marsha Novak lived in the same household as Shawn for four years, until graduating from high school.  After moving, she remained close with Shawn, and stayed in contact with him during his military service.

21.     Plaintiff David Lucas at all times relevant hereto was and is the stepbrother of Shawn Falter.  Plaintiff David Lucas is a citizen of the United States of America who resides in the state of New York.  Plaintiff David Lucas can sue and be sued in this Court.  Plaintiff David Lucas lived in the same household with Shawn since Shawn was six years old.  They spent a great deal of time together in many daily activities and events.  For instance, David coached Shawn's soccer team.  David was a constant presence in Shawn's daily life until Shawn joined the military, and they corresponded until Shawn's death.

22.     Plaintiff Tim Lucas at all times relevant hereto was and is the stepbrother of Shawn Falter.  Plaintiff Tim Lucas is a citizen of the United States of America who resides in the state of New York.  Plaintiff Tim Lucas can sue and be sued in this Court.  Plaintiff Tim Lucas lived in the same household with Shawn until graduating from high school.  Thereafter, he lived nearby, shared nightly meals with Shawn and helped raise him.

23.     Plaintiff Andrew Lucas at all times relevant hereto was and is the stepbrother of Shawn Falter.  Plaintiff Andrew Lucas is a citizen of the United States of America who resides in the state of New York.  Plaintiff Andrew Lucas can sue and be sued in this Court.  Plaintiff Andrew Lucas joined the Air Force when Shawn was young, and inspired Shawn to join the military. Andrew remained close with Shawn during his military service and until Shawn's death.

24.     Plaintiff Elizabeth Chism at all times relevant hereto was and is the mother of Johnathan Chism.  Plaintiff Elizabeth Chism is a citizen of the United States of America who resides in the state of Louisiana.  Plaintiff Elizabeth Chism brings this suit individually in her personal capacity and in her capacity as the Independent Administratrix of the Estate or Succession of Johnathan Chism.  Plaintiff Elizabeth Chism can sue and be sued in this Court.

25.     Plaintiff Danny Chism at all times relevant hereto was and is the father of Johnathan Chism.  Plaintiff Danny Chism is a citizen of the United States of America who resides in the state of Louisiana.  Plaintiff Danny Chism can sue and be sued in this Court.

26.     Plaintiff Vanessa Chism at all times relevant hereto was and is the stepmother of Johnathan Chism.  Plaintiff Vanessa Chism is a citizen of the United States of America who resides in the state of Louisiana.  Plaintiff Vanessa Chism can sue and be sued in this Court.  Plaintiff Vanessa Chism played a significant role in Johnathan's life, and cared for him whenever Johnathan stayed with his father.  They remained close up until Johnathan's death.

27.     Plaintiff Julie Chism at all times relevant hereto was and is the sister of Johnathan Chism.  Plaintiff Julie Chism is a citizen of the United States of America who resides in the state of Louisiana.  Plaintiff Julie Chism can sue and be sued in this Court.

28.     Plaintiff Kousay Al-Taie at all times relevant hereto was and is the father of Ahmed Al-Taie.  Plaintiff Kousay Al-Taie is a citizen of the United States of America who resides in the state of Michigan.  Plaintiff Kousay Al-Taie brings this suit individually in his personal capacity and in his capacity as the personal representative of Ahmed Al-Taie and can sue and be sued in this Court.

29.     Plaintiff Nawal Al-Taie at all times relevant hereto was and is the mother of Ahmed Al-Taie.  Plaintiff Nawal Al-Taie is a citizen of the United States of America who resides in the state of Michigan.  Plaintiff Nawal Al-Taie brings this suit individually in her personal capacity and can sue and be sued in this Court.

30.     Bashar Al-Taie at all times relevant hereto was and is the brother of Ahmed Al-Taie.  Plaintiff Bashar Al-Taie is a citizen of the United States of America who resides in the state

of Michigan.  Plaintiff Bashar Al-Taie brings this suit individually in his personal capacity and can

sue and be sued in this Court.

31.     Plaintiff Hathal K. Taie at all times relevant hereto was and is the brother of Ahmed

Al-Taie.  Plaintiff Hathal K. Taie is a citizen of the United States of America who resides in the

state of Michigan.  Plaintiff Hathal K. Taie can sue and be sued in this Court.

**B.**     **The Defendants**

32.     Defendant Islamic Republic of Iran ("Iran") is a foreign state that was designated as

a State sponsor of terrorism on January 19, 1984 pursuant to section 6 of the Export Administration

Act of 1979 (50 U.S.C. App. § 2405), section 620A of the Foreign Assistance Act of 1961 (22

U.S.C. § 2371), and section 40 of the Arms Export Control Act (22 U.S.C. § 2780).  Iran has

remained so designated continuously ever since.   According to an April 30, 2008 U.S. Department

of State Report on State Sponsors of Terrorism (the "2008 State Department Report"):

> Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to
> provide lethal support, including weapons, training, funding, and guidance, to some Iraqi
> militant groups that target Coalition and Iraqi security forces and Iraqi civilians.

33.     In an April 2008 "Report to Congress on the Situation in Iraq," the U.S. Commander

of the Coalition Forces in Iraq, echoed this sentiment noting that "Iran has fueled the violence [in

Iraq] in a particularly damaging way, through its lethal support to the Special Groups."

34.     Defendant Iranian Revolutionary Guard Corps, also known as the Islamic

Revolutionary Guard Corps (the "IRGC"), was founded in the aftermath of the 1979 Islamic

Revolution as a military organization charged with safeguarding and protecting the ruling men of

the Islamic Republic of Iran against internal and external challenges and threats.  It is a military

branch of the Iranian government and therefore is considered "the state itself".  The U.S.

