## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NOALA FRITZ *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Civil Action No.: 15-456 (RDM) |
| | : | |
| v. | : | |
| | : | |
| ISLAMIC REPUBLIC OF IRAN *et al*., | : | |
| | : | |
| Defendants. | : | |
| . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . :

## PLAINTIFFS' TRIAL BRIEF

Pursuant to the Court's September 15, 2017 Order, Plaintiffs respectfully submit their trial brief outlining: (1) the factual background of this civil action; (2) the legal background surrounding the Court's jurisdiction under 28 U.S.C. § 1605A over Defendants the Islamic Republic of Iran ("Iran") and Iran's Islamic Revolutionary Guard Corps ("IRGC"); and (3) a summary of the trial evidence Plaintiffs intend to present.

Plaintiffs in this action are the estates and family members of U.S. service-members Jacob Fritz, Johnathan Bryan Chism, and Shawn Falter who were abducted and murdered by an Iranian-supported militia in Karbala, Iraq on January 20, 2007 and U.S. service-member Ahmed Al-Taie who was abducted in Baghdad, Iraq on October 23, 2006 and subsequently murdered by an Iranian-supported militia. These two separate incidents of kidnapping and murder are linked in this action because both were planned and executed mere months apart by the same network of Iraqi Shia militants acting with the training, funding, direction, and support of Iran and the IRGC as part of a coordinated scheme by Iran's government to target U.S. service-members in Iraq.

## TABLE OF CONTENTS

I.  FACTUAL BACKGROUND ................................................................................................. 2

   A.  January 2007 Karbala Incident ................................................................................. 2

   B.  Abduction and Murder of Ahmed Al-Taie ............................................................. 3

   C.  Iran's Material Support for Iraqi Special Groups ................................................... 4

II.  LEGAL BACKGROUND ................................................................................................ 7

   A.  Subject Matter Jurisdiction under Section 1605A of the FSIA ............................. 7

   B.  Federal Cause of Action under 1605A .................................................................... 7

   C.  Elements of Common Law Claims ....................................................................... 10

III.  TRIAL EVIDENCE ...................................................................................................... 14

   A.  Plaintiffs' Burden under Section 1608(e) ............................................................. 15

   B.  Witnesses .............................................................................................................. 16

   C.  Exhibits ................................................................................................................. 19

   D.  Evidentiary Issues ................................................................................................ 19

IV.  CONCLUSION .............................................................................................................. 23

## I.  FACTUAL BACKGROUND

### A.  January 2007 Karbala Incident

On January 20, 2007, U.S. service-members Jacob Fritz, Johnathan Bryan Chism, and Shawn Falter were murdered while they were held prisoners by agents of the IRGC and Hezbollah (an Iranian agent and proxy), and members of the Iranian-supported Iraqi militia called Asaib Ahl al-Haq, also known as the Khazali Network (hereinafter "AAH" or the "Khazali Network").  Earlier that day on Saturday, January 20, AAH militants posing as American troops infiltrated the Karbala Provincial Joint Coordination Center ("PJCC") and took captive U.S. Service-members Fritz, Chism, and Falter and one of their colleagues.  The U.S. Service-members, some of whom were wounded during their capture, were handcuffed together in the back of SUVs, made to look like U.S. vehicles, and driven in the direction of the Iranian border.  When the kidnappers were unable to get past an Iraqi checkpoint and proceed into Iran,

they subsequently executed Jacob Fritz, Johnathan Bryan Chism, Shawn Falter, and the fourth solider, Brian Freeman.[1]

In March 2007, the U.S. military captured Ali Musa Daqduq (a longtime Lebanese Hezbollah member and leader and a liaison for the IRGC-Qods Force to Iraqi Special Groups such as AAH), Qais Khazali (Head of AAH) and Laith Khazali (a member of AAH).  These individuals admitted to their involvement in the attacks during their detention and described the material support which they had received from Iran and the IRGC's Qods Force for their activities in Iraq, including the January 20 attack on the Karbala PJCC.  During a July 2, 2007 public press conference and through accompanying presentation slides titled "Multi-National Force – Iraq, Situational Update," the U.S. Army disclosed copies or excerpts from terrorist training manuals, a journal, identification documents, and written summaries of prior attacks and kidnappings obtained from Daqduq.  The Army Press Officer at the time, Brigadier General Kevin Bergner also explicitly stated that it was "important to point out that **both Ali Musa Daqduq and Qais Khazali state that senior leadership within the Qods Force knew of and supported planning for the eventual Karbala attack that killed five coalition soldiers**" and that "**Ali Musa Daqduq contends that the Iraqi special groups could not have conducted this complex operation without the support and direction of the Qods Force.**"  Transcript of General Bergner's July 2, 2007 Press Conference (emphasis added).

### B.    Abduction and Murder of Ahmed Al-Taie

Staff Sergeant Ahmed Al-Taie was deployed by the U.S. Army to Baghdad in 2005 as part of a Provincial Reconstruction Team in Iraq and served as a translator.  On October 23, 2006 Ahmed Al-Taie, who was a U.S. citizen born in Iraq, left the secure Green Zone in Baghdad to visit family.  During this visit, a group of masked gunmen seized Staff Sergeant Al-Taie, forced

---

[1] The estate and family of Brian Freeman are not parties to this litigation.

him into a car, and drove away.  On February 14, 2007, a Shiite militant group called Ahl al-Bayt Brigades, which is part of AHH, posted a video online of Ahmed Al-Taie in captivity.  U.S. Government reports detail that Qais Khazali later confirmed to U.S. officials that AAH itself was holding Mr. Al-Taie.  U.S. Government reports also confirm that U.S. officials were tracking Mr. Al-Taie's movements by his captors through at least the end of 2010.  On February 22, 2012, AAH turned over Mr. Al-Taie's remains to the Iraqi government under the terms of an amnesty agreement. Mr. Al-Taie's autopsy results confirm he was murdered and suffered torture prior to his death in approximately late 2010 or early 2011.

