UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NOALA FRITZ *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Civil Action No.: 15-456 (RDM) |
| | : | |
| v. | : | |
| | : | |
| ISLAMIC REPUBLIC OF IRAN *et al*., | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFFS' SUPPLEMENTAL TRIAL BRIEF

Plaintiffs hereby submit this Supplemental Trial Brief to provide information in response to issues noted by the Court during the March 27, 2018 Pretrial Conference regarding: (1) the standard of proof necessary to hold Defendants the Islamic Republic of Iran ("Iran") and Iran's Islamic Revolutionary Guard Corps Qods Force ("IRCG-QF") liable under 28 U.S.C. § 1605A for the acts of extrajudicial killings, torture, and hostage taking alleged in the Amended Complaint; and (2) the Plaintiffs' reliance upon both the federal law cause of action under Section 1605A(c) of the Foreign Sovereign Immunities Act ("FSIA") and a state law cause of action.

## I.   STANDARD OF PROOF TO FIND DEFENDANTS LIABLE UNDER 28 U.S.C. § 1605A

### A.   Overview of Vicarious Liability Under Section 1605A(c)

During the recent March 27 Pretrial Hearing, the Court asked Plaintiffs whether they could establish liability over Iran without evidence that the Government of Iran directly participated in or specifically intended the hostage takings, tortures, and extrajudicial killings alleged in the Amended Complaint. As noted at the pretrial hearing, the answer is yes: The standard of liability for designated state sponsors of international terrorism under Section 1605A(c) of the FSIA is a vicarious liability standard. Although Plaintiffs intend to present evidence that members of the

Government of Iran, specifically members of the IRGC-QF, directly participated in planning and approval of the January 20, 2007 Karbala attack, such direct participation is not required under the FSIA or binding precedent in this Circuit.

In Section 1605A(c), as relevant here, Congress set forth a private right of action against foreign states designated as a state sponsor of terrorism for personal injury or death of a U.S. citizen, a member of the U.S. armed forces, or their legal representative caused by an act of extrajudicial killing, torture, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources in engaged in by an official employee, or agent of such foreign state.  28 U.S.C. § 1605A(c).  Congress explicitly stated in Section 1605A(c) the following:  **"In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents."**  (emphasis added.)

The U.S. Court of Appeals for the D.C. Circuit recently addressed the issue discussed at the Pretrial Conference in this matter.  Specifically, the D.C. Circuit held that specific intent or advanced knowledge by the foreign state of a terrorist act is not required for a finding that a state sponsor of terrorism provided "material support" under the FSIA's terrorist exception.  In *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), the D.C. Circuit explicitly rejected the argument that the FSIA requires a "greater showing of intent than proximate cause." *Owens*, 864 F.3d at 798.  In *Owens*, the Government of Sudan argued that the FSIA terrorism exception "graft[ed] an additional requirement onto the proximate cause analysis" such that a victim of an extrajudicial killing, torture, or abduction must demonstrate that the "material support" provided by the designated state sponsor of international terrorism was provided with the intent to achieve the particular predicate or violent act.  The Court "dispatched" that argument—just as it did to a

2

related argument in the prior case of *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123 (D.C. Cir. 2004)—and explained as follows:

> Although the record contains much evidence of Sudan's support for al Qaeda and its general awareness of the group's terrorist aims, nothing suggests that Sudan specifically knew of or intended its support to cause the embassy bombings. Nothing in the FSIA, however, requires a greater showing of intent than proximate cause. Indeed, we dispatched a similar argument in *Kilburn*, along with a hypothetical raised by the sovereign defendant:
>
> 'A terrorist organization is supported by two foreign states. One specifically instructs the organization to carry out an attack against a U.S. citizen. Can the state which only provides general support, but was not involved with the act giving rise to the suit, also be stripped of its immunity?'
>
> 376 F.3d at 1128.  **Yes, we said.  Because material support 'is difficult to trace,' requiring more than proximate cause 'could absolve' a state from liability when its actions significantly and foreseeably contributed to the predicate act.** *Id*.
>
> **Further, we rejected the related argument that the 'provision of material support or resources . . .** *for such an act*' **required that 'a state's material support must go directly for the specific act.'** *Id*. at 1130.  That limitation, we explained, 'would likely render § 1605(a)(7)'s material support provision ineffectual' because material support 'is fungible' and 'terrorist organizations can hardly be counted on to keep careful bookkeeping records.' *Id*.  Indeed, in other situations, courts have required neither specific intent nor direct traceability to establish the liability of material supporters of terrorism. *See Boim*, 549 F.3d at 698 (approving liability for donors to terrorist organizations whose donations were made for non-terrorism purposes). As Judge Posner has aptly said, '[t]o require proof that [a defendant] intended that his contribution be used for terrorism … would as a practical matter eliminate …  liability except in cases in which the [defendant] was foolish enough to admit his true intent.' Id. at 698-99.  **The same holds true for a state sponsor of terrorism under the FSIA; it may not avoid liability for supporting known terrorist groups by professing ignorance of their specific plans for attacks.** In sum, that the evidence failed to show Sudan either specifically intended or directly advanced the 1998 embassy bombings is irrelevant to proximate cause and jurisdictional causation.