Government has described defendant IRGC as being "composed of five branches (Ground Forces,

Air Force, Navy, Basij militia, and Quds Force special operations) in addition to a counterintelligence directorate and representatives of the Supreme Leader" of Iran.[3]  According to the U.S. State Department, the IRGC and its leaders "were directly involved in the planning and support of terrorist acts throughout the region and continued to support a variety of groups in their use of terrorism to advance their common regional goals."  2007 U.S. State Department Report.

35.    The IRGC relies on its Quds Force, a specialized component, to further Iran's political goals directly and indirectly through the use of terror and various foreign groups as proxies.  On October 25, 2007, the U.S. Treasury Department officially designated the IRGC-Quds Force as a material supporter of terrorism pursuant to the President's Executive Order 13224.  In connection with that designation, the Treasury Department noted that Quds Force "provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians" in Iraq.[4] The 2007 State Department Report observed that in 2007 IRGC-Quds Force "continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs), and are specially designed to defeat armored vehicles used by Coalition Forces." At all times relevant to this action, the United States also found and publicly stated that IRGC-Quds Force provided "material support to the Taliban, Lebanese Hezbollah, Hamas, Palestinian Islamic Jihad, and the

---

[3] U.S. Treasury Department Press Release, "Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," (October 25, 2007), available at http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx

[4] U.S. Treasury Department Press Release, "Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," (October 25, 2007), available at http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx.

Popular Front for the Liberation of Palestine-General Command," all designated terrorist organizations or supporters of terrorists.

36. The Quds Force, at all times relevant to this action, carried out acts of terrorism in Iraq, including the provision of material support and resources for other extrajudicial killings of members of the U.S. armed forces and employees of the United States.

37. Defendants John Does #1-5, at all times relevant to this action, were and are senior Iranian government officials and members of the IRGC who planned, supported, and approved the abduction and murder of Jacob Fritz, Shawn Falter, and Johnathan Chism and the abduction of Ahmed Al-Ta on October 23, 2006, probable torture, and his subsequent murder sometime prior to February 22, 2012.

## JURISDICTION AND VENUE

38. Jurisdiction over the subject matter of this case arises under 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), and 1605A.

39. Defendants Iran, IRGC, and John Does #1-5 are subject to suit in the courts of the United States as sponsors of and organizers of the January 20, 2007 Karbala attack and the abduction of Ahmed Al-Ta on October 23, 2006 and his subsequent murder sometime prior to February 22, 2012 pursuant to the FSIA and related statutes.

40. Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4), which provides, in pertinent part, that a civil action against a foreign state may be brought in the United States District Court for the District of Columbia.

41. 28 U.S.C. § 1605A(c) provides a federal private right of action against a foreign state that is or was a State sponsor of terrorism, and also against any official, employee or agent of that foreign state while acting within the scope of his or her office, employment or agency, for

wrongful death, personal injury and related torts caused by an act of torture or extrajudicial killing or the provision of material support and resources for such acts.

## IRAN'S UNDECLARED PROXY WAR IN IRAQ AGAINST THE UNITED STATES

42.   Iran conducts its foreign policy, in part, through proxy paramilitary and terrorist organizations which carry out kidnappings and extrajudicial killings on Iran's behalf.   The State Department's 2007 Country Report on Terrorism described Iran as "the most active state sponsor of terrorism" and "a threat to regional stability and U.S. interests in the Middle East because of its continued support for violent groups."[5]

43.   One of Iran's most prolific proxy organizations is Hezbollah.   The formation of Hezbollah was a product of direct intervention of Iranian Quds Force operatives in the 1980s. Over the following decades, Iran's training and support for Hezbollah would make it one of the most professional and violent paramilitary groups in the world.   Hezbollah has carried out many violent acts of terrorism, on the direct orders of the highest levels of the Iranian government. Hezbollah's primary sponsor is Iran, and almost all of Hezbollah's terrorist activities are well known in advance, if not directly planned, by the Iranian government.   Given Iran's control of Hezbollah, the terrorist group's activities directed against the United States and its citizens usually must be sanctioned by the Iranian government because of the potential for retaliation directly against Iran.

44.   In various cases before this Court, Iran has been found liable for sponsoring attacks carried out by Hezbollah against citizens of the United States.[6]

---

[5] http://www.state.gov/j/ct/rls/crt/2007/103711.htm.
[6] *See, e.g.*, *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107 (D.D.C. 2000); *Cicippio v. Islamic Republic of Iran,* 18 F.Supp.2d 62 (D.D.C. 1998).

45.     Additionally, in a 2011 criminal case in the U.S. District Court for the Southern District of New York, members of the IRGC-Quds Force were identified as co-conspirators in a plot to murder a foreign ambassador (and U.S. civilians) at a restaurant in Washington, D.C.[7]

46.     According to statements of the United States Government made through an American military spokesman during a July 2, 2007 press briefing at the Combined Press Information Center in Baghdad: "The Iranian Quds Force is using Lebanese Hezbollah essentially as a proxy, as a surrogate in Iraq."  Hezbollah is "being used specifically as a proxy for the [IRGC] Quds Force efforts."

47.     At the direction of Iran, Hezbollah began training Shiite paramilitary "special groups" in Iraq and Iran shortly after the U.S. and Coalition Forces invasion of Iraq.  According to a November, 2012 U.S. Treasury Department press release:  "In approximately 2005, Iran asked [Hezbollah] to form a group to train Iraqis to fight Coalition Forces in Iraq."  Accordingly, as the 2012 U.S. Treasury Department press release further indicated, Hezbollah ordered its operatives into Iraq to provide training and equipment to Shiite paramilitary groups "to augment their ability to inflict damage against U.S. troops."[8]  According to a U.S. military spokesman speaking in July 2007, Iraqi "special group" members were prepared at one of three training camps in Iran.