### C.    Iran's Material Support for Iraqi Special Groups

The IRGC is a military institution within the Iranian government charged with preserving the ideals of the Islamic Republic by targeting the nation's enemies. Iranian Supreme Leader Ali Khamenei created the Qods Force in the 1990s as part of his effort to expand the IRGC.  The Qods Force is a special branch of the IRGC tasked with extending the IRGC's mission beyond Iran's borders and carries out Iran's extraterritorial and clandestine operations, including cultivating and supporting pro-Iran proxies. The Qods Force commander, General Qasem Soleimani, reports directly to Iran's Supreme Leader. IRGC-Qods Force has facilitated and executed acts of international terrorism, prompting the U.S. Treasury Department to designate it a Specially Designated Global Terrorist (SDGT) on October 25, 2007.[2]

Iran and the IRGC-Qods Force also rely on their long-time proxy, Hezbollah,[3] to facilitate acts of international terrorism.  Iran played a role in organizing Hezbollah when the

---

[2] U.S. Department of the Treasury, press release, "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," October 25, 2007, available at https://www.treasury.gov/press-center/pressreleases/Pages/hp644.aspx.  Such designations occur under the authority granted by Executive Order 13224.

[3] Hezbollah has been a U.S. designated Foreign Terrorist Organization since October 8, 1997. *See* https://www.state.gov/j/ct/rls/other/des/123085.htm

group was founded, and it is one of the few Shia groups outside Iran to accept the doctrine of "velayat-e faqih" (guardianship of the jurist), which characterizes Iran's Supreme Leader as the highest political power and paramount religious authority.  It is widely acknowledged that "Iran is Hezbollah's primary benefactor, giving the Lebanese political party and militant group some $200 million a year in addition to weapons, training, intelligence, and logistical assistance."[4] At the direction of Iran, Hezbollah began training Shiite paramilitary "Special Groups" in Iraq and Iran shortly after the U.S. and Coalition Forces invasion of Iraq in 2003.

Iran and the IRGC's support for terrorist groups in Iraq such as the Shia Special Groups, including AAH, is well-documented in U.S. Government sources, findings, terrorism designations, and reports and undisputed even by the perpetrators of the abduction and murders themselves.  The U.S. State Department's 2007 Country Report on Terrorism noted that that "**Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to some Iraqi militant groups that target Coalition and Iraqi security forces and Iraqi civilians**."[5]  On September 12, 2007 at an authorized press event following his Congressional Testimony, the then Commander of Multi-National Forces in Iraq, General David Petraeus, repeated the U.S. Government's determination that the Khazali network could not have carried out the attacks on Coalition Forces, including the Karbala attack, without Iranian support:

> **"We interrogated these individuals.  We have on tape -- we have shown it to senior Iraqi leaders -- Qais Khazali himself.  When asked, could you have done what you have done without Iranian support, he literally throws up his hands and laughs and says, of course not.  And again we have shown that to Iraqi leaders, several of whom**

---

[4] Matthew Levitt, "Hezbollah's Growing Threat Against U.S. National Security Interests in the Middle East," Testimony before the House Foreign Affairs Subcommittee on the Middle East and North Africa, March 22, 2016, available at http://www.washingtoninstitute.org/policy-analysis/view/hezbollahs-growing-threat-against-u.s.-national-securityinterests-in-the-m.

[5] U.S. State Department's 2007 Country Report on Terrorism, Chapter 3 – State Sponsors of Terrorism Overview (April 30, 2008) (emphasis added), available at https://www.state.gov/j/ct/rls/crt/2007/103711.htm

**then went to Iran and made their case quite forcefully about their concern of Iranian involvement**.

**So they told us about the amounts of money that they have received. They told us about the training that they received.  They told us about the ammunition and sophisticated weaponry and all of that that they received**."[6]

The information and materials obtained as a result of the March 2007 capture of Ali Musa Daqduq, Qais Khazali, and Laith Khazali were later used to support a February 2012 Office of Military Commissions charge sheet against Mr. Daqduq.  In November 2012, the U.S. Department of the Treasury designated Ali Musa Daqduq based on his participation in numerous attacks against Coalition Forces in Iraq, "**including planning an attack on the Karbala Joint Provincial Coordination Center (JPCC) on January 20, 2007, which resulted in the deaths of five U.S. soldiers**."[7]  The Treasury Department statement noted that "[t]hese terrorist acts are in some cases funded, coordinated, and carried out in concert with the Iranian Revolutionary Guard Corps-Qods Force (IRGC-QF)" and "Hizballah, along with its Iranian allies, trained and advised Iraqi militants to carry out numerous terrorist attacks against Coalition and Iraqi forces."

More recently, in an interview on the U.S. television documentary program "Frontline," Qais Khazali confirmed what had long been recognized by the U.S. Government—that Iran provided direct support for AAH to facilitate attacks on U.S. and Coalition Forces.  Mr. Khazali admitted that "Iran supports all the resistance movements in the region.  During the occupation [of Iraq], the resistance had good relations with the Islamic Republic.  For Iran, to support the resistance in Iraq the same way it supports other resistance movement is no longer a secret."[8]

---

[6] Press Conference with General David Petraeus and Ryan Crocker, U.S. Ambassador to Iraq, September 12, 2007 (emphasis added).
[7] U.S. Department of the Treasury Press Release, "Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq," November 19, 2012 (emphasis added), available at https://www.treasury.gov/press-center/press-releases/Pages/tg1775.aspx
[8] Transcript and Video of Frontline Interview with Qais Khazali, "Bitter Rivals: Iran and Saudi Arabia," February 21, 2018 (at approximately 1:40 of Volume 1).

## II.     LEGAL BACKGROUND

### A.     Subject Matter Jurisdiction under Section 1605A of the FSIA

Jurisdiction over Iran and the IRGC in this action is premised on 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), and 1605A.  The Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611 ("FSIA"), provides the sole basis for obtaining jurisdiction over a foreign state in the United States.  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).  Under the FSIA, a court can assert personal jurisdiction over a defendant if the state is properly served in accordance with 28 U.S.C. § 1608.  *See* 28 U.S.C. § 1330(b); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 298 (D.D.C. 2003) (Lamberth, J.).  Service in this case on Iran was properly effected on Iran on January 31, 2017.  (Dkt. 19).  Service on the IRGC was properly effected on December 10, 2017.  (Dkt. 30).