*Owens*, 864 F.3d at 798-99 (emphasis added).

The district court in *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F.Supp.2d 48 (D.D.C. 2011), outlined how vicarious liability applies in a Section 1605A action against a state sponsor of terrorism where the underlying acts were carried out by a separate non-state actor:

3

> Vicarious liability is a common law concept, wherein "[o]ne may be liable for the acts of another under theories of vicarious liability, such as conspiracy, aiding and abetting, and inducement . . .The elements of civil conspiracy are: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; and (4) which overt act was done pursuant to and in furtherance of the common scheme. I*d*. at 27 (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C.Cir.1983)) . . .  As this Court has noted on a number of occasions, "sponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks." *Id*. (quoting *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 27 (D.D.C.1998)).  It has been established, with evidence satisfactory to the Court, that Syria, through its officials acting in their official capacity, provided funding, training, safe havens, access, and a variety of other supports to the ANO. Former State Department officials and expert witnesses testified that the ANO would have been unable to accomplish the EgyptAir hijacking and the Rome and Vienna Airport attacks without Syrian aid. The elements of a civil conspiracy between Syria and the ANO are therefore satisfied.

775 F.Supp.2d at 78.

Applying this standard of vicarious liability, Plaintiffs need only to offer evidence "satisfactory to the court"[1] sufficient to establish that Iran and the IRGC's material support of Asaib Ahl al-Haq ("AAH" or the Khazali Network) and Hezbollah proximately caused: (1) the hostage taking, torture, and extrajudicial killing in relation to the January 2007 Karbala attack; and (2)  the hostage taking, torture, and extrajudicial killing of Staff Sergeant al-Taie following his initial abduction in October 2006 until the recovery of his remains in 2012.  *Owens*, 864 F.3d at 798 (concluding that "Sudan's actions in the 1990s were undoubtedly a 'substantial factor in the sequence of responsible causation' that led to the embassy bombings" and that those bombings were "reasonably foreseeable or anticipated as a natural consequence" of its material support) (*quoting Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)).  Thus, Plaintiffs must show satisfactorily to the court that the hostage takings, torture, and murders were reasonably

---

[1] 28 U.S.C. § 1608(e) requires Plaintiffs to provide "evidence satisfactory to the court" in support of a default judgment against Iran and the IRGC.  The quantum of evidence required under this standard is further described below.  *See* Section I.B. *supra*.

4

foreseeable or anticipated as a natural consequence of Iran/IRGC-QF's material support for Hezbollah and AAH. But, Plaintiffs are not required to show "specific intent", that Iran intended the particular acts to take place, or that the material support provided to AAH must go directly for the specific acts.

### B.     Quantum of Evidence & Admissibility of Government Reports and Records

#### 1.  Quantum of Evidence – Satisfactory to the Court

Congress has specified that to obtain a default judgment under Section 1605A, a plaintiff must demonstrate a right to relief "***by evidence satisfactory to the court.***" 28 U.S.C. § 1608(e). That standard may be met "through uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence." *Valore v. Islamic Republic of Iran*, 700 F. Supp.2d 52, 59 (D.D.C. 2010) (emphasis added and internal quotation marks omitted). "This 'satisfactory to the court' standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e)." *Campuzano v. Islamic Republic of Iran*, 281 F.Supp.2d 258, 268 (D.D.C. 2003) (citations omitted). "In evaluating the plaintiffs' proof, the court may 'accept as true the plaintiffs' uncontroverted evidence.'" *Id.* (quoting *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 100 (D.D.C. 2000)). In considering this burden, the U.S. Court of the Appeals for the D.C. Circuit has recently observed that a "district court also has an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism." *Owens*, 864 F.3d at 785-86.