48.     Mohsen Sazegara, a founding member of the IRGC who now reportedly lives in exile, has been quoted in a public report as stating that the IRGC's Quds Force viewed Iraq as a "golden opportunity" to "keep the Americans busy" and "make chaos."[9]

---

[7] *See Criminal Complaint*, *United States v. Arbasiar*, 11-mj-2617 (S.D.N.Y. Oct. 11, 2011).

[8] http://www.treasury.gov/press-center/press-releases/Pages/tg1775.aspx

[9] http://www.nytimes.com/2012/10/03/world/middleeast/qassim-suleimani-irans-master-of-iraq-chaos-still-vexes-the-us.html

49.    At all times relevant to this Complaint, Iran provided between $750,000 and $3,000,000 in funding to Iraqi "special group" cells per month.  According to public statements by a U.S. military spokesman in July 2007, without Iranian funds these "special groups" would be "hard pressed to carry out their operations in Iraq." Additionally, Iran supplied the "special groups" with training and sophisticated materiel such as explosively formed penetrators, machine guns, sniper rifles, rocket-propelled grenades and rockets.

## THE KIDNAPPING, TORTURE, AND MURDER OF JACOB FRITZ, SHAWN FALTER, AND JOHNATHAN CHISM

50.    On the evening of January 20, 2007, a group of SUVs entered the entry control point of the Karbala Provincial Joint Coordination Center ("PJCC").  The SUVs had been modified with false antennas to give the impression that they were American military vehicles.  The attackers within these SUVs spoke English, wore United States Army combat uniforms, and had U.S. identification cards.  Iraqi Police permitted the attackers past the checkpoint.  Once past the checkpoint, several of the attackers exited the SUVs, spoke with Shawn Falter and Johnathan Chism, who were on guard, and began to enter the PJCC as if they had a meeting.  As they passed Falter, the last attacker turned and shot Falter from behind while another shot Chism.  Both were taken wounded but alive, and the medical autopsy reports and other evidence indicate that they resisted to the best of their abilities.

51.    The attackers knew exactly where to find the PJCC Command and Control Room. Once there, they attacked several soldiers with a grenade.  Private First Class Johnathon Millican saved the lives of other service members by courageously throwing himself on top of the grenade. Due to Millican's heroism, the other soldiers in the Command and Control Room survived with shrapnel wounds.

52.   The attackers then proceeded immediately to the PJCC office in which Captain Brian Freeman and Lieutenant Fritz were working.  They attacked both officers with small arms fire and a grenade and captured both alive.

53.   The attackers loaded their four captives, Shawn Falter, Jacob Fritz, Johnathan Chism and Brian Freeman, into the modified SUVs and, as escaping, destroyed several Humvees in front of the PJCC with explosives.  This complex and sophisticated attack took only minutes.  The attack had no apparent objective beyond the kidnapping (and eventual murder) of U.S. servicemen.

54.   The U.S. Army incident report concluded that this attack was "a well-coordinated and synchronized attack" that was "well beyond the caliber associated the local insurgent or militia capabilities," and that "the complex attack was not one designed by locals or militia of this region."

55.   At least one witness reported that the attackers used Iranian rifles.   Additionally, Iranian 5.56mm and 7.62mm ammunition rounds were later found in the area where the modified SUVs were abandoned.

56.   The attackers' SUV convoy, with their captives, headed east toward the Iranian border.   The convoy approached an Iraqi Army checkpoint north of Al-Mahawil, Iraq, approximately 27 miles east of Karbala, which did not allow the convoy to pass freely. Though the SUVs and the attackers escaped under pursuit by the Iraqi Army, several Iraqis attempting to facilitate the convoy's passage were detained.  One of the men detained for attempting to facilitate the convoy's passage through the checkpoint was the number two ranking official in Mahawil for the Office of the Martyr Sadr, the political wing of the Mahdi Army, Moqtada al-Sadr's Shiite militia.

57.   Moqtada al-Sadr is a well-known Iranian-backed Iraqi militia leader who spent years living in Iran during the time period of the Saddam Hussein regime.

58.   Jacob Fritz and Shawn Falter were handcuffed to one another and shot behind one of the SUVs, then thrown in its trunk by their attackers.

59.   Brian Freeman and Johnathan Chism were handcuffed to one another, placed in the back of a different SUV, and then shot at close range.  Chism was killed and Freeman mortally wounded.  He died shortly afterwards from his injuries.

60.   In March 2007, the U.S. military captured three individuals in Iraq involved in the Karbala attack: two Iraqi "special group" commanders, Qais Khazali and his brother, Laith, along with a Hezbollah operative, Ali Musa Daqduq.

61.   Both Khazali brothers were former high ranking members of Al-Sadr's Iranian-backed Mahdi Army, and Qais Khazali had served as its spokesman in 2004.  At the time of the kidnappings and murders of the U.S. servicemen in Karbala, the Khazali brothers were also leaders of what has come to be known as the Khazali Network, an Iran-supported network of Iran-supported "special groups" also known as Asa'ib Ahl al-Haq (Arabic for "League of the Righteous").

62.   The Khazali Network is a network of Iranian-funded, trained and supported "special groups."  On March 22, 2007, in a public statement, the U.S. Commander of the Coalition Forces in Iraq stated that the Khazali brothers constituted "the head of a secret cell network," that received training "on Iranian soil," and were directed by Iran.  He went on to note, "there's no question, again, that Iranian financing is taking place through the Quds Force of the Iranian Republican Guard Corps."