Subject matter jurisdiction exists if the defendant's conduct falls within one of the specific statutory exceptions to immunity. *See* 28 U.S.C. §§ 1330(a); 1604.  Here, Defendants' conduct falls within the "state sponsor of terrorism" exception set forth at 28 U.S.C. § 1605A.  28 U.S.C. § 1605A strips immunity "in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of . . . extrajudicial killing . . . or the provision of material support or resources for such an act if such an act or provision of material support or resources is engaged in by an official, employee, or agent or such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1).

### B.     Federal Cause of Action under Section 1605A(c)

Section 1605A(c) creates a federal cause of action for any "national of the United States," "member of the armed forces," U.S. government employee, or their legal representative for an

act of "torture, extrajudicial killing . . . or the provision of material support or resources for such act" if the "claimant or *the victim*" was at the time the act occurred a U.S. citizen, a member of the Armed Forces or an employee of the United States which allows such person to collect "economic damages, solatium, pain and suffering, and punitive damages."   28 U.S.C. § 1605A(a)(1), (a)(2)(A)(ii), (c) (emphasis added).   The four U.S. Service-members all of their family members, except one,[9] are U.S. nationals and thus have federal causes of action under Section 1605A(c).   *See e.g.*, *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 73 (D.D.C. 2010).   The single non-U.S. national has causes of action under applicable state law through the jurisdiction conferred by Section 1605A(a).

Section 1605A(c)'s private right of action has four basic elements.   A plaintiff must prove:

> (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" where
> (2) the act was committed, or the material support was provided, by the foreign state or agent of the foreign state, and the act
> (3) caused personal injury or death
> (4) "for which courts of the United States may maintain jurisdiction under this section for money damages."

*Shoham v. Islamic Republic of Iran*, 2017 WL 2399454, at 17 (D.D.C. 2017) (citing Section 1605A(a)(1), (c)).

The definitions of "torture," and "extrajudicial killing," at Section 1605A(h) follow the definitions set forth in the Torture Victims Protection Act of 1991.   "Torture" is defined as:

---

[9] One of the Plaintiff family members, Mr. Bashar Al-Taie, who is a brother of Staff Sergeant Al-Taie, is not a United States citizen.  The Amended Complaint erroneously describes Bashar Al Taie as "a citizen of the United States of America who resides in the state of Michigan."  Plaintiffs will correct this error through a separate motion filed prior to trial.  Although Bashar Al Taie does not have a substantive federal cause of action under Section 1605A(c), he is still entitled as noted above to seek recovery under applicable state law pursuant to the jurisdiction conferred by Section 1605A(a).  *See, e.g., Owens v. Republic of Sudan*, 864 F.3d 751, 809 (D.C. Cir. 2017) ("Of course, in most cases brought under the new terrorism exception, the plaintiff need not rely upon state tort law" but "[t]his does not, however, imply that the Congress intended to foreclose access to state law by those who need it, as do foreign family members").

> "[1] any act, [2] directed against an individual in the offender's custody or physical control, [3] by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, [4] is intentionally inflicted on that individual [5] for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind."

Torture Victim Protection Act of 1991 (set forth as a note to 28 U.S.C. § 1350); 28 U.S.C. § 1605A(h)(7).

"Extrajudicial killing," in turn, is defined as:  [1] "a deliberated killing [2] not authorized by a previous judgment pronounced by a regularly constituted court [3] affording all the judicial guarantees which are recognized as indispensable by civilized peoples" and [4] that, under international law, is not lawfully carried out "under the authority of a foreign nation." Torture Victim Protection Act of 1991 (set forth as a note to 28 U.S.C. § 1350); 28 U.S.C. § 1605A(h)(7).

Section 1605A(h)(2)'s "definition of 'hostage taking' incorporates the definition from Article 1 of the International Convention Against the Taking of Hostages . . . and that definition applies to a person who 'seizes or detains and threatens to kill, to injure or to continue to detain another person.'"  *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 16 (D.C. Cir. 2015); 28 U.S.C. § 1605A(h)(2).

Finally, the definition of "material support or resources" in Section 1605A is drawn from the Anti-Terrorism Act, 18 U.S.C. § 2339A, and is defined as:

> "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . , and transportation, except medicine or religious materials."

18 U.S.C. § 2339A(b)(1); 28 U.S.C. § 1605A(h)(3).

**C.      Elements of Common Law Claims**

Section 1605A(c) imposes liability on "any foreign state that is or was a state sponsor of terrorism" and "any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency." As these elements make clear, liability under Section 1605A is premised on the existence of an underlying injury resulting in damages. Federal courts in the District of Columbia "rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions" to define the elements and scope of these theories of recovery. *Oveissi*, 879 F.Supp.2d at 54 (quoting *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009)). These courts have "recognized that the laws of this District are an appropriate model for the development of a federal standard with respect to liability in actions against state sponsors of terrorism." *In re Islamic Republic of Iran Terrorism Litig.*, 659 F.Supp.2d at 100 (citation omitted). The Amended Complaint includes cause of action for: (1) wrongful death and survival; (2) battery; (3) assault; (4) false imprisonment and kidnapping; (5) civil conspiracy and aiding and abetting; (6) intentional infliction of emotional distress; and (7) punitive damages. Each of these claims for relief looks to, and is based upon, prior written precedent established by the judges of this Circuit, a small number of those opinions are cited below.

**1.      Wrongful Death and Survival Claims**

To prove a wrongful death claim under D.C. Law, "a decedent's heirs may pursue claims for economic losses which result from a decedent's premature death" if they can prove the "(1) . . . the loss of financial support the decedent could have been expected to provide the next of kin

had he lived; and (2) the value of lost services (*e.g.*, care, education, training, and personal advice)." *Herbert v. D.C.*, 808 A.2d 776, 778 n. 2 (D.C. 2002).

A survival claim is simply a claim "that could have been brought by the decedent, had he lived to bring it." *Valore*, 700 F.Supp.2d at 77 (citing Restatement (Second) of Torts § 926); D.C. Code § 12-101.   The recovery is limited, however, to harms suffered before death. Restatement (Second) of Torts § 926(a).   Thus, it is mechanism for obtaining compensation for "pain and suffering" of the victim prior to death.