"While the 'FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be satisfactory to the court, courts must be mindful that Congress enacted Section 1605A, FSIA's terrorism exception, and Section 1608(e) with the 'aim to prevent state sponsors of terrorism—entities particularly unlikely to

submit to this country's laws—from escaping liability for their sins.'" *Thuneibat v. Syrian Arab Republic*, 167 F.Supp.3d 22, 33 (D.D.C. 2016) (*quoting Han Kim v. Democratic People's Republic of Korea (aka North Korea)*, 774 F.3d 1044, 1047–48 (D.C. Cir. 2014)). With this objective in mind, the D.C. Circuit in *Han Kim*, 774 F.3d at 1048, explained that the quantum and nature of required evidence in a FSIA action against a designated state sponsor of terrorism should be determined in light of the admonition that "courts have the authority—indeed, we think, the obligation—to 'adjust [evidentiary requirements] to . . . differing situations.'"[2] In short, "[i]n FSIA default judgment proceedings, the plaintiffs may establish proof by affidavit." *Campuzano*, 281 F.Supp.2d at 268. In *Han Kim*, the D.C. Circuit overturned the district court's denial of a motion for default judgment, and found "evidence sufficiently 'satisfactory' to require a default judgment", 774 F.3d at 1045, based solely on the motion and accompany expert affidavits. *Id.* at 1045, 1050.

In another recent FSIA case, the district court held Syria and Iran vicariously liable for a kidnapping in Israel carried out by Hamas based almost exclusively on expert declarations. The court found Syria and Iran liable even though "no evidence [was] provided directly linking a weapon or dollar provided by Iran and Syria to the kidnapping and murder" because "both Iran and Syria knew of Hamas's tactics and ideological goals and supported those efforts." *Fraenkel v. Islamic Republic of Iran*, 248 F.Supp.2d 21, 38 (D.D.C. 2017).

### 2. Types of Evidence & U.S. Government Reports and Records

The D.C. Circuit also made clear in *Owens* that "[n]othing in the FSIA . . . requires a greater showing of intent than proximate cause" and whether a state sponsor of terrorism "specifically intended or directly advanced" a specific attack "is irrelevant to proximate cause and jurisdictional

---

[2] The Court of Appeals in *Kim* relied upon and quoted from *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981) and added the bracketed material to the quoted passage from *Bundy*.

causation." *Owens*, 864 F.3d at 798 and 799. Nevertheless, Plaintiffs in this case will offer substantial evidence admissible under the Federal Rules of Evidence that the Government of Iran had a direct role in the some of the conduct alleged in the Amended Complaint.

Among other forms of evidence, the Plaintiffs will present: (1) factual testimony from former U.S. Army generals with knowledge of Iran's role in supporting AAH and Hezbollah in Iraq and Iran's involvement in the specific abductions and murders described in the Amended Complaint; (2) factual testimony by a former U.S. military officer who contemporaneously in 2007 interviewed more than 100 witnesses and examined voluminous records and materials relating to the January 20, 2007 attack upon the PJCC in Karbala, Iraq; (3) expert testimony regarding Iran's support of terrorism in Iraq during the relevant time period as well as its support of the specific attacks in this case, both the Karbala attack and the hostage taking and murder of Staff Sergeant Al-Taie by AAH; (4) expert medical testimony concerning the abuse and torture of the victims; and (5) substantial documentary evidence including U.S. Government reports, public findings, and public statements describing Iran's role in these attacks and admissions by AAH leaders Qais Khazali, his brother Layth Khazali, and a high-ranking Hezbollah operative, Ali Musa Daqduq, who was embedded with AAH by the IRGC-QF.

Among others, these U.S. Government reports and public statements include: (1) U.S. government investigative reports (e.g., a U.S. Army investigation into the January 20, 2007 attack in Karbala Iraq prepared pursuant to Army Regulation 15-6); (2) internal military reports provided to Multi-National Commanders and the U.S. Secretary of Defense; (3) official U.S. Government statements to the press; and (4) public testimony by U.S. military and civilian officials to Congress.