63.   Ali Musa Daqduq is a Lebanese-born Hezbollah agent who, according to a July 3, 2007 Multinational Force Iraq press release, was a "surrogate for Iranian Revolutionary Guards Corps Quds Force operatives" and had been tasked with creating "Hezbollah-like capabilities"

among domestic Iraqi paramilitary groups.[10]  According to the November 19, 2012 U.S. Treasury press release, "Daqduq had been ordered by [Hezbollah] to work with IRGC [Quds Force] to provide training and equipment to [Iraqi Shiite] Special Groups to augment their ability to inflict damage against U.S. troops."[11]  Specifically, in 2005 Hezbollah leadership ordered Daqduq to travel to Iran to commence the training of Iraqi "special groups."  Daqduq met with the Commander and Deputy Commander of the Quds force who ordered him to make trips from Iran to Iraq, bringing back groups of 20 to 60 Iraqis for training and then returning them to operate in cells within Iraq.  Before his capture Daqduq made at least four such trips.

64.    Hezbollah is well-established to be a proxy force of Iran, its primary financial, technical, and logistical supporter.  For many years, the Department of State has designated and included Iran among the "State sponsors of terrorism."  Indeed, more than once in recent years, the Department of State has described Iran as "the most active" among State sponsors of terrorism. The formation of Hezbollah and its emergence as a major terrorist organization was the product of direct intervention by Iranian operatives, including the IRGC.  Hezbollah operatives are trained in Iran, and IRGC trainers are present in Lebanese Hezbollah training camps.  Hezbollah agents also staff the camps in Iran where Iraqi "special group" members are trained.

65.    In a July 2, 2007 press conference in Baghdad, an American military spokesman announced that after their capture, both Qais Khazali and Ali Musa Daqduq stated that "senior leadership within the Quds Force knew of and supported planning for the eventual Karbala attack that killed five Coalition soldiers."  According to the U.S. military spokesman, Daqduq stated that

---

[10] http://www.army.mil/mobile/article/?p=3890
[11] http://www.treasury.gov/press-center/press-releases/Pages/tg1775.aspx

the Khazali Network "could not have conducted this complex operation without the support and direction of the Quds Force."[12]

66.    The U.S. military spokesman also explained in the July 2007 press conference in Baghdad that documents seized from Qais Khazali and statements he made after his arrest demonstrated that senior leadership within the Quds Force directed the planning of the Karbala attack.  Specifically, the U.S. military spokesman noted:

> When Qais was captured, [the U.S. military] found a [22-page] in-depth planning and lessons learned document . . . about the attack the special groups coordinated against the Karbala Provincial Joint Coordination Center on January 20[, 2007].

67.    Quds Force operatives provided the Khazali Network and Hezbollah with detailed information on the activities of U.S. soldiers at the PJCC, such as shift changes and defensive positions.  The military spokesman also stated that the Quds Force relied on Hezbollah as a proxy to provide training and supply of material to the Khazali Network in preparation for the Karbala attack.

68.    According to both Daqduq and Qais Khazali, Khazali chose the specific time for the attack and a Quds Force and Hezbollah-trained Iraqi, Azhar al-Dulaimi, commanded the group of attackers that carried out the attack.

69.    According to a statement by a U.S. military spokesman in May 2007, the fingerprints of al-Dulaimi, who was killed in a U.S. raid, were found in one of the abandoned SUVs which were used in the abduction and murder of Brian Freeman, Jacob Fritz, Johnathan Chism, and Shawn Falter.

70.    Daqduq and Qais Khazali's account of Iran's support for Iraqi "special groups," and more specifically the Karbala attack, is corroborated by a number of sources including several

---

[12] http://www.army.mil/mobile/article/?p=3890

interviews with detained members of Iran-supported "special groups," as well as numerous electronic and written documents, including an "in-depth planning and lessons learned document" regarding the Karbala attack, that were seized from Qais Khazali.

71.     Upon information and belief, one of the reasons that Iran directed Hezbollah and the Khazali Network to carry out the Karbala attack was as retaliation for the arrest of Iranian agents operating in Iraq by United States forces.

72.     Defendants Iran and the IRGC and their agents had direct involvement in the manufacture and distribution of improvised explosive devices ("IEDs") and explosively formed penetrators ("EFPs") used in Iraq to kill and injure American and Coalition troops and Iraqi civilians.  In June 2006, the United States' commanding military leader in Iraq stated that the U.S. military was "quite confident that the Iranians through their covert special ops forces are providing weapons, IED technology and training to Shia extremist groups in Iraq."[13]   Similarly, in a February 2007 White House Press Conference, the President of the United States stated, "I can say with certainty that the Quds force, a part of the Iranian government, has provided these sophisticated IEDs that have harmed our troops."[14]  Finally, in 2011, the U.S. Department of Justice criminally prosecuted five individuals for "impeding U.S. export controls relating to the shipment of 6,000 radio frequency modules from a Minnesota company through Singapore to Iran, some of which were later found in unexploded IEDs in Iraq."[15]  IEDs "also known as 'roadside bombs,' caused approximately 60 percent of all American combat casualties in Iraq between the years 2001 and 2007" and thus, "were the number one threat to American troops in Iraq."[16]

---

[13] CBS New Report, "General: Iran Planting Bombs In Iraq," (June 23, 2006), available at http://www.cbsnews.com/news/general-iran-planting-bombs-in-iraq/.
[14] February 14, 2007 Press Conference by the President, available at http://georgewbush-whitehouse.archives.gov/news/releases/2007/02/20070214-2.html.
[15] DOJ Press Release, "Five Individuals Indicted in a Fraud Conspiracy Involving Exports to Iran of U.S. Components Later Found in Bombs in Iraq," (October 25, 2011).
[16] Superseding Indictment, *United States v. Lariajani*, 10-cr-00174 (D.D.C. 2010), at ¶ 10.