### 2.   **Battery**

To prove the Defendants are liable for battery, Plaintiffs must prove that the defendants: (1) "acted 'intending to cause a harmful or offensive contact with ..., or an imminent apprehension of such a contact' by, those attacked and (2) 'a harmful contact with' those attacked 'directly or indirectly result[ed].'" *Valore*, 700 F. Supp. 2d at 77 (alterations in original) (quoting Restatement (Second) of Torts § 13).   Federal courts have concluded that for purposes of the first element, "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm." *Id.*

### 3.   **Assault**

To prove the Defendants are liable for assault, Plaintiffs must prove that when Iran committed extrajudicial killing or provided material support and resources therefore: (1) it acted "intending to cause a harmful contact with . . . , or an imminent apprehension of such a contact" by, those attacked and (2) those attacked were "thereby put in such imminent apprehension." *Murphy v. Islamic Republic of Iran*, 740 F.Supp.2d 51, 73 (D.D.C. 2010).

### 4.      **False Imprisonment and Kidnapping**

To prove the defendants are liable for false imprisonment, plaintiffs must prove that defendants: (1) acted intending to confine [a person] within boundaries fixed by the defendants; (2) the act directly or indirectly resulted in such a confinement of the victim, and (3) the victim was conscious of the confinement or was harmed by it. *See e.g.*, *Sutherland v. Islamic Republic of Iran*, 151 F.Supp.2d 27, 49 (D.D.C. 2001).

### 5.      **Civil Conspiracy and Aiding and Abetting**

Under D.C. law, the elements of civil conspiracy are: (1) an agreement between two or more persons or entities; (2) to participate in an unlawful act or in an otherwise lawful act in an unlawful manner; (3) that an injury or death or other damages was caused by an unlawful overt act performed by one of the parties to the agreement; and (4) pursuant to or in furtherance of the common scheme. *See Acosta v. Islamic Republic of Iran*, 574 F.Supp.2d at 27 (*citing Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)); *accord Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 108–09 (D.D.C. 2007) (civil conspiracy basis for vicarious liability established with respect to Iran and MOIS' provision of "material support and resources to Hezbollah" to bomb U.S. Marine barracks in Beirut).

To prove aiding and abetting liability against the defendants, the plaintiffs must show that: "(1) the party the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation." *Halberstam,* 705 F.2d at 483.

### 6.      Intentional Infliction of Emotional Distress Including Solatium

The family members of the direct victims in this case have all brought claims for solatium damages, as provided by 28 U.S.C. § 1605A(c).  Plaintiffs will separately submit briefing on the issues of damages to the Special Master appointed in this matter for later consideration by the Court.  Although the Court need not address these issues during the April 2018 liability hearing, for the convenience of the Court, Plaintiffs provide an overview of such claims.

Courts in D.C. "have generally viewed solatium and intentionally inflicted emotional distress claims as being closely connected." *Belkin v. Islamic Republic of Iran*, 667 F.Supp.2d 8, 22  (D.D.C. 2009).  To prove liability for intentional infliction of emotion distress or solatium, plaintiffs must demonstrate: (1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.  *See e.g.*, *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 808 (D.C. 2003). "[A]cts of terrorism are by their very definition intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience." *Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C. 2002).  The "intent to create maximum emotional impact, particularly on third parties, is terrorism's raison d'etre." *Estate of Heiser v. Islamic Republic of Iran*, 659 F.Supp.2d 20, 27 (D.D.C. 2009).  Federal judges in this Circuit previously have held that one "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result." *Valore*, 700 F.Supp.2d at 80.[10]

---

[10] The D.C. Circuit has recently certified to the District of Columbia Court of Appeals the question whether a plaintiff must be physically present at the site of the tort to recover IIED damages under the law of the District of Columbia. *Owens v. Republic of Sudan*, 864 F.3d 751, 825 (D.C. Cir. 2017).  As noted above, all Plaintiffs except one are able to utilize the federal cause of action at Section 1605A(c), which district courts in this Circuit have ruled does not require presence for an award of damages for infliction of emotional distress and injury.  Thus, the *Owens* proceeding may only impact one plaintiff in this case and only to the extent that the Court were to choose D.C. law in a choice of law analysis for the single non-U.S. national Plaintiff.  Of course, even with regard to that single

### 7.  **Punitive Damages**

Plaintiffs have also asserted claims for punitive damages against Defendants arising from the abduction and murder of Jacob Fritz, Johnathan Bryan Chism, Shawn Falter, and Ahmed Al-Taie.  Through Section 1605A(c), Congress expressly authorized "punitive damages" without temporal limitation.  Moreover, the enacting legislation (codified as a note to § 1605A) provides that "[t]he amendments made by this section shall apply to any claim arising under section 1605A of title 28, United States Code."  Note to Section 1605A, Pub. L. No. 110–181, § 1083(c), 122 Stat. 3, 342–43.  Federal courts generally calculate the proper amount of punitive damages by considering "four factors: (1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Moradi v. Islamic Republic of Iran*, 77 F.Supp.3d 57, 73 (D.D.C. 2015) (quoting *Oveissi*, 879 F.Supp.2d at 56).[11]  Plaintiffs will submit separate briefing on punitive damages to the Special Master for consideration by the Court.  The Court need not address this issue at the April 2018 liability hearing.

## III.  **TRIAL EVIDENCE**

To obtain a default judgment in this proceeding, Plaintiffs must show that: (1) Iran was designated as a state sponsor of terrorism when the act occurred; (2) that Plaintiffs were either themselves nationals of the United States, members of the armed forces, or U.S. Government

---

plaintiff, the Court may enter an award of solatium damages pending the D.C. Court of Appeals decision.