Based on the authentication by official government certifications under Federal Rule of Evidence 902, Plaintiffs will seek the admission of these reports and statements by Government

7

officials either as records of regularly conducted activity under Federal Rule of Evidence 803(6) or government records under Federal Rule of Evidence 803(8). Courts in similar matters have found that such public reports and documents may be extensively relied upon to support claims against a state sponsor or terrorism. *See*, *e.g.*, *Owens v. Republic of Sudan*, 864 F.3d at 792 ("Pursuant to the 'broad approach to admissibility' under Rule 803(8), a court may also admit 'conclusion[s] or opinion[s]' contained within a public record . . . . The State Department's Patterns of Global Terrorism reports fit squarely within the public records exception.").[3] "Once proffered, a public record is presumptively admissible, and the opponent bears the burden of showing it is unreliable." *Id*. (citation omitted). "The party opposing the admission of the report has the burden of proving the report's untrustworthiness." *Union Pac. R.R. Co. v. Kirby Inland Marine, Inc. of Miss*., 296 F.3d 671, 679 (8th Cir. 2002) (citing *Moss v. Ole S. Real Estate, Inc*., 933 F.2d 1300, 1304 (5th Cir. 1991).

"The Rule 803 trustworthiness requirement, therefore, means that the trial court is to determine primarily whether the report was compiled or prepared in a way that indicates that its conclusions can be relied upon." *Id.,* at 679 (citing *Moss*, 933 F.2d at 1307). All of the U.S. Government reports and public statements that Plaintiffs seek to admit on this basis meet this basic standard of trustworthiness and, in fact, far exceed it. The following section sets forth illustrative examples of such U.S. Government reports which Plaintiffs will rely upon as trial exhibits.

---

[3] *Accord Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143-144 (2d Cir. 2000) (affirming admission of U.S. State Department Report over objection); *Holliday v. J S Exp. Inc*., 2013 WL 2395333, at *5 (E.D. Mo. May 30, 2013) (admitting Department of Labor Report under Rule 803(8)).

**C.      Illustrative Trial Exhibits relating to Iranian and the IRGC Support of AAH and Involvement in Terrorist Acts in this Case**

Several of the U.S. Government reports and public statements that Plaintiffs will seek to admit as trial exhibits in this case demonstrate direct links between Iran, the IRGC, Hezbollah, and AAH.

### 1. Trial Exhibit No. 3 – U.S. Department of Defense Report relating to the Detention of Qais Khazali, Laith Khazali, and Ali Musa Daqduq (May 2007 – May 2009)

For example, in a series of U.S. Department of Defense Reports issued between May 2007 and May 2009, Plaintiffs' Trial Exhibit No. 3, U.S. military officials set forth some of the bases for the continued detention of Qayis Khazali, Layth Khazali, and Ali Musa Daqduq after their capture by Coalition Forces in March 2007. In doing so, those reports set forth the relationship between AAH and Hezbollah, the IRGC-QF, and Iran, including admissions by the AAH leaders (the Khazali brothers) and the Lebanese Hezbollah Commander Daqduq:

- "**Qayis [Khazali] led a delegation to Tehran to discuss the situation in Iraq and Iranian support for JAM. According to reporting, Ali Khomeini met with Qais and recruited him to lead a special group known as Asayb al-Haq, or the K2 network . . . Iran was interested in working with Qayis because of his influence on MAS. Layth [Qais al-Khazali's brother] served as a liaison between the secret network formed by Qayis and the Iranians.**" Plaintiff's Exhibit 3: U.S. Department of Defense Reports concerning the detention of Qais Khazali, Laith Khazali, and Ali Musa Daqduq (May 2007-May 2009), August 13, 2007 Magistrate Review Memorandum Regarding Detainee Qais Khazali, at 324 (emphasis added).

- "Qayis admitted traveling 5-6 times to Tehran to meet with the Quds Force (Iranian Islamic Revolutionary Guard)." *Id.* at 325.

- "Qayis had significant links to Iran," and "[t]his affiliation was used to procure weapons and funding for use by JAM and special groups against" coalition forces. *Id.* at 324.

- "Qayis told his interrogators that there are three training camps north of Tehran," and that "Layth became a JAM explosives expert after receiving extensive explosives training from Iran." *Id.* at 326.

9

- "Qayis and Layth are both involved in weapons smuggling from Iran," and "[b]oth Iran's Ministry of Itla'at (intel) and the Quds Force play roles smuggling weapons into Iraq." *Id*. at 326.

- A U.S. military report described Ali Musa Daqduq as "a Lebanese Hizballah Commander" and "an advisor to AAH," who "**took his direction from IRGC-QF Officer Hajji Yusif** and [Lebanese Hizballah] Unit 2800 Commander Yusif Hashim." Plaintiffs' Exhibit 3, May 22, 2009 Memorandum for Commander of Regarding Request to Transfer Ali Musa Daqduq, at 328 (emphasis added).