73.     Iran's provision of material support to, and direction of the Khazali Network through the Quds Force and its proxy, Hezbollah, in regards to the January 20, 2007 Karbala attack constitute violations of numerous United States laws, thereby rendering Iran liable to Plaintiffs for the extrajudicial abduction, torture, and killing of Shawn Falter, Jacob Fritz, and Johnathan Chism.

74.     Upon information and belief, the highest levels of the Iranian government sanctioned the provision of material support and resources to these groups of terrorists.

### THE KIDNAPPING, TORTURE, AND MURDER OF AHMED AL-TAIE

75.     Staff Sergeant Ahmed Al-Taie was deployed to Baghdad in 2005 as part of a Provincial Reconstruction Team in Iraq and served as a translator.  Al-Taie had married his wife Israa Abdul-Sataar, an Iraqi national, during an earlier trip to Iraq and often visited her in Baghdad's Karrada neighborhood while he was stationed in Iraq.  On October 23, 2006 Ahmed Al-Taie left the secure Green Zone in Baghdad to visit his wife at her family's house.  While visiting her family's house, a group of masked gunmen seized Al-Taie, forced him into a car, and drove away.

76.     Shortly after Al-Taie's capture, in November 2006, Al-Taie's uncle made contact with a trusted intermediary of the captors. Al-Taie's uncle requested that the captors submit proof of life in response to their initial ransom demands. After several emails, however, the uncle lost contact with the Al-Taie's captors in January 2007.

77.     On February 14, 2007, a Shiite militant group called Ahl al-Bayt Brigades that is tied to the Khazali Network posted a video online of Ahmed Al-Taie in captivity.  The video had no audio but Staff Sergeant Al-Taie appeared frail and his lips were moving as though he was reading

aloud.  Along with the video came a message from Ahl al-Bayt Brigades: "We warn the American people of the result of sending their soldiers to Iraq so they don't face the same fate."[17]

78.    The video posted on February 14, 2007 was the last time Staff Sergeant Al-Taie was heard from.

79.    On February 22, 2012, the Khazali Network turned over Al-Taie's remains to the Iraqi government under the terms of an amnesty agreement.  "On Feb. 25, [2012] the armed forces medical examiner at the Dover Port Mortuary in Dover, Del., positively identified the remains of Staff Sgt. Ahmed K. Altaie, of Ann Arbor, Mich."[18]  Iran's provision of material support to, and direction of the Khazali Network regarding the October 23, 2006 abduction, probably torture, and later murder of Ahmed Al-Taie constitute violations of numerous United States laws, thereby rendering Iran liable to Plaintiffs for the extrajudicial abduction, torture, and killing of Ahmed Al-Taie.  Upon information and belief, the highest levels of the Iranian government sanctioned the provision of material support and resources to these groups of terrorists.

## CLAIM I – ACTION FOR WRONGFUL DEATH
### (Under 28 U.S.C. § 1605A and State Common Law and State Statutory Law)

80.    Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

81.    The death of Shawn Falter was caused by a deliberate act of extrajudicial killing, as he was murdered by the agents of the Defendants in the course the Karbala attack, as directed and materially supported by Iran.  He endured pain and suffering and his estate is entitled to economic damages due to his premature death.

---

[17] Francis X. Donnelly, *Family Seeks Fate of Soldier Kidnapped in Iraq*, Army Times, June 6, 2011, *at* http://www.armytimes.com/article/20110606/NEWS/106060306/Family-seeks-fate-soldier-kidnapped-Iraq.
[18] News Release, U.S. Department of Defense, *DOD Identifies Army Casualty*, Feb. 27, 2013, at http://www.defense.gov/releases/release.aspx?releaseid=15086.

82.    The death of Jacob Fritz was caused by a deliberate act of extrajudicial killing, as he was murdered by the agents of the Defendants in the course the Karbala attack, as directed and materially supported by Iran.  He endured pain and suffering and his estate is entitled to economic damages due to his premature death.

83.    The death of Johnathan Chism was caused by a willful and deliberate act of extrajudicial killing, as he was murdered by the agents of the Defendants in the course the Karbala attack, as directed and materially supported by Iran.  He endured pain and suffering and his estate is entitled to economic damages due to his premature death.

84.    The death of Ahmed Al-Taie was caused by a willful and deliberate act of extrajudicial killing, as he was murdered by the agents of the Defendants while being held as a prisoner as directed and materially supported by Iran.  He endured pain and suffering and his estate is entitled to economic damages due to his premature death.

**WHEREFORE,** Plaintiffs, the estate of Jacob Fritz, Noala Fritz, the estate of Lyle Fritz, Ethan Fritz, Daniel Fritz, the estate of Shawn Falter, Russell J. Falter, Linda Braun Falter, Marjorie Falter, Russell C. Falter, Marsha Novak, John Sackett, Jason Sackett, David Lucas, Tim Lucas, Andrew Lucas, the estate of Johnathan Chism, Danny Chism, Vanessa Chism, Julie Chism, Elizabeth Chism, the estate of Ahmed Al-Taie, Kousay Al-Taie, Nawal Al-Taie, Bashar Al-Taie, and Hathal K. Taie demand that judgment be entered against Defendants for the damages suffered, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of $10 million ($10,000,000) dollars and pre-judgment interest, for each of the deaths of Shawn Falter, Jacob Fritz, Johnathan Chism, and Ahmed Al-Taie on this Claim I, and their costs expended.

**CLAIM II – BATTERY**
**(Under 28 U.S.C. § 1605A and State Common Law)**

85.    Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

86.    On January 20, 2007, at the direction of the Iranian government, agents of the Defendants violently and forcefully committed illegal acts during the abduction, torture and extrajudicial killing of Shawn Falter.  These willful, wrongful and intentional acts constitute a battery upon the person of Shawn Falter, causing injury to him.