[11] The D.C. Circuit recently held that punitive damages under Section 1605A(c) are not retroactive to the enactment of Section 1605A in 2008 and, thus, not available retroactively under state or federal law for conduct that preceded the enactment of statute in 2008. *Owens v. Republic of Sudan*, 864 F.3d 751, 818, 825 (D.C. Cir. 2017).  However, in *Republic of Austria v. Altmann*, 541 U.S. 677, 696 (2004), the Supreme Court held that the presumption against retroactivity outlined in *Landgraf v. USI Film Prods.*, 511 U.S. 244, 267 (1994) does not apply to the FSIA.  The D.C. Circuit's decision is now before the U.S. Supreme Court on a petition for a writ of certiorari.  If that holding is not overturned, it could impact the ability of the victims of the Karbala attack to recover punitive damages. However, since the evidence will show that Ahmed Al-Taie was killed in captivity after the enactment of Section 1605A(c) in January 2008, the *Owens* decision will not prevent the award of punitive damages arising from his kidnapping and death.

employees at the time of the attacks, or their claims are derived from claims where the victims were members of one of those categories; and (3) that Plaintiffs' injuries were caused by the defendants' actions or the actions of their agents or co-conspirators. *See e.g.*, *Owens v. Republic of Sudan*, 826 F.Supp.2d 128, 149 (D.D.C. 2011), *affirmed on liability and vacated, in part, on damages,* 864 F.3d at 813-814.  Plaintiffs can meet all of these elements.

First, Iran was a designated state sponsor of terrorism as the time of the attacks and abductions described in the Amended Complaint and remains so today.  U.S. Dep't of State, Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2836, Jan. 23, 1984 (designating Iran as a state sponsor of terrorism for the first time upon concluding that "Iran is a country which has repeatedly provided support for acts of international terrorism").  Second, Plaintiffs will present evidence that all of the direct victims of the underlying terrorist attacks in this action were U.S. citizens and members of the U.S. Armed Forces at the time they were abducted and murdered.  Finally, Plaintiffs will present substantial evidence that the abduction and murders were carried out by AAH/Khazali Network and Hezbollah acting with the material support of Iran and the IRGC's Qods Force.  Below is an outline of Plaintiffs' evidentiary burden in this action and a brief summary of evidence that will meet this burden.

## A.    Plaintiffs' Burden under Section 1608(e)

To obtain a default judgment under Section 1605A, a plaintiff must demonstrate a right to relief "***by evidence satisfactory to the court***," 28 U.S.C. § 1608(e), a standard that may be met "through uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence." *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 59 (D.D.C. 2010) (emphasis added and internal quotation marks omitted).  "This 'satisfactory to the court' standard

is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e)" and "[i]n evaluating the plaintiffs' proof, the court may 'accept as true the plaintiffs' uncontroverted evidence." *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (citations omitted).  In meeting this burden, the U.S. Court of the Appeals for the D.C. Circuit has recently observed that a "district court also has an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism":

> "For example, we have allowed plaintiffs to prove their claims using evidence that might not be admissible in a trial. *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048-51, 413 U.S. App. D.C. 356 (D.C. Cir. 2014) (noting "courts have the authority — indeed, we think, the obligation — to adjust evidentiary requirements to differing situations" and admitting affidavits in a FSIA default proceeding) (internal alterations and quotation marks removed). This broad discretion extends to the admission of expert testimony, which, even in the ordinary case, "does not constitute an abuse of discretion merely because the factual bases for an expert's opinion are weak." *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 567 (D.C. Cir. 1993).  Section 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion. This is part of the risk a sovereign runs when it does not appear and alert the court to evidentiary problems. *Cf. Bell Helicopter Textron*, 734 F.3d at 1181."

*Owens v. Republic of Sudan*, 864 F.3d 751, 785-86 (D.C. Cir. 2017).

### B.    Witnesses

Below is a list of the anticipated trial witnesses and a brief summary of their anticipated testimony.[12]

#### 1.    Fact Witnesses

- o **George Casey,** General, U.S. Army (ret.)
- o **Kevin Bergner,** Brigadier General, U.S. Army (ret.)
- o **William Rabena,** Colonel, U.S. Army (ret.)
- o **Kirk Alkire,** First Sergeant, U.S. Army (ret.)
- o **Noala Fritz**, Mother of Jacob Fritz

---

[12] Plaintiffs may supplement or amend this list prior to April 6, 2018, the date on which the Court ordered Plaintiffs to submit their trial witnesses and exhibits.

- o **Linda Falter**, Mother of Shawn Falter
- o **Julie Chism**, Sister of Johnathan Bryan Chism
- o **Hathal K. Taie**, Brother of Ahmed Al-Taie

2.  **Expert Witnesses**

- o **Dr. Matthew Levitt**, Expert on Iran and Iranian support of Terrorism in Iraq
- o **Dr. Daveed Gartenstein-Ross,** Expert in Iranian support of Terrorism in Iraq
- o **Dr. Craig Mallak**, Forensic Pathology Expert

3.  **Summary of Anticipated Testimony**

Plaintiffs will offer direct testimony from four former U.S. military officials: (1) **George Casey,** General, U.S. Army (ret.)**;** (2) **Kevin Bergner,** Brigadier General, U.S. Army (ret.)**;** (3) **Colonel William Rabena,** Colonel, U.S. Army (ret.); and (4) **Kirk Alkire,** former First Sergeant, U.S. Army.[13]

- • Consistent with prior public statements, **Generals Casey** and **Bergner** will testify about their personal knowledge of Iran's support of AAH/Special Groups in Iran. General Bergner will specifically describe his knowledge of the Karbala attack.

- • **Colonel Rabena** will testify regarding the Karbala attack and the after-incident report he was commissioned to generate regarding the attacks pursuant to Army Regulation 15-6 ("AR 15-6 Report"). He will outline the sophistication of the Shia militants who infiltrated the Karbala PJCC and highlight the specific elements of the attack which strongly support the conclusion that the militants were well-funded and well-trained.

- • **Sergeant Alkire** was part of the same unit as the direct victims of the Karbala attack and will testify regarding his recollection of the events that day as well as details regarding the PJCC compound, the work at the PJCC, and the attack itself.

Plaintiffs intend to offer expert testimony pursuant to Federal Rule of Evidence 702 from three witnesses whose background and professional experience qualify as "specialized knowledge" gained through "experience, training, or education," Fed. R. Evid. 702, and who

---

[13] On March 7, 2018, Counsel obtained a *Touhy* waiver from the Department of the Army pursuant to 32 CFR 516.41(d) to clear the anticipated testimony of these witnesses involving "official information" learned during the performance of official duties.

have been qualified as expert witnesses on prior occasions:  (1) Dr. Matthew Levitt; (2) Dr. Daveed Gartenstein-Ross; and (3) Dr. Craig Mallak.