- Daqduq "admitted to an active role in Iraq as an agent of Iranian state sponsored terrorism," and that "**Abdul Reza Shahlai, Iranian Revolutionary Guard Corps–Quds Force (IRGC-QF) Department 9000 (Lethal Aid) Deputy Chief facilitated [Daqduq's] illegal entry into Iraq on four separate occasions**." Plaintiffs' Exhibit 3, October 5, 2008 Recommendation for Continued Internment Memorandum for Commander of Regarding Request to Transfer Ali Musa Daqduq, at 330 (emphasis added).

- Qayis also "has admitted to meeting Iranian Revolutionary Guard Corps-Quds Force (IRGC-QF) personalities on multiple occasions including Hajj Yusif, who is assessed to be Abdul Reza Shahlai, the Department 9000 (Lethal Aid) Deputy Commander." Plaintiffs' Exhibit 3, May 31, 2007 Memorandum Regarding Request for Qayis Hadi Sa'id al-Khazali, at 322.

Plaintiffs will present further testimonial and documentary evidence at trial concerning Abdul Reza Shahlai (a/k/a Hajj Yussef), who is a top leader of the IRGC-QF. Shahlai was designated by the U.S. Department of the Treasury in September 2008 for "plan[ing] the January 20, 2007 attack by JAM Special Groups against U.S. soldiers stationed at the Provincial Joint Coordination Center in Karbala, Iraq." That September 2008 public finding and determination by the U.S. Department of Treasury/Office of Foreign Assets Control ("OFAC") will be Plaintiffs' Trial Exhibit 62.[4] By way of further background regarding IRGC-QF official Shahlai, the U.S. Government subsequently made a public finding and designated him in October 2011 for his involvement in

---

[4] Plaintiff's Trial Exhibit 62: U.S. Department of the Treasury Public Announcement, "Treasury Designates Individuals and Entities Fueling Violence in Iraq," dated September 16, 2008

the plot to murder the Kingdom of Saudi Arabia's Ambassador to the United States in Washington, D.C.[5]

### 2. Trial Exhibit No. 1 – July 2, 2007 Official Public Statement by U.S. Military relating to Iran's Involvement and Responsibility for January 20, 2007 Karbala Attack

Similarly, Plaintiffs will also introduce a number of U.S. Government statements that Iran and the IRGC-QF were specifically involved in the attacks in this case. For example, during a July 2, 2007 Press Conference, U.S. Military Spokesman General Kevin Bergner publicly reported that "both Ali Musa Daqduq and Qais Khazali state that senior leadership within **the Qods Force knew of and supported planning for the eventual Karbala attack that killed five coalition soldiers.**" Plaintiffs' Exhibit 1: Transcript of General Kevin Bergner's July 2, 2007 Press Conference. When asked directly by a media representative if "the Quds Force directed and helped plan [the] attack in Karbala," General Bergner answered affirmatively, adding: "**That is what we learned from Qais Khazali**." *Id*.

### 3. Trial Exhibit No. 55 – Weekly Reports by Commander Multi-National Forces – Iraq to U.S. Secretary of Defense

In a June 9, 2007 Weekly Report, U.S. General David Petraeus, Commander of the Multi-National Forces-Iraq, reported to the U.S. Secretary of Defense Robert Gates and included description of Qais Khazali's admissions:

> The five-page Qais Khazali sworn statement, made last week and marked with his inked fingerprints, is an unequivocal indictment of Iranian interference. **His statement, along with those of his brother and other detainees, provides incontrovertible evidence that Iran is arming, funding, training, equipping, and advising Shi'a extremists operating in Iraq**. Iranian interference began shortly after the Coalition began operations, but advanced significantly after the Najaf operation in 2004. The statements of those interrogated are buttressed by

---

[5] Plaintiffs' Trial Exhibit 51 U.S. Department of the Treasury Public Announcement, "Treasury Sanctions Five Individuals Tied to Iranian Plot to Assassinate the Saudi Arabian Ambassador to the United States," dated October 11, 2011.

dozens of documents taken from the captured laptops. **As Qais asserted, without Iranian funding, JAM special groups would not be able to function.**

### 4. Trial Exhibit No. 26 – Summary Presentation by U.S. Army Terrorism and Criminal Investigation Unit relating to Interview Statements by Daqduq