87.    On January 20, 2007, at the direction of the Iranian government the Defendants' agents violently and forcefully committed illegal acts during the abduction, torture and extrajudicial killing of Jacob Fritz.  These willful, wrongful and intentional acts constitute a battery upon the person of Jacob Fritz, causing injury to him.

88.    On January 20, 2007, at the direction of the Iranian government agents of the Defendants violently and forcefully committed illegal acts during the abduction, torture and extrajudicial killing of Johnathan Chism.  These willful, wrongful and intentional acts constitute a battery upon the person of Johnathan Chism, causing injury to him.

89.    On October 23, 2006 and perhaps as late as February 2012, at the direction of the Iranian government, agents of the Defendants violently and forcefully committed illegal acts during the abduction, torture and extrajudicial killing of Ahmed Al-Taie.  These willful, wrongful and intentional acts constitute a battery upon the person of Ahmed Al-Taie, causing injury to him.

90.    As a direct and proximate result of the willful, wrongful, and intentional acts of the Defendants' agents, Shawn Falter, Jacob Fritz, Johnathan Chism, and Ahmed Al-Taie were injured in that they endured extreme mental anguish, physical injury, and pain and suffering, all to their damage.

WHEREFORE, Plaintiffs, the estate of Ahmed Al-Taie, the estate of Shawn Falter, the estate of Jacob Fritz, and the estate of Johnathan Chism, demand that judgment be entered against Defendants for the damages suffered, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of $10 million ($10,000,000) dollars and pre-judgment interest, on this Claim II, and the costs expended.

**CLAIM III – ASSAULT**
**(Under 28 U.S.C. § 1605A and State Common Law)**

91.     Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

92.     During the extrajudicial killing of Shawn Falter, agents of the Defendants at the direction of the Iranian government intentionally and willfully put Shawn Falter in fear for his life and apprehension of harm and injury as a direct result of the attackers' use of firearms and explosives, and the physical and mental abuse inflicted upon him.

93.     During the extrajudicial killing of Jacob Fritz, agents of the Defendants at the direction of the Iranian government intentionally and willfully put Jacob Fritz in fear for his life and apprehension of harm and injury as a direct result of the attackers' use of firearms and explosives, and the physical and mental abuse inflicted upon him.

94.     During the extrajudicial killing of Johnathan Chism, agents of the Defendants at the direction of the Iranian government intentionally and willfully put Johnathan Chism in fear for his life and apprehension of harm and injury as a direct result of the attackers' use of firearms and explosives, and the physical and mental abuse inflicted upon him.

95.     During the kidnapping and extrajudicial killing of Ahmed Al-Taie, agents of the Defendants at the direction of the Iranian government intentionally and willfully put Ahmed Al-

Taie in fear for his life and apprehension of harm and injury as a direct result of the attackers' use of firearms, and the physical and mental abuse inflicted upon him while he was held prisoner.

96.    As a direct and proximate result of the willful, wrongful and intentional acts of the Defendants' agents, which were directed and materially supported by Iran through the IRGC, Shawn Falter, Jacob Fritz, and Johnathan Chism were injured in that they endured extreme mental anguish, physical injury, and pain and suffering, all to their damage.

97.    As a direct and proximate result of the willful, wrongful and intentional acts of the Defendants' agents, which were directed and materially supported by Iran through the Khazali Network, Ahmed Al-Taie was injured in that he endured extreme mental anguish, physical injury, and pain and suffering, all to his damage.

    **WHEREFORE,** Plaintiffs, the estate of Ahmed Al-Taie, the estate of Shawn Falter, the estate of Jacob Fritz, and the estate of Johnathan Chism, demand that judgment be entered against Defendants for the damages suffered, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of $10 million ($10,000,000) dollars and pre-judgment interest, for each of them, on this Claim III, and the costs expended.

## CLAIM IV – FALSE IMPRISONMENT AND KIDNAPPING
### (Under 28 U.S.C. § 1605A and State Common Law)

98.    Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

99.    At the direction of the Iranian government, agents of the Defendants willfully and illegally abducted Shawn Falter.  The wrongful acts of agents of the Defendants, which were sponsored and directed by Iran, constitute false imprisonment and kidnapping upon the person of Shawn Falter, causing injury to him.

100.         At the direction of the Iranian government, the Defendants' agents willfully and illegally abducted Jacob Fritz.  The wrongful acts of the Defendants' agents, which were sponsored and directed by Iran, constitute false imprisonment and kidnapping upon the person of Jacob Fritz, causing injury to him.

101.         At the direction of the Iranian government, agents of the Defendants willfully and illegally abducted Johnathan Chism.  The wrongful acts of agents of the Defendants, which were sponsored and directed by Iran, constitute false imprisonment and kidnapping upon the person of Johnathan Chism, causing injury to him.

102.         At the direction of the Iranian government, agents of the Defendants willfully and illegally abducted Ahmed Al-Taie.  The wrongful acts of agents of the Defendants, which were sponsored and directed by Iran, constitute false imprisonment and kidnapping upon the person of Ahmed Al-Taie, causing injury to him.

103.         As a direct and proximate result of the wrongful acts of the Defendants' agents, which were directed and materially supported by Iran, as well as the IRGC, Shawn Falter, Jacob Fritz, and Johnathan Chism were injured in that they endured extreme mental anguish, physical injury, and pain and suffering, all to their damage.

104.         As a direct and proximate result of the wrongful acts of the Defendants' agents, which were directed and materially supported by Iran, Ahmed Al-Taie was injured in that he endured extreme mental anguish, physical injury, and pain and suffering, all to his damage.