- **Dr. Matthew Levitt** is a leading scholar on terrorism, a former Deputy Assistant Secretary for Intelligence and Analysis at the United States Treasury Department, and a former FBI investigator.  Mr. Levitt has been qualified testify as an expert on Hezbollah and international terrorism in similar civil actions in this court, *Wyatt v. Syrian Arab Republic*, 908 F.Supp.2d 216, 222 (D.D.C. 2012), and has testified a number of times in criminal trials on behalf of the United States Government following voir dire examination and challenge by defense counsel. *See, e.g.*, *United States v. Kadir*, 718 F. 3d 115, 121-122 (2d Cir. 2013); *Odeh v. United States*, 2015 WL 1442836, at *4 (N.D. Tex. Mar. 30, 2015); *United States v. Defreitas*, No. 07–CR–543, 2011 WL 317964, at *4–7 (E.D.N.Y. Jan. 31, 2011).  Dr. Levitt will provide expert testimony regarding the organizational structure of Hezbollah, its relationship with Iran, and Iran's use of Hezbollah and other proxies in Iraq.  Dr. Levitt's testimony will establish that Iran directed Hezbollah operatives in Iraq to train Shia Special Groups and provided such militias with funding and, in some cases, direction resulting in abductions and murders.

- **Dr. Daveed Gartenstein-Ross** is the Chief Executive Officer of Valens Global, a private commercial entity that focuses on the challenges posed by international terrorist organizations. He previously served as an Adjunct Assistant Professor in Georgetown University's Security Studies Program, where he taught a course on Violent Non-State Actors.  Dr. Gartenstein-Ross has worked as a consultant for the U.S. Government and has testified previously in similar matters in this Court. *See*, *Foley v. Syrian Arab Republic*, 249 F.Supp.3d 186 (D.D.C. 2017).  Dr. Gartenstein-Ross will testify that AAH/the Khazali Network was an Iranian-supported Shia militia that is responsible for the abduction and murder of the victims in this case and that AAH/the Khazali Network received funding, training, and direction from Iran and the IRGC.  Dr. Gartenstein-Ross will also authenticate and testify regarding internet videos in which AAH and an affiliated Shia militia took responsibility for the abductions and murders.

- **Dr. Craig Mallak** is a forensic pathologist.  He was the U.S. Armed Forces Medical Examiner during the time period in which the direct victims in this case were murdered.  Dr. Mallak has regularly been required to make official determinations not only as to cause of death but also as to whether deceased individuals were subjected to torture prior to their death.  Dr. Mallak will testify that all four U.S. service-members killed in this case died as a result of homicide and suffered torture prior to their deaths.  With respect to Mr. Al-Taie, Dr. Mallak will also provide testimony based on his professional experience and training and the condition of the remains as to the approximate timing of the death of Mr. Al-Taie.

Plaintiffs will also offer testimony from a single representative from each of the families to provide the Court with insights into the life and service of each of the four U.S. Service-members:  (1) **Noala Fritz**, mother of Jacob Fritz; (2) **Linda Falter**, mother of Shawn Falter; (3) **Julie Chism**, sister of Johnathan Bryan Chism; and (4) **Hathal K. Taie**, brother of Ahmed Al-Taie.

### C.     Exhibits

The Court has directed that the Plaintiffs submit their exhibit list on April 6, 2018.  To provide the Court with a preliminary review of the anticipated exhibits, attached at Appendix A is a chart listing the principal exhibits which the Plaintiffs anticipate seeking to admit at the upcoming liability hearing.  The Plaintiffs will supplement and update their exhibit list prior to or on April 6 and will provide the Court with a working-set of exhibits before trial.

### D.     Evidentiary Issues

#### 1.     Government Reports and Public Statements by Government Officials

Plaintiffs will seek to admit a number of government reports and statements by Government officials under Federal Rule of Evidence 803(8) which permits the admission of a record or statement of a public office if it sets out: "(i) the office's activities; (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or (iii) in a civil case or against the government in a criminal case, **factual findings from a legally authorized investigation**."  Fed. R. Evid. 803(8)(A) (emphasis added).    For example, Plaintiffs will offer copies of government investigative reports such as the U.S. Army official report AR 15-6 relating to the Karbala attack and reports relating to the abduction and murder of Mr. Al-Taie.  Plaintiffs will also rely on other public reports, such as the U.S. State Department's 2007 Report on Terrorism regarding Iranian

support for Special Groups in Iraq and the attacks carried out on U.S. forces such as those in Karbala and with respect to Mr. Al-Taie.

Courts in similar matters have held that public reports may be extensively relied upon to support claims against a state sponsor or terrorism. *See*, *e.g*., *Owens v. Republic of Sudan*, 864 F.3d 751, 792 (D.C. Cir. 2017) ("Pursuant to the 'broad approach to admissibility' under Rule 803(8), a court may also admit 'conclusion[s] or opinion[s]' contained within a public record. . . . The State Department's Patterns of Global Terrorism reports fit squarely within the public records exception."). "The party opposing the admission of the report has the burden of proving the report's untrustworthiness. *Union Pac. R.R. Co. v. Kirby Inland Marine, Inc. of Miss*., 296 F.3d 671, 679 (8th Cir. 2002) (citing *Moss v. Ole S. Real Estate, Inc*., 933 F.2d 1300, 1304 (5th Cir. 1991). "When evaluating the trustworthiness of a factual report, [courts] look to (a) the timeliness of the investigation, (b) the special skills or experience of the official, (c) whether a hearing was held and the level at which it was conducted, and (d) possible motivation problems. *Bridgeway Corp. v Citibank*, 201 F. 3d 134, 143 (2d Cir 2000) (citing Fed. R. Evid. 803(8)(C)). "The Rule 803 trustworthiness requirement, therefore, means that the trial court is to determine primarily whether the report was compiled or prepared in a way that indicates that its conclusions can be relied upon." *Union Pac. R.R. Co.,* 296 F.3d at 679 (citing *Moss*, 933 F.2d at 1307). All of the reports that Plaintiffs seek to admit on this basis meet this standard of trustworthiness.