As another illustrative example of the U.S. Government reports and records upon which the Plaintiffs will rely, Trial Exhibit No. 26 presents a summary of the statements and admissions of the Hezbollah commander Ali Musa Daqduq prepared by the U.S. Army's Terrorism and Criminal Investigation Unit. That U.S. Government report reveals that Daqduq told investigators "that Sayyid Yussef and Hajj Yussef were involved in development of the PJCC attack plan – they had inside information regarding US personnel eating and sleeping habits, shift change, and other movements at the [Karbala] PJCC" and "that PJCC attack could not have been conducted by Iraqis without outside support." Plaintiffs' Trial Exhibit No. 26: Summary Presentation of Interview Statements by Daqduq, Army Terrorism and Criminal Investigation Unit, Slide 11. The presentation also reveals the substantial training that Iraqi Shia militia such as AAH received in Iran even explaining that "IRGC-QF and [Lebanese Hezbollah] are training the special groups to improve their kidnapping capability." *Id.* at Slide 6.

The above-noted trial exhibits are just a few examples of evidence directly linking Iran, the IRGC-QF, and Hezbollah to the abductions and murders in this case. Although such evidence is not required to establish liability under Section 1605A(c), such evidence certainly meets and exceeds Plaintiffs' burden.

## II. FEDERAL AND STATE CLAIMS FOR RELIEF

During the March 27 Pretrial Hearing, the Court also requested further clarification on whether each plaintiff was asserting a federal cause of action and a state cause of action. In summary, all plaintiffs save one seek relief under the federal cause of action pursuant to 28 U.S.C.

§ 1605A(c). One plaintiff, a brother of Staff Sergeant Al-Taie, seeks recovery solely under a state law claim because he is not a U.S. citizen.

As noted above, Section 1605A(c) of the FSIA creates a federal cause of action against a state sponsor of terrorism for "economic damages, solatium, pain and suffering, and punitive damages" for any "national of the United States," "member of the armed forces," U.S. government employee, or their legal representative for an act of torture, hostage taking, extrajudicial killing, or the provision of material support or resources for such act. 28 U.S.C. § 1605A(c) (emphasis added). Shawn Falter, Johnathan Bryan Chism, Jacob Fritz, and Ahmed Al-Taie were all U.S. citizens and members of the U.S. Armed Forces at the times of their abduction and murders. Thus, their four estates all have a federal cause of action under Section 1605A(c). Additionally, all but one of their family members are also U.S. citizens and also have federal causes of action under Section 1605A(c). Although alleged also under state law claims, these Plaintiffs are pursuing their claims at this time solely under the federal cause of action. *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F.Supp.2d 31, 94 (D.D.C. 2009) (observing that "reliance on state law is no longer necessary or appropriate under § 1605A because it expressly provides plaintiffs with a federal cause of action.").

The single non-U.S. citizen plaintiff is Bashar Al-Taie, the brother of Ahmed Al-Taie. Mr. Al-Taie is a foreign national. Although Bashar Al-Taie does not have a federal cause of action, he is still entitled to pursue state law remedies pursuant to the jurisdiction conveyed by Section 1605A(a)(1). *See Owens v. Republic of Sudan*, 864 F.3d at 809 (holding that in most cases brought under § 1605A "the plaintiff need not rely upon state tort law" but "[t]his does not, however, imply that the Congress intended to foreclose access to state law by those who need it, as do foreign family members."); *Worley v. Islamic Republic of Iran*, 75 F.Supp.3d 311, 327 (D.D.C. 2014)

(holding that foreign plaintiffs may assert claims that are based on "injuries suffered by victims who meet the statute's requirements") (citations omitted).

DATED:  April 9, 2018                                             Respectfully Submitted,

/s/ Steven W. Pelak                                             /s/ Steven R. Perles
Steven W. Pelak (No. 408744)                          Steven R. Perles (No. 326975)
Michael J. O'Leary (No. 1014610)                    Edward MacAllister   (No. 494558)
Gwen S. Green (No. 980495)                           Joshua Perles (No.1031069)
Holland & Hart LLP                                            PERLES LAW FIRM, PC
975 F Street, N.W.  9th Floor                           1050 Connecticut Ave, NW
Washington, D.C. 20004                                   Suite 500
Telephone 202-654-6929                                  Washington, D.C. 20036
                                                                              Telephone: 202-955-9055

                                                                              *Attorneys for Plaintiffs*

14