**WHEREFORE,** Plaintiffs, the estate of Ahmed Al-Taie, the estate of Shawn Falter, the estate of Jacob Fritz, and the estate of Johnathan Chism, demand that judgment be entered against Defendants for the damages suffered, including, but not limited to, pain, suffering, mental anguish,

and pecuniary losses, in the amount of $10 million ($10,000,000) dollars and pre-judgment interest, for each of them, on this Claim IV, and the costs expended.

**CLAIM V – INTENTIONAL INFLICTION
OF EMOTIONAL DISTRESS, INCLUDING SOLATIUM**
**(Under 28 U.S.C. § 1605A and State Common Law)**

105.       Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

106.       The extrajudicial killing of Shawn Falter constitutes extreme and outrageous conduct with the intent to inflict emotional distress, including solatium, upon the victim and the victim's family.

107.       The extrajudicial killing of Jacob Fritz constitutes extreme and outrageous conduct with the intent to inflict emotional distress, including solatium, upon the victim and the victim's family.

108.       The extrajudicial killing of Johnathan Chism constitutes extreme and outrageous conduct with the intent to inflict emotional distress, including solatium, upon the victim and the victim's family.

109.       The extrajudicial killing of Ahmed Al-Taie constitutes extreme and outrageous conduct with the intent to inflict emotional distress, including solatium, upon the victim and the victim's family.

110.       As a direct and proximate result of the willful, wrongful and intentional acts of the Defendants' agents, the estate of Jacob Fritz, Noala Fritz, the estate of Lyle Fritz, Ethan Fritz, Daniel Fritz, the estate of Shawn Falter, Russell J. Falter, Linda Braun Falter, Marjorie Falter, Russell C. Falter, Marsha Novak, John Sackett, Jason Sackett, David Lucas, Tim Lucas, Andrew Lucas, the estate of Johnathan Chism, Danny Chism, Vanessa Chism, Julie Chism, Elizabeth

Chism, the estate of Ahmed Al-Taie, Kousay Al-Taie, Nawal Al-Taie, Bashar Al-Taie, and Hathal K. Taie were injured in that they endured extreme mental anguish, physical injury, and pain and suffering, all to their damage.

**WHEREFORE,** Plaintiffs, the estate of Jacob Fritz, Noala Fritz, the estate of Lyle Fritz, Ethan Fritz, Daniel Fritz, the estate of Shawn Falter, Russell J. Falter, Linda Braun Falter, Marjorie Falter, Russell C. Falter, Marsha Novak, John Sackett, Jason Sackett, David Lucas, Tim Lucas, Andrew Lucas, the estate of Johnathan Chism, Danny Chism, Vanessa Chism, Julie Chism, Elizabeth Chism, the estate of Ahmed Al-Taie, Kousay Al-Taie, Nawal Al-Taie, Bashar Al-Taie,and Hathal K. Taie demand that judgment be entered against Defendants for the damages suffered, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of $10 million ($10,000,000) dollars and pre-judgment interest, for each of them, on this Claim V, and their costs expended.

## CLAIM VI – ACTION FOR SURVIVAL DAMAGES
### (Under 28 U.S.C. § 1605A and State Common Law and State Statutory Law)

111.  Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

112.  Before his death, Shawn Falter suffered extreme bodily pain and mental anguish and suffering, entitling his Estate to compensatory damages.

113.  Before his death, Jacob Fritz suffered extreme bodily pain and mental anguish and suffering, entitling his Estate to compensatory damages.

114.  Before his death, Johnathan Chism suffered extreme bodily pain and mental anguish and suffering, entitling his estate to compensatory damages.

115.  Before his death, Ahmed Al-Taie suffered extreme bodily pain and mental anguish and suffering, entitling his estate to compensatory damages.

**WHEREFORE,** Plaintiffs, the estate of Ahmed Al-Taie, the estate of Shawn Falter, the estate of Jacob Fritz, and the estate of Johnathan Chism, demand that judgment be entered against Defendants for the damages suffered, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of $10 million ($10,000,000) dollars and pre-judgment interest, for each of them, on this Claim VI, and their costs expended.

## CLAIM VII – ACTION FOR CONSPIRACY
### (Under 28 U.S.C. § 1605A and State Common Law)

116.  Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

117.  Defendants did knowingly and willfully conspire with, and agree to sponsor, their agents within the meaning of 28 U.S.C. § 1605A, which willfully and deliberately committed acts of extrajudicial killing, which caused the personal injuries and death of Shawn Falter.

118.  Defendants did knowingly and willfully conspire with, and agree to sponsor, their agents within the meaning of 28 U.S.C. § 1605A, which willfully and deliberately committed acts of extrajudicial killing, which caused the personal injuries and death of Jacob Fritz.

119.  Defendants did knowingly and willfully conspire with, and agree to sponsor, their agents within the meaning of 28 U.S.C. § 1605A, which willfully and deliberately committed acts of extrajudicial killing, which caused the personal injuries and death of Johnathan Chism.

120.  Defendants did knowingly and willfully conspire with, and agree to sponsor, their agents within the meaning of 28 U.S.C. § 1605A, which willfully and deliberately committed acts of extrajudicial killing, which caused the personal injuries and death of Ahmed Al-Taie.

121.  For the reasons stated above, and having conspired to sponsor agents of the Defendants in these illegal acts, Defendants are liable to Plaintiffs for all damages in this civil action.

**WHEREFORE,** Plaintiffs, the estate of Jacob Fritz, Noala Fritz, the estate of Lyle Fritz, Ethan Fritz, Daniel Fritz, the estate of Shawn Falter, Russell J. Falter, Linda Braun Falter, Marjorie Falter, Russell C. Falter, Marsha Novak, John Sackett, Jason Sackett, David Lucas, Tim Lucas, Andrew Lucas, the estate of Johnathan Chism, Danny Chism, Vanessa Chism, Julie Chism, Elizabeth Chism, the estate of Ahmed Al-Taie, Kousay Al-Taie, Nawal Al-Taie, Bashar Al-Taie, and Hathal K. Taie demand that judgment be entered against Defendants for the damages suffered, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of $10 million ($10,000,000) dollars and pre-judgment interest, for each of them, on this Claim VII, and their costs expended.