In addition to reports, Plaintiffs also seek to admit official public statements by U.S. Government officials relating to the underlying attacks and Iran's support of Special Groups in Iraq. The Supreme Court has interpreted Rule 803(8) exception to the hearsay rule broadly to include both conclusions and opinions of public offices and agencies. *See Beech Aerospace*

*Services, Inc. v. Rainey*, 488 U.S. 153, 162 (1988) ("[F]actually based conclusions or opinions are not on that account excluded from the scope of Rule 803(8)(C)."). Case law applying Rule 803(8) suggests that this hearsay exception encompasses statements made by government officials even in the absence of any express duty to report. *See*, *e.g.*, *Washington-El v. Beard*, 2013 WL 1314528, at *7 (W.D. Pa. Feb. 26, 2013) (holding DOJ press release admissible under 803(8) because it detailed the office's activities); *General Mills Operations, LLC v. Five Star Custom Foods, Ltd.*, 703 F.3d 1104, 1108-1109 (8th Cir. 2013) (holding USDA press release admissible because it detailed findings from a legally authorized investigation and admitting public statements by USDA official detailing investigation on same basis).

Here, many of the underlying investigation reports were explicitly prepared pursuant to military regulations (*e.g.*, reports prepared according to Army Regulation 15-6) or were otherwise authorized by law. Many other public statements relate to the findings of Government investigations (*e.g.*, the July 2, 2007 Press Conference by Brigadier General Bergner) or reflect statements of fact by U.S. Government officials which are otherwise sufficiently reliable for purposes of admissibility.

### 2.      **Statements/Admissions by Co-Conspirators**

Plaintiffs will also seek to admit statements and admissions by agents of the Defendants, such as Qais Khazali and Ali Musa Daqduq, under Federal Rule of Evidence 804(d)(3) as statements against interest or under Rule 801(d)(2) as statements of co-conspirators of Defendants Iran and the IRGC or while acting as agents of Iran and the IRGC. Some of these statements will be offered directly such as from the aforementioned television interview of Mr. Khazali. Others may be offered through other U.S. Government reports or public statements which memorialize the statements. Such statements would ordinarily constitute hearsay within

the meaning of the Federal Rules.  *See Mukhtar Yahia Naji al Warafi v. Obama,* 704 F. Supp. 2d 32, 39 (D.D.C. 2010) ("interrogation reports and summaries are hearsay evidence").  However, if such a report containing a summary of factual investigation (including statements by third parties) is properly admitted under the Rule 803(8), courts have ruled that statements contained in the report may also be admissible.  *See also United States v. American Tel. & Tel. Co*., 498 F. Supp. 353, 364 (D.D.C. 1980) (holding that if a public report is sufficiently trustworthy, Rule 803(8)(C) dispenses with the ban on double hearsay).

On this basis, Plaintiffs may seek to admit admissions by some of the co-conspirators such as Qais Khazali or Ali Musa Daqduq regarding Iran's role in the attacks as statements by party opponents and/or statements of co-conspirators under Rule 801(d)(2) that are contained in such Government reports or relayed in statements by Government officials.  Provided the statements are deemed reliable, there would be no constitutional issues admitting otherwise "testimonial" statements against Iran in a civil case.  *See Austin v. United States*, 509 U.S. 602, 608 (1993) ("The protections provided by the Sixth Amendment are explicitly confined to criminal prosecutions.").  Additionally, Rule 807 provides that "a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception" if "(1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice."  Fed. R. Evid. 807.   All of the statements upon which Plaintiffs seek to rely meet this standard.

3.      **Videos and Social Media**

Plaintiffs will also be seeking the admission of videos and statements posted on websites operated or controlled by jihadi/militant groups such as the AAH/Khazali Network and its affiliates taking credit for the Karbala attack and Mr. Al-Taie's abduction.  Courts have generally held that a party seeking to admit the contents of a website "must show a reasonable likelihood that the information was posted by the individual or organization to which the postings were attributed."  *Linde v. Arab Bank PLC*, 97 F. Supp. 3d 287, 337 (E.D.N.Y. 2015), *vacated on other grounds*, -- F.3d ---, 2018 WL 797454, at *1 (2d Cir. Feb. 9, 2018).  Under this standard "clearly authentic evidence is admitted, clearly inauthentic evidence is excluded, and everything in between is conditionally relevant and admitted for the jury to make the final determination of authenticity."  *State v. Gibson*, 2015 Ohio App. LEXIS 1679 (Ohio Ct. App. May 1, 2015).

Federal Rule of Evidence 901(b) provides parties with broad latitude regarding the ways that it seeks to meet the basic requirement of authentication.  For example, authentication can be achieved way of expert testimony suggesting the authenticity of the postings.  *See*, *e.g.*, *Linde*, 97 F. Supp. 3d at 338  (holding that testimony by plaintiff's expert witness "was sufficient to show a 'reasonable likelihood' that [web] postings were authentic, and to allow a reasonable jury to conclude that the claims of responsibility were indeed issued by Hamas.").  Plaintiffs expect to rely on this authentication methodology at trial.  Once such evidence is authenticated, Plaintiffs will seek to admit the statements of responsibility for the attacks principally under Federal Rules of Evidence 801(d)(2), 804(b)(3), and 807.

## IV.    CONCLUSION

Plaintiffs brought this case to hold the Iranian government responsible for the kidnapping, torture, and extrajudicial killing of Jacob Fritz, Johnathan Bryan Chism, Shawn

Falter, and Ahmed Al-Taie.  The evidence at trial will show that Iran and the IRGC provided material aid and support to AAH/Khazali Network and Hezbollah which carried out these brutal acts.  Congress has provided a legal mechanism that allows an award of various kinds of damages against designated foreign states, like Iran, that have chosen to sponsor brutal acts of international terrorism against innocent parties to advance its political agenda.  At the conclusion of the trial, the families will ask this Court to enter a finding of liability against Defendants.