## CLAIM VIII – ACTION FOR AIDING AND ABETTING
### (Under 28 U.S.C. § 1605A and State Common Law and State Statutory Law)

122.  Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

123. Defendants did knowingly and willfully provide substantial assistance to and sponsorship of their agents within the meaning of 28 U.S.C. § 1605A, which caused the personal injury and death of Shawn Falter.

124. Defendants did knowingly and willfully provide substantial assistance to and sponsorship of their agents within the meaning of 28 U.S.C. § 1605A, which caused the personal injury and death of Jacob Fritz.

125. Defendants did knowingly and willfully provide substantial assistance to and sponsorship of their agents within the meaning of 28 U.S.C. § 1605A, which caused the personal injury and death of Johnathan Chism.

126. Defendants did knowingly and willfully provide substantial assistance to and sponsorship of their agents within the meaning of 28 U.S.C. § 1605A, which caused the personal injury and death of Ahmed Al-Taie.

127. For the reasons stated above, and having aided and abetted the agents of the Defendants in these illegal acts, Defendants are liable to Plaintiffs for all damages in this civil action.

**WHEREFORE,** Plaintiffs, the estate of Jacob Fritz, Noala Fritz, the estate of Lyle Fritz, Ethan Fritz, Daniel Fritz, the estate of Shawn Falter, Russell J. Falter, Linda Braun Falter, Marjorie Falter, Russell C. Falter, Marsha Novak, John Sackett, Jason Sackett, David Lucas, Tim Lucas, Andrew Lucas, the estate of Johnathan Chism, Danny Chism, Vanessa Chism, Julie Chism, Elizabeth Chism, the estate of Ahmed Al-Taie, Kousay Al-Taie, Nawal Al-Taie, Bashar Al-Taie, and Hathal K. Taie  demand that judgment be entered against Defendants for the damages suffered, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of $10 million ($10,000,000) dollars and pre-judgment interest, for each of them, on this Claim VIII, and their costs expended.

## CLAIM IX – PUNITIVE DAMAGES
### (Under 28 U.S.C. § 1605A, P.L. 104-208, 110 Stat. 3009-172, 28 U.S.C. § 1605, *Note*)

128. Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in each of the foregoing paragraphs as if fully set forth herein.

129. The actions of agents of the Defendants, as set forth above and in additional actions, were intentional and malicious and in willful, wanton, and reckless disregard of the rights and well-being of all Plaintiffs.  All of the acts of Defendants' agents were facilitated by funding,

training, and other material support, resources and sponsorship from Iran, as well as from the IRGC

in the Karbala attack and Al-Taie's kidnapping and execution.

130.   The Defendants and their agents directed the attack and rendered material support

and resources to their agent attackers that carried out the abduction, torture and extrajudicial

killings described above.   Under 28 U.S.C. § 1605A(c), the Plaintiffs are entitled to an award of

economic damages, solatium, pain and suffering, and punitive damages, and the same is hereby

requested against the Defendants in accordance with the provisions of 28 U.S.C. § 1605A(c),

making both a foreign state that has been designed as a "state sponsor of terrorism" and an official,

employee, or agent of such a foreign state liable for economic damages, solatium, pain and

suffering, and punitive damages.

**WHEREFORE,** Plaintiffs, the estate of Jacob Fritz, Noala Fritz, the estate of Lyle Fritz,

Ethan Fritz, Daniel Fritz, the estate of Shawn Falter, Russell J. Falter, Linda Braun Falter, Marjorie

Falter, Russell C. Falter, Marsha Novak, John Sackett, Jason Sackett, David Lucas, Tim Lucas,

Andrew Lucas, the estate of Johnathan Chism, Danny Chism, Vanessa Chism, Julie Chism,

Elizabeth Chism, the estate of Ahmed Al-Taie, Kousay Al-Taie, Nawal Al-Taie, Bashar Al-Taie,

and Hathal K. Taie demand that judgment be entered against Defendants and their agents for

punitive damages in the amount of at least three times the amount of Plaintiffs' damages, including

their full compensatory damages which include pre-judgment interest, for these acts of abduction,

torture, and extrajudicial killings, on this Claim IX, and their costs expended.

The award of punitive damages, as requested, is to punish Defendants for their conduct in

supporting the murderous acts described herein and to serve notice that the rule of law can and will

be used to deter and disrupt violent acts of terror by States designated for their acts of international

terrorism against the United States of America and its citizens by limiting financial resources

available to the Defendants to fund, facilitate, and support terrorism and terrorist organizations.

## ADDITIONAL RELIEF REQUESTED

Plaintiffs request leave of Court to amend this Complaint as the interests of justice

require and such other and further relief as to the Court deems just and proper.

DATED                           Respectfully Submitted,

November 5, 2015                   s/Steven R. Perles
                                Steven R. Perles (D.C. Bar No. 326975)
                                Edward B. MacAllister (D.C. Bar No. 494558)
                                PERLES LAW FIRM, PC
                                1050 Connecticut Ave., NW
                                Suite 500
                                Washington, D.C. 20036
                                Telephone: 202-955-9055

                                   s/Steven W. Pelak
                                Steven W. Pelak (D.C. Bar No. 408744)
                                Michael J. O'Leary (D.C. Bar No. 1014610)
                                HOLLAND & HART LLP
                                975 F Street, NW
                                Suite 900
                                Washington, DC 20004
                                Telephone:  202-393-6500
                                Telefax:     202-618-6194