DATED:  March 13, 2018                          Respectfully Submitted,

/s/ Steven R. Perles
Steven R. Perles (No. 326975)
Edward MacAllister   (No. 494558)
Joshua Perles (No.1031069)
PERLES LAW FIRM, PC
1050 Connecticut Ave, NW
Suite 500
Washington, DC 20036
Telephone: 202-955-9055

/s/ Steven W. Pelak
Steven W. Pelak (No. 408744)
Michael J. O'Leary (No. 1014610)
Gwen S. Green (No. 980495)
Holland & Hart LLP
975 F Street, N.W. 9th Floor
Washington, DC 20004
Telephone: 202-654-6929

*Attorneys for Plaintiffs*

APPENDIX A

| **Anticipated Principal Trial Exhibits** |
|---|
| **U.S. Government Reports and Public Statements** |
| 1.  Transcript of General Kevin Bergner's July 2, 2007 Press Conference |
| 2.  Presentation Slides from General Kevin Bergner's July 2, 2007 Press Conference |
| 3.  U.S. Government Reports of Interviews of Qais Khazali and Ali Musa Daqduq[14] |
| 4.  Army Regulation 15-6 Investigating Officer's Report (including all disclosed exhibits and attachments) regarding the January 20, 2007 attack on the Karbala PJCC, dated February 15, 2007 |
| 5.  U.S. Army Criminal Investigation Command (CID) Report of Investigation, 2006-CID-899-77037-5 (including all disclosed exhibits and attachments), dated April 3, 2014 regarding abduction and murder of Ahmed Al-Taie |
| 6.  Armed Forces Medical Examiner's Report - Jacob Fritz |
| 7.  Armed Forces Medical Examiner's Report - Johnathan Chism |
| 8.  Armed Forces Medical Examiner's Report - Shawn Falter |
| 9.  Armed Forces Medical Examiner's Report - Ahmed Al Taie |
| 10. U.S. State Department's 2007 Country Report on Terrorism dated April 30, 2008 |
| 11. Transcript of April 26, 2007 U.S. Department of Defense Press Briefing by General David Petraeus |
| 12. *Iraq: The Crocker-Petraeus Report*, Hearing Before the Subcommittee on Foreign Relations, United States Senate, September 11, 2007 |
| 13. Presentation Slides from General David Petraeus's Report at September 11, 2007 Hearing |
| 14. Press Conference with General David Petraeus and Ryan Crocker, U.S. Ambassador to Iraq, September 12, 2007 (emphasis added). |

---

[14] Plaintiffs have pending requests to the U.S. Government for production of these documents.  Plaintiffs do not intend to file a motion to compel production.  Plaintiffs continue to work with U.S. Government personnel to obtain these documents. However, in the unlikely event that Plaintiffs' efforts fail, Plaintiffs reserve the right to present similar factual information through other witnesses' testimony or documentary evidence.

| **Anticipated Principal Trial Exhibits** |
|---|
| 15. *Report to Congress on the Situation in Iraq*, General David H. Petraeus Commander, Multi-National Force–Iraq, April 8, 2008. |
| 16. U.S. Department of the Treasury Press Release, "Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq," dated November 19, 2012 |
| 17. United States Central Command Reports on Search for Ahmed Al Taie |
| 18. U.S. Office of Military Commissions Charge Sheet initiating charges against Ali Musa Daqduq for January 2007 Karbala attack, dated January 3, 2012 |
| 19. News Release, U.S. Department of Defense, DOD Identifies Remains of Ahmed Al Taie, Feb. 27, 2012 |
| **Videos or Website Postings** |
| 20. Video entitled "5.20.2015 – Leauge [sic] of the Righteous (Asai'b Ahl Alhaq) - Generals Downfall" obtained from Shiite website containing body camera footage of the PJCC compound in Karbala, Iraq |
| 21. February 2007 "Proof of Life" Video of Ahmed Al-Taie obtained from Shiite militia website. |
| 22. Video and Transcript of Frontline Interview with Qais Khazali, "Bitter Rivals: Iran and Saudi Arabia," February 21, 2018 detailing Iran's support of Special Groups in Iraq. |
| **Documentary Evidence and Photographs** |
| 23. Photographs of PJCC Compound in Karbala, Iraq |
| 24. Aerial Map of PJCC |
| 25. Aerial Photographs of SUV Recovery near Karbala, Iraq |
| 26. January 20, 2007 Photographs - Victims at Recovery Site near Karbala, Iraq |
| 27. January 20, 2007 Photographs of SUV Registration near Karbala, Iraq |
| 28. January 20, 2007 Photographs of Recovered Flak Jackets |
| 29. January 20, 2007 Photographs of Recovered Masks |
| 30. January 20, 2007 Photographs of Recovered Helmets |

| Anticipated Principal Trial Exhibits |
|---|
| 31. January 20, 2007 Photographs of Twelve Recovered Military Shirts |
| 32. January 20, 2007 Photographs of Recovered Military Boots |
| 33. January 20, 2007 Photographs of Data Plate and VINs of SUVs |
| 34. January 20, 2007 Photographs of Recovered M-16 Magazines |
| 35. 22 page "in-depth planning and lessons learned" document relating to the Karbala attack on January 20, 2007 seized from Khazalis and Mr. Daqduq at time of their arrest in March 2007[15] |
| 36. Mr. Daqduq's personal diary and "how to" training manuals on tactics seized at time of his arrest seized from Khazalis and Mr. Daqduq at time of their arrest in March 2007 |
| 37. false identification documents seized from Khazalis and Daqduq seized at time of their arrest in March 2007 |
| 38. "11 separate documents that recorded attacks against Coalition Forces" seized from Khazalis and Daqduq seized at time of their arrest in March 2007 |
| 39. Photographs - Jacob Fritz |
| 40. Photographs - Johnathan Chism |
| 41. Photographs - Shawn Falter |
| 42. Photographs - Ahmed Al Taie |
| 43. Estate Documents - Jacob Fritz |
| 44. Estate Documents - Johnathan Chism |
| 45. Estate Documents - Shawn Falter |
| 46. Estate Documents - Ahmed Al Taie |
| 47. Photographs - Jacob Fritz and Family |
| 48. Photographs - Johnathan Chism and Family |

---

[15] See the preceding footnote.

| **Anticipated Principal Trial Exhibits** |
| --- |
| 49. Photographs - Shawn Falter and Family |
| 50. Photographs - Ahmed Al Taie and Family |