# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NOALA FRITZ, *et al.*,

     *Plaintiffs,*

     v.

ISLAMIC REPUBLIC OF IRAN, *et al.*,

     *Defendants.*

Civil Action No. 15-456 (RDM)

## <u>MEMORANDUM OPINION</u>

     This case arises from the abductions and murders of four U.S. soldiers serving in Iraq. In January 2007, First Lieutenant Jacob Fritz, Specialist Johnathan Bryan Chism, and Private First Class Shawn Falter were abducted from the Provincial Joint Coordination Center in Karbala, Iraq and, shortly thereafter, murdered by their captors. In October 2006, Staff Sergeant Ahmed Al-Taie was abducted while in Baghdad, held hostage, and, ultimately, murdered. Plaintiffs, the estates and family members of the four direct victims, contend that "[t]hese two separate incidents of kidnapping and murder are linked" because "both were planned and executed mere months apart" by the same terrorist organization: Asaib Ahl al-Haq ("AAH"), a network of Iraqi Shia militias. Dkt. 38 at 1. Significantly, plaintiffs assert that AAH benefited from and relied on "training, funding, direction, and support" from Iran, which Iran provided as part of a "coordinated scheme . . . to target U.S. service-members in Iraq." *Id.* Without Iranian aid, Plaintiffs continue, AAH could not have carried out the Karbala attack nor evaded the U.S. military's search for Staff Sergeant Al-Taie.

     Plaintiffs, all except one of whom are U.S. nationals, bring this action against the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps (collectively, "Iran"), and five "John

Doe" defendants. To establish subject matter jurisdiction, they invoke the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"). 28 U.S.C. § 1605A(a). They rely on another provision in the statute, § 1605A(c), to supply a federal cause of action, alleging that Iran provided "material support" to AAH, which in turn engaged in acts of extrajudicial killing, hostage taking, and torture. *Id.* § 1605A(c). Plaintiffs also assert state common law claims for wrongful death, battery, assault, false imprisonment, intentional infliction of emotional distress including solatium, survival damages, conspiracy, and aiding and abetting. Iran, in the form of either the Islamic Republic of Iran or the Islamic Revolutionary Guard Corps ("IRGC"), has not answered or otherwise appeared in this action and, at Plaintiffs' request, the clerk of the court has entered a default as to both Defendants. Dkt. 23; Dkt. 39. The John Doe defendants have not been served, and thus the Court's decision does not apply to those defendants.

Plaintiffs have moved for a default judgment against the Islamic Republic of Iran and the IRGC, Dkt. 64, and for the appointment of a special master to conduct damages proceedings, Dkt. 49. As explained below, the U.S. national plaintiffs have established their right to relief under 28 U.S.C. § 1605A. Plaintiffs concede, however, that because plaintiff Bashar Al-Taie is not a U.S. national, he is not entitled to relief under 28 U.S.C. § 1605A(c). The Court concludes, moreover, that Bashar Al-Taie has failed, at least at this stage of the litigation, to establish that he is entitled to relief based on his state law claims. Accordingly, Plaintiffs' motion for the entry of a default judgment against the Islamic Republic of Iran and the IRGC will be **GRANTED** as to the U.S. national plaintiffs and **DENIED** without prejudice as to Bashar Al-Taie. *See* 28 U.S.C. § 1608(e). Having found that the U.S. national plaintiffs have established Defendants' liability to the satisfaction of the Court, the Court will **GRANT** Plaintiffs' motion for the appointment of

a special master as to the U.S. national plaintiffs, **DENY** the motion without prejudice as to Bashar Al-Taie, and **APPOINT** a special master to hear the damage claims of the U.S. national plaintiffs and to report to the Court regarding the appropriate award.

## I. INTRODUCTION

Plaintiffs, the estates of the four U.S. soldiers and twenty-two of their family members, bring this action for damages against the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, and five unidentified "senior Iranian government officials and members of the IRGC" who, Plaintiffs allege, "planned, supported, and approved the abduction[s] and murder[s]" of Fritz, Chism, Falter, and Al-Taie. Dkt. 9 at 6–10, 12 (Am. Compl. ¶¶ 11–31, 37). They effected service on the Islamic Republic of Iran and the IRGC in January 2017 and December 2017, respectively, and neither Defendant has answered, filed a motion under Federal Rule of Civil Procedure 12, or otherwise appeared. *See* Dkt. 21; Dkt. 37. Accordingly, at Plaintiffs' request, the clerk of the court declared the Islamic Republic of Iran in default on August 14, 2017, Dkt. 23, and declared the IRGC in default on March 27, 2018, Dkt. 39.

Plaintiffs now seek entry of a default judgment with respect to liability against both Defendants pursuant to Federal Rule of Civil Procedure 55. Dkt. 64. Even in a garden variety case, the entry of a default judgment is not automatic and requires the exercise of sound discretion. *See Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005); *Sanchez v. Devashish Hospitality, LLC*, 322 F.R.D. 32, 36 (D.D.C. 2017); *Boland v. Yoccabel Const. Co., Inc.*, 293 F.R.D. 13, 17 (D.D.C. 2013) (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)). Most notably, the Court must—at a minimum—satisfy itself that it has subject matter jurisdiction over the claims and personal jurisdiction over the defendants. *See Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014) ("A default judgment rendered in excess of a court's

jurisdiction is void."); *Mwani*, 417 F.3d at 6 (explaining that the Court must "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant").

In cases brought against a foreign state, however, the Court's discretion to enter a default judgment is more narrowly circumscribed. By statute, no federal or state court may enter a default judgment against a foreign state or instrumentality "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This is the same standard that applies to default judgments against the United States under Federal Rule of Civil Procedure 55(d). *See Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017); *Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003). In a case, such as this, alleging that a foreign state materially supported acts of terrorism, the district court must determine "how much and what kinds of evidence the plaintiff must provide." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014). But the Court must do so in light of Congress's purpose in enacting § 1605A—that is, to "compensate the victims of terrorism [so as to] punish foreign states who have committed or sponsored such acts and [to] deter them from doing so in the future," *id.* at 1048 (citation omitted)—and the difficulty in obtaining "firsthand evidence and eyewitness testimony . . . from an absent and likely hostile sovereign," *Owens*, 864 F.3d at 785. This means that, to obtain a default judgment against Iran, plaintiffs must (1) carry their burden of producing evidence sufficient to show that their claims fall within the state-sponsored terrorism exception to the FSIA, *see* 28 U.S.C. § 1605A(a); *Owens*, 864 F.3d at 784; (2) establish that defendants were served in accordance with the FSIA, *see* 28 U.S.C. § 1608(a); and (3) establish their right to relief under federal, *see* 28 U.S.C. § 1605A(c), or state law, *Owens*, 864 F.3d at 809 ("the pass-through approach remains viable"), by offering evidence "satisfactory to the court," 28 U.S.C. § 1608(e).

Against this backdrop, the Court held a four-day hearing on liability, Dkt. 51 (Transcript of Evidentiary Hearing, Apr. 10, 2018); Dkt. 52 (Transcript of Evidentiary Hearing, Apr. 11, 2018); Dkt. 53 (Transcript of Evidentiary Hearing, Apr. 12, 2018); Dkt. 54 (Transcript of Evidentiary Hearing, Apr. 13, 2018), and received additional evidentiary submissions, Dkt. 55, as well as proposed findings of fact and conclusions of law from plaintiffs, Dkt. 59-1. In the course of the hearing, the Court applied the Federal Rules of Evidence, but did so on the understanding that, first, it has "the authority—indeed, . . . the obligation—to 'adjust [evidentiary requirements] to . . . differing situations,'" *Han Kim*, 774 F.3d at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)) (modifications in *Han Kim*), and, second, that the Court need not "step into the shoes of the defaulting party and pursue every possible evidentiary challenge," *Owens*, 864 F.3d at 785. Recognizing that expert testimony is not only entirely proper, but often sufficient, *id.* at 788, and even indispensable in "terrorism cases . . . because firsthand evidence of terrorist activities is difficult, if not impossible to obtain," *id.* at 787, the Court also considered the extensive expert testimony the Plaintiffs presented. Whether through expert testimony or other competent evidence, the Court must ultimately determine whether the Plaintiffs have "substantiate[d] [the] essential element[s] of jurisdiction" with admissible evidence. *Id.* at 786.

The Court now makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

Plaintiffs' evidentiary presentation included testimony from thirteen witnesses (including experts) and dozens of exhibits (including several government reports). Along with other witnesses, the Court heard from Colonel William Rabena (ret.), the U.S. Army officer appointed to investigate the 2007 Karbala attack; General George Casey (ret.), the Commander of the

Multi-National Forces in Iraq at the time of the Karbala attack and of the abduction of Staff

Sergeant Al-Taie; Dr. Matthew Levitt, an expert on Hezbollah and Iran's support for terrorist

proxies, including AAH; Dr. Daveed Gartenstein-Ross, an expert on AAH and Iranian support

for terrorism in Iraq; Dr. Craig Mallak, a forensic pathologist who previously served as the U.S.

Armed Forces Medical Examiner; ███████████████████████████████

███████████████████████ ; [1] and representatives from each of the four families of

the murdered servicemembers.

Based on the testimony of these witnesses, and almost one hundred trial exhibits, the

Court finds as follows: First, Iran provided AAH with significant support—in the form of

training, supplies, intelligence, and funding—as part of its larger strategy to destabilize Iraq and

drive the United States from the Middle East using Iraqi Shia militias as proxies. Second, AAH

carried out the Karbala attack, took Fritz, Chism, and Falter hostage, and brutally beat and

---

[1] The Court has redacted references to one witness from the public version of this Memorandum
Opinion in order to protect the privacy and safety of that individual. While "[t]he right of public
access is a fundamental element of the rule of law, important to maintaining the integrity and
legitimacy of an independent judiciary," *Metlife, Inc. v. Fin. Stability Oversight Council*, 865
F.3d 661, 663 (D.C. Cir. 2017), the presumption of public disclosure of judicial proceedings may
give way under certain conditions. As the D.C. Circuit explained in *United States v. Hubbard*,
650 F.2d 293 (D.C. Cir. 1980), courts must weigh:

> (1) the need for public access to the documents at issue; (2) the extent of previous
> public access to the documents; (3) the fact that someone has objected to disclosure,
> and the identity of that person; (4) the strength of any property and privacy interests
> asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the
> purposes for which the documents were introduced during the judicial proceedings.

*E.E.O.C. v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996) (citing *Hubbard*, 650
F.2d at 317–22). Here, after considering the *Hubbard* factors—and, in particular, the limited
nature of the redactions and the witness's substantial privacy interests—the Court determined
that the redactions were appropriate.

murdered them. Third, AAH held Al-Taie hostage, brutally beat and murdered him. Finally, AAH could not have committed any of these acts without Iran's support.

**A. Iran's Provision of Support to Asaib Ahl al-Haq**

1. *Overview of Iran's Proxy Strategy*

Shortly after the Iranian Revolution in 1979, the Islamic Republic of Iran initiated a campaign to export the principles of the Iranian Revolution to areas with large communities of Shia Muslims by, among other things, using local groups as proxies.[2] Dkt. 52 at 192 (Levitt). The Islamic Revolutionary Guard Corps—or IRGC—played a critical role in this effort. *Id.* at 194 (Levitt). The IRGC is a military institution that operates separately from the ordinary Iranian military; instead of defending Iran's borders, the IRGC is "charged with preserving the ideals of the Islamic Republic," both in Iran and elsewhere. Ex. 66 at 25; *see* Dkt. 52 at 193–94 (Levitt).

A "special branch" of the IRGC known as the Quds Force is "tasked with extending" the IRGC's "mission beyond Iran's borders." Ex. 66 at 25; Dkt. 52 at 194 (Levitt). The commander of the Quds Force, General Qasem Soleimani, reports directly to Iran's Supreme Leader, Ali Khomeini. Ex. 66 at 25. Among other responsibilities, the Quds Force is charged with

---

[2] Many of the Court's findings in this section are derived from the testimony and expert reports of Dr. Matthew Levitt and Dr. Daveed Gartenstein-Ross. Having considered the requirements of Federal Rule of Evidence 702, the Court qualified Dr. Levitt as an expert on (1) Iran's relationship with Hezbollah and, in particular, Hezbollah terrorists in Iraq after 2003; and (2) Iran's relationship with and support for Iraqi Shia militias and, in particular, AAH after 2003, Hrg. Tr. (Apr. 11, 2018) at 190–91 (Levitt), and qualified Dr. Gartenstein-Ross as an expert on (1) violent non-state actors, including identifying and analyzing online content generated by violent non-state actors; (2) Iran's use of proxy organizations in Iraq from the 1990s to 2012; and (3) Iraqi Shia militias in general and AAH in particular. *See* Hrg. Tr. (Apr. 12, 2018) at 39 (Gartenstein-Ross). The Court also admitted Dr. Levitt's expert report, Ex. 65, and Dr. Gartenstein-Ross's expert report, Ex. 66, into evidence. *See* Hrg. Tr. (Apr. 12, 2018) at 7 (Levitt); *id.* at 40 (Gartenstein-Ross).

"cultivating and supporting pro-Iran proxies" in foreign countries and coordinating with these militant groups to conduct terrorist attacks. *Id.*; *see also* Dkt. 52 at 194 (Levitt). According to the U.S. Department of the Treasury, the Quds Force has supported militant groups including the Taliban, Hamas, and—most relevant here—the Lebanese Hezbollah ("Hezbollah") and Iraqi Shia militant groups. Ex. 67 at 2. By using these groups as proxies, Iran has sought to achieve its goals in other regions while simultaneously denying responsibility for the actions of its proxies. Ex. 65 at 19; Ex. 66 at 22, 26; Ex. 15 at 4.[3] The State Department has designated Iran

---

[3] Exhibits 3, 4, 5, 10, 12, 15, 16, 67, and 87(b)–(f) are "official U.S. Government reports, records, and statements." Dkt. 43 at 1 (O'Leary Decl. ¶ 1); Dkt. 55 at 1. Under the public records exception to the hearsay rule, Fed. R. Evid. 803(8), "a record or statement of a public office" is admissible if it contains "factual findings . . . from a legally authorized investigation." *See Owens v. Republic of Sudan*, 864 F.3d 751, 792 (D.C. Cir. 2017). Those requirements are satisfied here:

Exhibits 3, 4, 5, and 87(b)–(f) were released to Plaintiffs by the U.S. Army's Litigation Division pursuant to the legal process outlined in, *inter alia*, Army Regulation 15-6. Dkt. 43 at 2 (O'Leary Decl. ¶ 3); Dkt. 55 at 1; *see also, e.g.,* Ex. 4 at 1. Exhibit 4 is a U.S. Army Investigating Officer's Report about the Karbala Attack, and Exhibit 5 is a U.S. Army Criminal Investigation Command Report on the abduction and murder of Al-Taie. Dkt. 43 at 2 (O'Leary Decl. ¶¶ 5–6). Exhibit 3 is a U.S. Department of Defense Report concerning the detention of the Khazali brothers and Daqduq and Exhibits 87(b)–(f) are Tactical Interrogation Reports that reflect statements that Qais Khazali made to U.S. government interrogators. Dkt. 43 at 2 (O'Leary Decl. ¶ 4); Dkt. 55 at 2–3. Although Exhibits 3 and 87(b)–(f) contain nested hearsay, the Court admitted these reports under the exception to the rule against hearsay for statements against interest. Under that exception, courts may admit statements (1) that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was . . . contrary to the declarant's . . . interest," Fed. R. Evid. 804(b)(3), and (2) that were made by a declarant who is "absent from the trial" and whose "attendance or testimony" cannot be procured "by process or other reasonable means," Fed. R. Evid. 804(a)(5).

Exhibits 10, 12, 15, 16, and 67 were released to Plaintiffs and certified as public records by the U.S. Department of Defense. Dkt. 43 at 5 (O'Leary Decl. ¶ 13). Exhibit 10 is the U.S. State Department's 2007 Country Report on Terrorism; Exhibit 12 is the Congressional Report "Iraq: The Crocker-Petraeus Report"; Exhibit 15 is the transcript of General David Petraeus' Report to Congress on the Situation in Iraq; Exhibit 16 is the U.S. Department of the Treasury's Public Announcement of Terrorism Designation; and Exhibit 67 is the U.S. Department of the Treasury's Public Announcement designating Iranian entities and individuals that support terrorism. *Id.* at 5–9 (O'Leary Decl. ¶¶ 13–14, 16, 19–20, 26).

as a state sponsor of terrorism, *see* U.S. Dep't of State, *State Sponsors of Terrorism* (last visited August 2, 2018),[4] and the Treasury Department has designated the IRGC's Quds Force as an entity providing support for terrorism, Ex. 67 at 2.

In order to fully understand AAH's role in the Karbala attacks, it is necessary to understand Iran's prior conduct in supporting proxy organizations and the role those organizations played in AAH's development. Accordingly, the Court will outline how Iran turned Hezbollah into an Iranian proxy before describing the similar approach that Iran took with Iraqi Shia militias, including AAH.

   2.   *Hezbollah*

Hezbollah's development into an Iranian proxy in Lebanon is relevant to this case in two respects. First, it serves as an example of how Iran cultivates militant organizations in other countries and employs them as surrogates—a model that Iran then applied to Iraqi Shia militias. *See* Dkt. 52 at 216 (Levitt). Second, Hezbollah served as a liaison between Iran and AAH and helped Iran establish a proxy relationship with AAH. *See infra* Part II.A.3.b. Iran's relationship with Hezbollah, accordingly, is part of the story of AAH's emergence as an Iranian proxy.

Hezbollah was founded in the early 1980s as a loose network of Shia militias that sought to transform Lebanon into an Islamic republic. Ex. 65 at 6–8. Iran played a central role in Hezbollah's development and growth. *Id.* at 8. Notably, shortly after Israel invaded Lebanon in 1982, "approximately 1,500 [IRGC] advisors set up a base in [Lebanon] with the goal of exporting the Islamic revolution to the Arab world," and, according to Naim Qassem, Hezbollah's deputy Secretary General, the organization's "members were required to attend these camps and learn how to confront the enemy." *Id.* By 1985, Hezbollah's "ideological

---

[4]  Available at https://www.state.gov/j/ct/list/c14151.htm.

platform" identified "the Iranian regime as the vanguard and new nucleus of the leading Islamic

State in the world" and declared: "We abide by the orders of one single wise and just leadership,

represented by 'Waliyat el Faqih' [rule of jurisprudent] and personified by Khomeini." *Id.*

(alteration in original). In the expert opinion of Dr. Levitt, "Hezbollah has been Iran's proxy

ever since, and it is estimated that," today, "Iran provides Hezbollah with as much as $700

million–$1 billion per year" *id.*, in the form of cash, training, intelligence, and weapons, *see* Dkt.

52 at 204 (Levitt).[5]

Hezbollah envisions itself as "the sharp end of the spear[,] going where Iran tells it to go

in defense of. . . . Shia [Muslims] around the world." Dkt. 52 at 202 (Levitt). Of particular

relevance here, Hezbollah has committed numerous terrorist attacks on Americans at the behest

of Iran. *Id.* at 208–09. As Dr. Levitt explained at trial:

> Starting in the early 1980s, even before Hezbollah officially announced itself in
> 1985, Hezbollah at Iran's behest carried out attacks on the U.S. Embassy in 1983
> in Beirut; the U.S. Marine barracks and French and Italian forces later in 1983[;]
> [a]nd then the U.S. Embassy annex in Beirut in 1984. . . .
>
> Later, at Iran's behest, Lebanese Hezbollah together with Iraqi Shia militants . . .
> carried out a series of attacks targeting U.S. and other western interests, including
> the U.S. Embassy, in Kuwait in 1983, '84[,] and '85. . . .
>
> In 1992, Iran and Hezbollah partnered in a very, very detailed, intricate way[,] using
> Iranian diplomats[,] . . . diplomatic institutions[,] . . . ministries[,] and front
> companies and Hezbollah operatives to blow up the Israeli embassy in Buenos
> Aires in 1994. And just a few weeks before that, they nearly blew up the Israeli
> embassy in Bangkok, Thailand.

---

[5] To the extent these dollar figures "recite potentially inadmissible facts," Dr. Levitt's expert
opinion that Hezbollah has been "Iran's proxy" for the last two-and-half decades is certainly
admissible, and the dollar figures appropriately "disclose" a portion of "the factual basis for" that
opinion. *Owens*, 864 F.3d at 790. The same is true with respect to various other "potentially
inadmissible facts" referenced in Plaintiffs' expert reports. *Id.*

*Id.* at 208–10. Iran and Hezbollah thus have a "deep relationship that involves not just shared interests, but [a] shared ideology and shared goals." *Id.* at 202. Hezbollah "sees itself as an important and capable tool available to Iran to not only export the revolution, but to do what Iran asks of it because," as a matter of the organization's core ideology, "the [S]upreme [L]eader of Iran is the leader of the Shia on planet earth." *Id.*

Consistent with numerous other decisions from this Court, the Court, accordingly, finds that Hezbollah is an Iranian proxy. *See Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*, No. 16-1436, 2018 WL 2023498, at *2 (D.D.C. May 1, 2018); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 53 (D.D.C. 2003); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 292 (D.D.C. 2003).

      3.   *Asaib Ahl al-Haq*

      a.   <u>Origins</u>

Following the U.S. invasion of Iraq in 2003, Iran pursued "a Lebanonization strategy" in Iraq to "co-opt elements of the local Shia community and use them as . . . instruments of Iranian force." Ex. 65 at 18–19 (quoting Ryan Crocker, the U.S. Ambassador to Iraq in 2008 and former U.S. Ambassador to Lebanon); *see also* Ex. 1 at 3–4 (press briefing by Brigadier General Kevin Bergner, the spokesperson for coalition forces in Iraq, on July 2, 2007).[6] Iran had several goals.

---

[6] Under the public records exception to the hearsay rule, "a record or statement of a public office" is admissible if it contains "factual findings . . . from a legally authorized investigation" and does not "indicate a lack of trustworthiness." Fed. R. Evid. 803(8); *see also Owens v. Republic of Sudan*, 864 F.3d 751, 792 (D.C. Cir. 2017). This press briefing, entitled "Security Operations in Iraq," describes "coalition and Iraqi operations against the[] special groups, their support from Iranian Q[u]ds Force operatives, and the involvement of other extremist organizations," Ex. 1 at 1, and includes the conclusions drawn by coalition forces after investigating the Karbala attack and interrogating several high level AAH operatives. "Pursuant to the 'broad approach to admissibility' under Rule 803(8), a court may also admit 'conclusion[s] or opinion[s]' contained within a public record" and "[o]nce proffered, a public record is presumptively admissible, and the opponent bears the burden of showing it is unreliable."

Most significantly, it sought to transform Iraq into a "weakened, decentralized, and Shi[]a-dominated" state that would be "incapable of posing a threat to Iran." Ex. 65 at 18 (quoting Lowell Jacoby, the director of the Defense Intelligence Agency in 2005). In addition, Iran sought "to push the United States out of the Gulf region," including out of Iraq. *Id.* "If the United States were humiliated in Iraq and forced out of the region in disgrace, the thinking went, the Americans would be deterred from pursuing similar military interventions in the [Gulf] region in the future." *Id.*; *see also* Ex. 66 at 22–23. But, while seeking "to bloody coalition forces in Iraq," Iran was "[c]areful not to provoke a direct confrontation with U.S. and coalition forces" and thus "trained[] and funded a variety of [Shia] militias and insurgent groups in an effort to bog down coalition forces in an asymmetric war of attrition." Ex. 65 at 18.

One Iraqi Shia group, Jaysh al-Mahdi ("JAM"), was an early beneficiary of Iranian support. Ex. 66 at 11. Formed by Muqtada al-Sadr in 2003, JAM served as the military wing of the Sadrist movement. *Id.* at 16. By 2004, JAM began to fracture, and a number of "splinter groups"—"a somewhat amorphous conglomeration of Iranian-backed Shia militias" known as the Special Groups—emerged. *Id.* at 11. These Special Groups functioned independently from JAM. *Id.* at 17; *see* Ex. 87b at 4 (interrogation report for Qais Khazali) ("[I]t was . . . decided that the Special Groups were necessary, but must be kept separate from [Muqtada al-Sadr], and the legitimate JAM."); Ex. 1 at 8 (explaining that the Special Groups "may have . . . been

---

*Owens*, 864 F.3d at 792 (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)). As the press statement contains the results of a lawful investigation undertaken by the U.S. military and bears no indicia of unreliability, the Court accordingly admits it into evidence under Fed. R. Evid. 803(8).

affiliated with [JAM] at one point" but that they had "broken away from [JAM]" and were "operating outside [al-Sadr's] control"). Like JAM, they were "funded, trained and armed by" IRGC "Q[u]ds Force operatives." Ex. 1 at 1. The Special Groups "plan[ned] and execut[ed] . . . bombings, kidnappings, extortion, sectarian murders, illegal arms trafficking[,] and other attacks" against Iraqi civilians, Iraqi forces, and coalition forces. *Id.* at 2. Many of the Special Groups eventually came to recognize the authority of Qais Khazali, a former leader of the Sadrist movement and an ally-turned-rival of Muqtada al-Sadr. Ex. 66 at 17–18; *see* Dkt. 52 at 18–19 (Casey). Under Qais Khazali's leadership, these groups became known as Asaib Ahl al-Haq, or "AAH." Ex. 66 at 11.

Iran played a central role in Qais Khazali's ascent and AAH's formation. The Supreme Leader of Iran, Ali Khomeini, "met with [Qais Khazali in Iran] and recruited him to lead [AAH]," which was to "operate without the knowledge or authorization of [Muqtada al-Sadr]." Ex. 3 at 4 (declassified Department of Defense memorandum); *see also* Ex. 66 at 20 (relying on same). Iran viewed Qais Khazali's AAH as a complement to Muqtada al-Sadr's JAM, Ex. 66 at 25, and thus "leapt at the opportunity to diversify its investment in Iraqi militant groups," *id.* at 35. Iran began to support AAH, along with JAM, in 2004. *Id.* at 25. By June 2006, Qais Khazali "was in charge of [S]pecial [G]roups throughout Iraq." Ex. 1 at 3; *see* Ex. 87b at 4 (March 2007 report stating that "[Qais Khazali] has been the sole authorizing authority for operations performed by the 'Special Groups' in Iraq for the past nine months."). As the "primary leader" of the Special Groups, Qais Khazali "had significant links to Iran." Ex. 3 at 4. He was familiar with "Iranian surrogate networks operating in Iraq" and their leadership structures and with "the facilitation and movement of personnel and equipment across the Iran-

Iraq border." *Id.* at 2. He also met with Quds Force officers "on multiple occasions." *Id.* Qais Khazali's brother, Laith Khazali, "effectively" served as "his deputy." Dkt. 52 at 222 (Levitt).

     b.   <u>Iran's Provision of Funding, Weapons, and Training</u>

Iran, through the Quds Force, sought "[to] turn . . . Shia militia extremists into a Hezbollah-like force to serve its interests and fight a proxy war against the Iraqi state and coalition forces in Iraq." Ex. 12 at 19 (2007 statement of General David Petraeus, Commander of Multi-National Force–Iraq); *see also* Ex. 2 at 8 (slides accompanying Brigadier General Kevin Bergner's July 2, 2007 press briefing); Ex. 66 at 33. This effort to use proxies in Iraq was part of a "deliberate policy to inflict casualties on U.S. forces" that was "approved by the [S]upreme [L]eader" of Iran and was "executed very covertly . . . by the Q[u]ds [F]orce." Dkt. 52 at 14 (Casey). Iranian support—in the form of funding, weapons, and training—was critical to the success of the Special Groups, which otherwise "would [have been] unable to conduct their terrorist attacks in Iraq." Ex. 1 at 3; *see also* Ex. 14 at 8 (press conference given by General David Petraeus, Commander, Multinational Force–Iraq, and Ryan Crocker, U.S. Ambassador to Iraq on September 12, 2007). With respect to AAH in particular, the Court credits Dr. Gartenstein-Ross's expert opinion that "Iran provided significant material support to AAH throughout [the relevant period which] made it much more capable of carrying out" attacks on U.S. service-members, and which "bolstered its overall prominence within the [Shia] insurgency." Dkt. 53 at 41 (Gartenstein-Ross). As Dr. Gartenstein-Ross further explained, Qais Khazali "had independent support from Iran" and, "by around 2006, . . . AAH was clearly the most powerful of what was called the Special Groups." *Id.* at 55.

The Special Groups were "funded, trained, armed, and directed by Iran's Q[u]ds Force, with help from Lebanese Hezbollah." Ex. 15 at 4 (General David Petraeus, Commander, Multi-

National Force–Iraq, Report to Congress on the Situation in Iraq, Apr. 8–9, 2008). The U.S.

Department of Defense estimated that, in addition to training, the Quds Force supplied the

Special Groups with arms and funding valued at between $750,000 and $3 million a month. Ex.

1 at 3; *see also* Dkt. 52 at 226 (Levitt) (same); Ex. 87c at 3 ("[T]he funding for the Special

Groups comes from . . . the [IRGC]."). In the words of Dr. Levitt, although far less than the

funding Iran provided to Hezbollah, the funds provided to AAH were devoted "to carry[ing] out

operations," and "three-quarter[s] of a million dollars to $3,000,000 a month . . . can buy a lot of

damage." Dkt. 52 at 226 (Levitt).

     The Quds Force, in particular, provided "Iraqi militants with Iranian-produced advanced

rockets, sniper rifles, automatic weapons, [and] mortars[,] [which] have killed thousands of

[c]oalition and Iraqi [f]orces," as well as "explosively formed projectiles (EFPs) that have a

higher lethality rate than other types of improvised explosive devices (IEDs) . . . and are

specially designed to defeat armored vehicles used by [c]oalition [f]orces." Ex. 10 at 2 (U.S.

State Department's 2007 Country Report on Terrorism); *see also* Ex. 14 at 8 (General Petraeus,

Commander of Multinational Force–Iraq, explaining that it was "very, very clear" that Iran had

provided Shia militias with EFPs and rockets); Dkt. 52 at 16 (Casey) (describing evidence that

Iran supplied Iraqi militias with EFPs). Iran smuggled the weapons into Iraq using supply routes

called "ratlines," Dkt. 53 at 139–40 (Gartenstein-Ross), primarily for use by AAH, Dkt. 52 at

213 (Levitt); *see also id.* at 24 (Casey) (describing the locations of "supply network lines"). On

the Iraqi side, both Qais and Laith Khazali were involved in smuggling arms and artillery from

Iran into Iraq. Ex. 3 at 5. Laith Khazali, for example, "was instrumental in acquiring surface-to-

air missiles (SAMs), RPGs, bazookas and stella missiles for [S]pecial [G]roups." *Id.* at 4.

In addition to providing financial support and weapons, Iran (directly and indirectly) provided training for Iraqi militants affiliated with AAH. At the behest of Iran, Hezbollah created a unit "whose sole purpose was to train Iraqi Shia militants," including AAH, to carry out attacks in Iraq directed at U.S. troops and others. Dkt. 52 at 217, 223 (Levitt); *see also* Ex. 16 at 1. Of particular relevance here, in 2005 or 2006, Hezbollah ordered Ali Musa Daqduq, a senior Hezbollah commander, to work with the Quds Force to "provide training and equipment" to the Special Groups, Dkt. 52 at 223 (Levitt); *see also* Ex. 1 at 2, and to "organize the [S]pecial [G]roups in ways that mirrored how Hezbollah was organized in Lebanon," Ex. 1 at 3. Daqduq, accordingly, traveled to Iraq, "met with the commander and the deputy commander of the . . . Q[u]ds Force special external operations," and "was directed by [the] Q[u]ds Force to make trips in and out of Iraq and [to] report on the training and operations of the Iraqi [S]pecial [G]roups." *Id.* at 2. Daqduq ultimately made four such trips to "monitor[] and report[] on the training and arming of [S]pecial [G]roups in mortars and rockets, manufacturing and employment of [IEDs], and kidnapping operations." *Id.*

With Hezbollah's assistance, Iran provided "training at every level of the militant organizations that received assistance, from foot soldier to leadership." Ex. 66 at 27; *see also* Ex. 12 at 25 (2007 statement of General David Petraeus, Commander of Multi-National Force–Iraq) (discussing the Hezbollah unit "created to support the training, arming, funding, and, in some cases, direction of the militia extremists by the Iranian Republican Guard Corps' Quds Force"). The leaders of Shia militias, for example, received "administrative, logistics, financial, religious[,] and small unit tactics leadership training." Ex. 3 at 10 (interrogation report of Daqduq). AAH members were also given training in engineering, artillery, intelligence, infantry, and kidnapping. Ex. 26 at 5–6. Much of the training occurred at camps in Iran. *See* Ex. 10 at 2;

Ex. 66 at 27; Dkt. 52 at 14 (Casey) ("[W]e had significant evidence through signals intelligence and human intelligence that Iran was operating training bases for Iraqi militia[s] in Iran."). The Quds Force would train "approximately 20 to 60 Iraqis at a time" in Iran and then send them back to Iraq. Ex. 1 at 3; *see* Ex. 26 at 5. These individuals, in turn, "passed on this training to additional militants inside Iraq," as part of "a 'train-the-trainer' program." Ex. 10 at 2. The Quds Force and Hezbollah also provided training inside Iraq. *Id.*

Hezbollah played a critical role in Iran's efforts to train Iraqi Shia militants. The Hezbollah trainers (like their Iraq trainees) spoke Arabic (unlike their Quds Force liaisons who spoke Farsi). Ex. 65 at 24. Some Iraqi militants, moreover, perceived a "lack of respect" on the part of Iranians. Ex. 66 at 26. Hezbollah trainers thus helped overcome the language barrier and bridge the "cultural divide between Persian Iran and Arab Iraq." *Id.*; *see* Ex. 26 at 7 ("The [Quds Force] needed [Hezbollah's] help . . . because Iranians are not accepted in Iraq whereas the Lebanese would be.").

These training programs played a significant role in the success of AAH and other Special Groups. Without that Iranian-backed training, the Special Groups would have been "nowhere" near as effective as they were. Dkt. 52 at 18 (Casey).

**B.      The January 20, 2017 Attack in Karbala**

The assistance that Iran provided to AAH included help in planning and executing an assault on the Provincial Joint Coordination Center ("PJCC") in Karbala, Iraq. In the course of that assault, Fritz, Chism, and Falter were abducted, and they were later brutally beaten and murdered by the assault team. AAH could not have carried out those acts of terrorism without Iran's support.

1.    *The Assault on the Karbala Provincial Joint Coordination Center*

    a.    Background

A U.S.-led coalition invaded Iraq in 2003. From July 2004 to February 2007, General George Casey served as the Commander of the Multi-National Force in Iraq. *See* Dkt. 52 at 7–8 (Casey). By the time General Casey arrived, the mission had evolved, and, with his input, the Multi-National Force directed its efforts to helping Iraq build a representative government "with security forces that [could] maintain domestic order and keep the terrorists out." *Id.* at 8. "[A]s the Iraqi security forces grew over time," a need emerged "to coordinate the security actions between" the Multi-National Force, "the Iraqi military[,] and the Iraqi police forces at the provincial level." *Id.* at 9. The Multi-National Force, accordingly, put a program "in place in 2006" that "would transfer security control of the province" to Iraqi military and police forces "when the Iraqis were ready." *Id.* To do so, a provincial governor would need to demonstrate an ability to coordinate the actions of the Iraqi military, Iraqi police, and coalition forces. *Id.* In each province, this coordinating activity was run out of Iraqi government facilities known as Provincial Joint Coordination Centers or "PJCCs." *Id.; see* Dkt. 51 at 56–57 (Rabena). In addition to serving as a base for transition efforts, these compounds also operated as the offices for local government. Dkt. 54 at 106 (Alkire). The PJCCs hosted meetings between local elected officials or religious leaders and the Iraqi police, Iraqi security forces, and coalition forces. *Id.*

The PJCC in Karbala, Iraq consisted of a main building attached to the Iraqi governor's building. Ex. 23. The main building faced an outdoor courtyard and, beyond the courtyard, a parking lot. *Id.* U.S. soldiers assisting the provincial government during the transition lived at the PJCC. Ex. 4 at 9. Their barracks were located to the side of the courtyard and the main

building. Ex. 23. These U.S. soldiers "often lived at the compound for up to a week at a time," Ex. 4 at 9, and, when there, worked "side by side, shoulder by shoulder" with Iraqi police and security forces to facilitate the transition, Dkt. 51 at 57 (Rabena). On average, thirty-seven to forty U.S. troops were positioned at the Karbala PJCC at any given time. *Id.* (Rabena). Because the PJCC was an Iraqi government facility, Iraqi police bore principal responsibility for the security. *Id.* at 58 (Rabena). Iraqi police staffed gates—or security checkpoints—at various locations in and around the facility. *Id.* at 65, 69–71 (Rabena); Ex. 23. American forces assisted with security, Dkt. 54 at 106–07 (Alkire), and, among other things, operated Humvees positioned around the main building, including in the courtyard and in the parking lot, *see* Ex. 23.

On January 20, 2007, the U.S. forces at the Karbala PJCC included the 1st Platoon, A Battery, 2d Battalion, 377th Parachute Field Artillery Regiment. Ex. 4 at 9. At that time, the platoon's mission was to help the provincial government plan security for an upcoming religious event that was expected to draw more than ten million pilgrims. *Id.* The 1st Platoon was led by First Lieutenant Jacob Fritz and included, among others, Specialist Johnathan Bryan Chism and Private First Class Shawn Falter. *Id.* at 7. As platoon leader, Fritz was responsible for interacting with elected and religious officials who "would come to the PJCC to speak with the governing body of the PJCC." Dkt. 54 at 106 (Alkire). He lived and worked out of a small, courtyard-facing room at the front of the main building along with Captain Brian Freeman.[7] Dkt. 51 at 66, 75 (Rabena); Dkt. 52 at 68 (Rabena); Ex. 23. Chism and Falter, meanwhile, worked rotating guard shifts, helping the Iraqi police secure the PJCC. Dkt. 51 at 69, 74 (Rabena); Ex. 23; Dkt. 54 at 107 (Alkire).

---

[7] Captain Freeman is not a plaintiff in this case, so the Court will only discuss the events involving him to the extent they relate to the claims of Fritz, Chism, and Falter.

### b.    The Attack

The Karbala attack was carried out by a team of AAH militants.  In brief, a small assault force bypassed the security checkpoints, infiltrated the PJCC, and captured Fritz, Chism, Falter, and Freeman.  The four soldiers were abducted, handcuffed, and driven away from the PJCC by a team of the militants.  Other militants aided in the abduction by securing the PJCC checkpoints, subduing the Iraqi police, and firing on the PJCC building to create the false impression that the compound was under a small arms attack, thereby diverting attention from the abduction.  Dkt. 52 at 41 (Rabena).  When the abduction team was unable to clear a security checkpoint about twenty-five miles east of Karbala, the militants murdered their hostages.  Ex. 4 at 8; Dkt. 52 at 80–96 (Rabena).  From start to finish, the assault on the PJCC took no more than fifteen minutes.  Ex. 4 at 11–13; Dkt. 52 at 63 (Rabena).  It was "well-coordinated and synchronized," Ex. 4 at 11, exceedingly "complex," *id.* at 20, and—of particular importance to this case—"well beyond the" range of "local insurgent or militia capabilities," *id.* at 11.

The assault on the PJCC began around 6 p.m. on January 20, 2007.  Ex. 4 at 10. Approximately seven vehicles approached from the south, driving up to the first of two gated checkpoints.  Dkt. 51 at 59–60 (Rabena); Ex. 4 at 7; *see* Ex. 23.  They gave "the impression [that] they were . . . a convoy that was coming from the [U.S.] embassy."  Dkt. 51 at 60 (Rabena).  The attackers had outfitted themselves and their vehicles (predominantly black Chevrolet Suburban SUVs) to appear as though they were American soldiers or security contractors: the SUVs were rigged with false antennae on their front bumpers and carried placards directing others to stay back a hundred meters, and the attackers spoke English, wore U.S. Army Combat Uniforms, and had helmets and weapons resembling those of U.S. soldiers.

Ex. 4 at 7; Dkt. 51 at 60–61, 79–80 (Rabena). Most of the vehicles then continued on to a second security gate, located due north of the first checkpoint. Ex. 4 at 11; Ex. 23.

At both gates, the attackers pretended that they were Americans, and then "bullied their way past" the checkpoints by demanding—in English—that the Iraqi police turn over their weapons. Dkt. 51 at 61 (Rabena); Ex. 4 at 10–11. One vehicle stayed behind at each gate. Dkt. 51 at 78 (Rabena). The passengers got out, one militant held the Iraqi police at gunpoint at each checkpoint, and the remaining occupants fanned out to take positions from which they could fire on the PJCC building once the assault began. Dkt. 51 at 62, 78–79 (Rabena); Dkt. 52 at 41, 45 (Rabena); Ex. 4 at 11. A third vehicle positioned itself between the two checkpoints. Ex. 4 at 11; Dkt. 51 at 78 (Rabena). The remaining SUVs continued north toward the PJCC's main building and entered the parking lot. Dkt. 51 at 79, 83 (Rabena); Ex. 4 at 11. An unknown number of militants disembarked and immediately subdued the Iraqi police stationed around the gated entrance to the courtyard. Dkt. 52 at 41 (Rabena); Ex. 4 at Tab M.

Five of the militants then crossed through the gated entrance into the courtyard and approached the front door of the PJCC main building. Ex. 4 at 11. At this time, Freeman and Fritz were in their room at the front of the building, *see id.* at 10, while Chism and Falter occupied an armored Humvee in the courtyard next to the building's entrance, *id.* at 11; *see* Ex. 23 (showing the position of American forces during the attack); *see also* Dkt. 51 at 73–74 (Rabena). Chism manned the machine gun mounted on top of the turret; Falter was in the driver's seat. Dkt. 51 at 73 (Rabena); Dkt. 52 at 47–48 (Rabena). The five insurgents, who wore the uniforms of American troops and spoke English, greeted Chism and Falter and walked toward the PJCC as though they were arriving for a meeting. Ex. 4 at 11; Dkt. 52 at 47–48 (Rabena). Falter exited the Humvee and started to approach the SUVs, presumably to determine

the reason for their arrival. *Id.* About five seconds later, three more militants entered the courtyard, greeted Chism and Falter, and followed the initial group of five to the front entrance of the PJCC. Ex. 4 at 11; Dkt. 52 at 48–49 (Rabena). Like the others, these militants were dressed in American uniforms and greeted Chism and Falter in English. Dkt. 52 at 49 (Rabena).

Each of the last three insurgents to enter the courtyard had specific tactical roles, and they executed their assignments more or less simultaneously. The last of the three walked past Falter, turned around, and shot him in the neck from behind. *Id.* (Rabena); Ex. 4 at 11. The second climbed on the back of the Humvee and shot Chism, who was facing the courtyard gate and "had no chance to react." Ex. 4 at 11; *see also* Dkt. 52 at 50 (Rabena). Despite the seriousness of their injuries, neither Chism nor Falter was killed by these gunshots. Dkt. 52 at 49–51 (Rabena). The third insurgent made his way to the front entrance of the main building and subdued the two Iraqi police officers there and took their weapons. *Id.* at 51 (Rabena); Ex. 4 at 11.

Seconds after the sound of gunfire in the courtyard, "a well-coordinated and synchronized attack occurred in the building, in the back, and against the barracks area." Ex. 4 at 11. The militants who were staged outside the building began to fire at the building, which had the effect of diverting the U.S. military personnel in the barracks areas and on the second floor of the PJCC to the roof of the building, where they responded to what they believed to be a small arms assault on the complex. Dkt. 52 at 51–55 (Rabena). At the same time, other militants launched an attack on the PJCC command and control room, which was located next to the room where Fritz and Freeman were working. *Id.* at 53 (Rabena); Ex. 4 at 12. According to Colonel William Rabena, the U.S. Army Officer appointed to investigate the attack, this focus of the attack was consistent with a plan to abduct Fritz and Freeman; the attackers "knew that" the occupants of the command and control room posed the most substantial threat to their mission,

and they therefore confronted that threat before turning their attention to the abduction of Fritz and Freeman. Dkt. 52 at 53 (Rabena); Ex. 4 at 12.

The command and control room held five U.S. soldiers—the only soldiers other than Fritz and Freeman located on the first floor of the main PJCC building—as well as radios for communicating between the PJCC and coalition forces. Dkt. 51 at 75 (Rabena); Ex. 23. By attacking that room, the militants were able to aid their exfiltration by delaying communications regarding the attack, and they were able to subdue "the closest support that could interfere with the abduction." Dkt. 52 at 54 (Rabena). The fact that the attackers "knew exactly where they were going" evidences that they had inside information and that the attack was a highly sophisticated one. *Id.* at 55 (Rabena); *see also* Ex. 4 at 12. The U.S. soldiers working in the command and control room were able to prevent the attackers from fully opening the door, but the militants were able to direct gunfire and a grenade into the room. Ex. 4 at 12; Dkt. 52 at 56–57 (Rabena). Three of these five soldiers were injured, and one, Private First Class Millican, was killed. Dkt. 52 at 55–56 (Rabena). PFC Millican thwarted the militants' effort to take the command and control room when he threw himself on the grenade.[8] *Id.* at 57 (Rabena); Ex. 4 at 17.

As the soldiers in the command and control room continued to fight back, they heard gunshots and explosions elsewhere. They heard shots in the hallway and heard a grenade explode in Fritz and Freeman's room next door. Ex. 4 at 12–13; Dkt. 52 at 57 (Rabena). The militants then took Fritz and Freeman from the officer's room and led them out of the building.

---

[8] PFC Millican was actually killed by gunfire and not the grenade, which was a "concussion"— as opposed to a "high explosive"—grenade. Ex 4 at 12; Hrg. Tr. (Apr. 11, 2018) at 56–57 (Rabena). Because PFC Millican's "actions absorbed the greater part of the blast," his bravery allowed the other soldiers in the room "to continue to resist." Ex. 4 at 12.

Dkt. 52 at 58–59 (Rabena). While exiting the PJCC, the militants threw a high explosive grenade into the hallway near the two rooms. Ex. 4 at 13; Dkt. 52 at 57 (Rabena). That grenade blast, along with increased gunfire, prevented the soldiers in the command and control room from leaving the room. Ex. 4 at 13. Both Fritz and Freeman were alive at this time, although it appears that Fritz was injured and bleeding. *Id.* Significantly, the militants did not attack the soldiers on the second floor of the PJCC, providing further evidence that their mission was to abduct the U.S. soldiers. Dkt. 52 at 59–60 (Rabena). Upon returning to the courtyard, the militants destroyed the Humvee that Chism and Falter had manned, as a well as an unmanned second Humvee, Ex. 4 at 13, and they used "smoke grenades" to obscure their exfiltration. Dkt. 52 at 61–62 (Rabena). They then handcuffed Freeman and Chism and put them in one SUV and handcuffed Fritz and Falter together and put them in a second SUV. *Id.* at 62 (Rabena). Up to this point, the entire attack took only about ten to fifteen minutes. *Id.* at 63 (Rabena).

The attackers fled, and a chase ensued. Hrg. Tr. (Apr 11, 2018) at 64, 73–74. The militants drove toward the city of Hillah in the general direction of Iran. Ex. 25; Dkt. 52 at 70–74 (Rabena). But instead of taking the road that directly connected Karbala with Hillah, they took a long detour through Musayib. Dkt. 52 at 74 (Rabena); *see* Ex. 75 at 2. Their route tracked a well-known "ratline," a path along which Iran smuggled weapons and ammunition into Iraq. Dkt. 52 at 74 (Rabena). Iraqis who were sympathetic to Iran controlled the checkpoints along the ratline and facilitated the passage of smuggled goods. *Id.* at 75–77 (Rabena). No one outside the area "would have known to take those roads unless they were being helped" by the IRGC. *Id.* at 76 (Rabena).

Ultimately, however, this escape route failed. Members of the Iraqi Army stationed at a checkpoint in the town of Mahawil received word that an attack had occurred in Karbala and that

they should stop a "fast moving small convoy of SUVs." *Id.* at 77–78 (Rabena); Ex. 4 at 8–9. Earlier that day, three men had approached the Iraqi Army soldiers stationed at the checkpoint and told them that a convoy would be coming through and that they needed to let the convoy proceed. Dkt. 52 at 78 (Rabena). In doing so, they provoked suspicion, asserting at times that those in the convoy were Americans, and at other times saying that they were Israelis. *Id.* (Rabena). Later, the three men came back to make sure that the Iraqi soldiers would facilitate the passage of the convoy, and, as the convoy approached, they "yelled out to the guards, 'Don't shoot them. Don't shoot them. This is what we talked about.'" *Id.* (Rabena). The Iraqi soldiers figured out what was happening and, accordingly, detained the three men and pursued the convoy. *Id.* (Rabena). It was later determined that one of the three men was a high ranking official from a Shia-affiliated militia. *Id.* at 77, 79–80 (Rabena).

With the guard posts now "really on alert" the militants knew "that someone [wa]s following them." Dkt. 52 at 79 (Rabena). As a result, they "took a back road, changed out of" the U.S. Army Combat Uniforms that they wore, "abandoned most of [their] equipment," and shot Fritz, Chism, Falter, and Freeman. Ex. 4 at 8; Dkt. 52 at 80–96 ("[The attackers] had to execute [the soldiers] because they couldn't go any further."). By the time the Iraqi Army arrived, only Freeman was still alive, and he died a short time later. Dkt. 52 at 83, 85 (Rabena).

 2. *The Direct Victims*

Fritz, Chism, and Falter each sustained numerous gunshot wounds and blunt force injuries. Based on the "signs of vital reaction" to these wounds, the Court finds that the injuries were inflicted while the soldiers were still alive. Dkt. 54 at 44–45 (Mallak). In addition, the Court finds that each soldier was deliberately killed—or, to put it more precisely, executed—by the attackers. This finding is based on the location and nature of the soldiers' wounds as well as

the fact that all four of the victims were handcuffed. *Id.* at 33–34 (Mallak). The Court also finds

that Fritz, Chism, and Falter were abducted so that they could be traded for militants held captive

by coalition forces. Finally, the Court finds that the militants inflicted severe pain on their

captives, likely for the purpose of punishing the U.S. military for its presence in Iraq or in order

to deter that presence.

The Armed Forces Medical Examiner concluded that First Lieutenant Fritz died from

multiple gunshot wounds and that the manner of death was homicide. Ex. 6 at 1.[9] Fritz was shot

four times in the chest and once in the right shoulder. Dkt. 53 at 207–08 (Mallak). He also

suffered blunt force injuries on his face and head that are consistent with being beaten and

kicked. *Id.* at 202–04 (Mallak). The evidence demonstrates, moreover, that Fritz was alive at

the time he was taken from the PJCC and at the time his injuries were inflicted. Among other

things, he wrote his name in blood with his finger on the back of one of the SUVs, Dkt. 52 at 84

(Rabena); his captors handcuffed him, *id.* at 62; and his autopsy showed that he was alive for a

sufficient period of time to permit severe bruises to develop, Dkt. 53 at 203–10 (Mallak). In the

expert opinion of Dr. Craig Mallak, which the Court credits, Fritz's attackers inflicted "many"

wounds on him "prior to the fatal wound," *id.* at 209 (Mallak), and these wounds would have

---

[9] The Court admitted Exhibits 6, 7, 8, 9, 37, and 53 under the business records exception to the hearsay rule. *See* Fed. R. Evid. 803(6). Exhibits 6, 7, 8, and 9 are the Armed Forces Medical Examiner's Report for the decedents made pursuant to 10 U.S.C. § 1471. Dr. Mallak confirmed that all reports were signed by "subordinates [he] assigned to conduct the autopsies" and were created as part of "standard procedure." Hrg Tr. (Apr. 12, 2018) at 188–89 (Mallak). Exhibit 37 is the U.S. Central Command Case Summary for Al-Taie, and Exhibit 53 is U.S. Central Command background information for Al-Taie and Qais al Khazali. Dkt. 43 at 4–5 (O'Leary Decl. ¶¶ 11–12). Both were released to Plaintiffs by the U.S. Department of Defense's Central Command and "(1) were made at or near the time of the occurrence of the matters set forth [therein]; (2) were kept in the course of regularly conducted activity of U.S. Central Command or [the] United States Government; and (3) [made] such records []as a regular practice of that regularly conducted activity." Dkt. 43-6 at 2 (Custodian of Records Decl.).

caused Fritz to suffer severe pain, *id.* at 195–209 (Mallak).[10] The Court also credits Dr. Mallak's

expert opinion that "the location of [Fritz's mortal] wounds, the manner of the wounds, [and] the

restraints placed on" Fritz, show that he was executed. Dkt. 54 at 33–34 (Mallak). The evidence

shows, for example, that the militants moved a Kevlar plate from Fritz's body armor in order to

inflict a mortal wound. Dkt. 53 at 211–12 (Mallak).

The Armed Forces Medical Examiner concluded that Chism also died from multiple

gunshot wounds and that the manner of his death was homicide. Ex. 7 at 2. Chism sustained

gunshot wounds to his torso, hand, and both legs. Ex. 7 at 3–4; Dkt. 53 at 218–21 (Mallak). The

fatal gunshot punctured one of his lungs. Dkt. 53 at 216–17 (Mallak). Both of the gunshot

wounds to Chism's upper body avoided his body armor, indicating that they were deliberately

inflicted by someone in close proximity who had control over Chism's movements. *Id.* at 225–

27 (Mallak). Chism also had numerous contusions on his face, head, and body that, like Fritz,

were consistent with being beaten and kicked. *Id.* at 221, 224 (Mallak). At least one of these

blows was severe enough to cause bleeding in the back of his skull, the middle ear, and in the

spinal cord. *Id.* at 223–24, 230 (Mallak). All of these injuries, moreover, occurred while Chism

was alive and likely conscious, and, according to Dr. Mallak, they caused Chism to experience

severe pain. *Id.* at 224–29; Dkt. 54 at 20–22 (Mallak). The location and nature of Chism's

wounds and the use of handcuffs indicate that he was executed. Dkt. 54 at 33–34 (Mallak).

According to the autopsy report, Falter also died from multiple gunshot wounds and his

manner of death was homicide. Ex. 8 at 1. Falter was shot in the neck during the attack on the

PJCC, and, although that injury was "a very, very serious" one "that most people probably would

---

[10] At the hearing, the Court concluded that Dr. Mallak was qualified under Federal Rule of
Evidence 702 to testify as an expert in the field of forensic pathology. Hrg. Tr. (Apr. 12, 2018)
at 187.

die [from] very quickly," Ex. 8 at 2; Dkt. 54 at 27–28 (Mallak), there is evidence that Falter was alive at the time of his abduction. Dkt. 54 at 26 (Mallak). After his abduction, he was shot "execution style" from several inches away. Dkt. 52 at 86 (Rabena); Dkt. 54 at 27 (Mallak). In addition, Falter had a "series of abrasions and contusions and hemorrhag[ing]" around his face and head, torso, and extremities, including a blunt force trauma to the head. Dkt. 54 at 28–29 (Mallak); Ex. 8 at 3. He was alive when these injuries were inflicted and, according to Dr. Mallak, would have suffered severe pain prior to and during his death. Dkt. 54 at 30–31; Ex. 8 at 2.

The Court, accordingly, finds that Fritz, Chism, and Falter were each shot, beaten, and subsequently executed. Although it is possible that many of the contusions on the victim's bodies were received in the course of the abduction, the evidence that both Fritz and Chism were kicked in the face, *see* Hrg. Tr. (Apr. 12, 2013) at 202–03, 221–23 (Mallak), along with the extensive nature of the injuries all three sustained, supports a finding that the victims were severely beaten while in captivity.

The Court also finds that each of the three were abducted to be used in an effort to compel the Multi-National Force in Iraq to release detainees. Just a few months after the Karbala attack, Qais Khazali admitted to U.S. authorities that the purpose of the attack was to capture American hostages to be used to trade for detainees in the custody of coalition forces. Ex. 87b at 3. That admission, moreover, is consistent with the militants' actions; they employed sophisticated tactics that, in retrospect, were clearly designed to abduct U.S. military personnel. They could have—and presumably would have—killed the victims at the PJCC if they did not want to take them captive and they had an extensive exfiltration plan in place. *See* Dkt. 52 at 59

(Rabena) (describing the PJCC attack as "a clear abduction case" where "there was a reason why they wanted to do a kidnapping").

Finally, the Court finds that each of the direct victims was both a U.S. citizen and a member of the U.S. armed forces. *See* Ex. 69 at 1 (Certificate of Death (Overseas) for Jacob Fritz, Feb. 1, 2007); Ex. 71 at 1 (Certificate of Death (Overseas) for Jonathan B. Chism, Feb. 1, 2007); Ex. 72 at 1 (Certificate of Death (Overseas) for Shawn Patrick Falter, Jan. 31, 2007).

    3.    *Asaib Ahl al-Haq and Iran's Responsibility for the Karbala Attack*

In the immediate aftermath of the Karbala attack, the identity, affiliation, and specific goals of the attackers were not clear. The United States and coalition forces, however, conducted a comprehensive investigation of the attack and concluded that it was the work of AAH, which had carried out the operation with Iran's support. *See* Ex. 1 at 1–4, 7. Evidence of AAH and Iran's involvement in the attack is manifest. First, the United States captured Qais Khazali (the leader of AAH), Laith Khazali (his brother and lieutenant), and Ali Musa Daqduq (the Hezbollah liaison between Iran and AAH). All three confirmed that AAH was responsible for the attack and that it would not have been possible without Iran's support. Second, the sophistication of the attack provides compelling circumstantial evidence that Iran assisted the militants.

    a.    <u>Asaib Ahl al-Haq</u>

AAH repeatedly claimed responsibility for the Karbala attack. First, the group produced and published a video titled "The General's Downfall," which contains footage of the PJCC, displays the photographs of the U.S. soldiers who were killed, and "claims [the attack] as one of [its] successes." Dkt. 53 at 98 (Gartenstein-Ross). This video, Ex. 20, was admitted into evidence based on testimony from Dr. Gartenstein-Ross, describing internal and external indicia that it was produced by AAH, *see* Dkt. 53 at 99-102 (Gartenstein-Ross). As Dr. Gartenstein-

Ross explained, the video served multiple purposes; it helped "rally[] popular support with AAH portraying itself as being at the forefront of the resistance," and it "show[ed] value to their sponsors[,] like Iran, that they[] [were] carrying out these attacks." *Id.* at 102 (Gartenstein-Ross).

Second, the Khazali brothers and Daqduq confessed that AAH planned and carried out the Karbala attack. Ex. 1 at 3. Daqduq, as noted earlier, was a senior Hezbollah operative tasked with building and supporting Iraqi Shia militias as Iranian proxies. Coalition forces captured him along with the Khazali brothers on March 20, 2007 in Iraq. Ex. 1 at 1–3; Ex. 2 at 4. Both Daqduq and Qais Khazali admitted that Khazali "authorized the operation" and that another AAH member, Azhar al-Dulaimi, "executed the operation." Ex. 1 at 3; *see* Ex. 3 at 2 (interrogation report of Qais Khazali) ("[Khazali] stated that he was the religious approval authority for the attack[]. . . . Reporting indicates that [Khazali] was directly in charge of the individuals [who] conducted the attack."); Ex. 87b at 3 (interrogation report of Qais Khazali). The purpose of the attack, Khazali explained, was "to capture American hostages to be . . . trade[d]." Ex. 87b at 3; *see also* Dkt. 52 at 59, 111 (Rabena).

Third, coalition forces recovered documents confirming that the attack was conducted by AAH, with Iranian support. When Daqduq was taken captive, he was found with "detailed documents that discussed tactics" for "attack[ing] Iraqi and coalition forces" as well as "a personal journal" that recounted "his involvement with extremist operations in Iraq." Ex. 1 at 3. And, when Qais Khazali was captured, coalition forces recovered a twenty-two page, "in-depth planning and lessons learned document" about the attack. Ex. 65 at 43. This document "laid bare the extensive preoperational surveillance, logistical preparation, and tactical drills that were carried out prior to the attack." *Id.* Daqduq also had in his possession "information on exactly

how" the U.S. soldiers at the PJCC "defended that place," which could only have been received by "someone watching [the soldiers'] drills." Hrg. Tr. (Apr. 11, 201) at 92–93 (Rabena).

      b.   <u>Iran</u>

The Court also finds that Iran assisted AAH in planning and executing the Karbala attack. The twenty-two page document found when Qais Khazali was captured revealed the Quds Force's "intimate role in the[] preparations, including provisions of the uniforms, vehicles, and identification cards that allowed the attackers to disguise their intentions." Ex. 66 at 45. Qais Khazali and Daqduq, moreover, confirmed that Iran—through the Quds Force—had provided training, intelligence, and supplies that were essential to AAH's ability to execute the operation. *Id.*. They reported that "senior leadership within the Q[u]ds Force knew of and supported planning for the eventual Karbala attack that killed five coalition soldiers." *Id.* According to Daqduq, "the Iraqi [S]pecial [G]roups could not have conducted th[e] complex operation without the support and direction of the Q[u]ds Force." *Id.*

The sophistication, complexity, and skilled execution of the attack corroborate Khazali and Daqduq's statements regarding Iran's involvement. The evidence leaves little doubt that the assault was "resourced from the outside" with supplies that the local militia could not have obtained without assistance. Dkt. 51 at 59 (Rabena). These supplies included U.S. uniforms, weapons, and vehicles designed to resemble those of American soldiers. *Id.* at 59–60 (Rabena); *see id.* at 80 (Rabena) ("The level of planning and resourcing and logistical support for this was . . . above and beyond anything we had ever seen before."). The black Suburban SUVs, for example, could not have been obtained by a Shia militia acting on its own. *Id.* at 81 (Rabena).

The attackers also had detailed knowledge about the layout of the PJCC and intelligence on how the soldiers there would respond to a small arms attack. Dkt. 52 at 52–53, 106–07

(Rabena). This information allowed the militants to abduct the U.S. soldiers even though they were vastly outnumbered by U.S. forces. *Id.* at 52 (Rabena). When the militants entered the PJCC, "they knew exactly where they were going" and were able to get out before the coalition forces were able to respond. *Id.* at 106–07 (Rabena). The attackers knew to cover the entry of the assault force by firing on the PJCC from outside the building, prompting the U.S. forces to believe that they were under a small arms attack rather than recognizing the true purpose of the mission. *Id.* (Rabena). The nature of the attack thus confirms Khazali and Daqduq's reports that Iran provided critical intelligence to the attackers. Ex. 1 at 3–4.

The speed, efficiency, and skill with which the attack was executed further supports the finding that the militants received training from Iran. The testimony Plaintiffs offered at the hearing showed that "local insurgents" were not "so well[-]orchestrated" and "coordinated." Dkt. 52 at 106 (Rabena). The planning document recovered during Daqduq's capture, moreover, showed that the attackers had set up "a mock site" where they "practice[d] and train[ed] and rehearse[d]" how the assault would unfold. *Id.* at 93 (Rabena). U.S. military officials concluded that this facility was "at a minimum sponsored by Iran and the IRGC." *Id.* at 115 (Rabena).

The nature of the exfiltration provides yet further support for a finding that Iran supported the attack. As explained above, during the exfiltration the attackers took an indirect route that followed an Iranian "ratline" rather than following a route that would have more directly connected Karbala with the militants' apparent destination. *Id.* at 73–74 (Rabena). The facts that the attackers knew to use this "ratline" and that they were able make their way through several security checkpoints suggests that Iran helped coordinate the attackers' safe passage. *Id.*

at 107 (Rabena) ("[F]acilitat[ing] the passage [from] one province . . . into another province has to be done by a central figure[] like the IRGC . . . .").

In sum, the evidence obtained from Qais Khazali and Daqduq, and each of these features of the attack, provides "credible evidence of Iranian involvement." *Id.* at 113 (Rabena). The Court finds that there is more than ample evidence that Iran assisted AAH in planning and carrying out the Karbala attack and that the attack would not have been possible without that assistance.[11]

## C.   The Abduction and Execution of Ahmed Al-Taie

### 1.   *The Abduction*

In 2005, Staff Sergeant Ahmed Al-Taie was deployed to Baghdad, Iraq to serve as a translator for a Provincial Reconstruction Team. Dkt. 54 at 51–52 (H. Taie); Hrg. Tr. (April 11, 2018) at 11 (Casey). On October 23, 2006, he left the secure zone to visit his wife, who lived in the city. Ex. 37. While outside of a relative's home, he was kidnapped and taken away in a vehicle. *Id.*; Ex. 53; Ex. 65 at 46; Dkt. 52 at 25 (Casey). At the time of the kidnapping, Al-Taie's captors, members of JAM, were unaware that Al-Taie was an American soldier and were not prepared to evade the massive search-and-rescue mission that the U.S. military would

---

[11] One of the reports from Qais Khazali's interrogation states: "Reporting also suggests [that] the attack was not sanctioned by IRGC['s] [Quds Force]." Ex. 3 at 6. The document does not describe the basis for that statement. The statement, as Dr. Gartenstein-Ross explained, is an example of low-level "raw intelligence" that will often contain "a number of different contradictory strands." Hrg. Tr. (Apr. 12, 2018) at 70–71 (Gartenstein-Ross). In contrast, the high-level intelligence on the Karbala attack—most notably, the conclusions summarized by Brigadier General Bergner during his press conference—consistently conclude that Iran was involved in the planning for the Karbala attack. *Id.* at 71 (Gartenstein-Ross). Similarly, the statement from the interrogation report is contradicted by the planning document found with Daqduq and other statements made by Qais Khazali and Daqduq themselves. *See, e.g.*, Ex. 1 at 3–4. The one piece of evidence that Iran was not involved, accordingly, does not alter the Court's finding that the Iran supported the Karbala attack.

inevitably undertake. Ex. 37 at 2 (case summary from U.S. Central Command on Al-Taie dated Feb. 28, 2010); Ex. 65 at 46; Dkt. 53 at 8 (Levitt). And, indeed, when the military learned of Al-Taie's abduction, in the words of General George Casey, the Commander of the Multi-National Forces in Iraq at the time of the search, it "locked down" Baghdad "for a week" and had "soldiers searching everywhere for him." Dkt. 52 at 25 (Casey). The entire "intelligence community of the United States [was] focused on recovering one soldier." *Id.* at 27 (Casey). On an ongoing basis, moreover, there was a unit dedicated solely to "track[ing] missing soldiers and missing remains until . . . everybody [was] back." *Id.* at 26 (Casey).

By early November 2006, after Al-Taie's abductors realized that he was a U.S. soldier, they transferred him to AAH. Dkt. 53 at 8–12 (Levitt); Ex. 37; Ex. 53 at 2; Ex. 65 at 46. AAH kept Al-Taie as a bargaining chip. Ex. 65 at 46. In December 2006, for example, it "demanded a prisoner exchange for his release," and a year later, it "demanded" that coalition forces release the Khazali brothers in exchange for Al-Taie. Ex. 53 at 2. On February 14, 2007, an AAH "front group" called Ahl al-Bayt Brigades released a "proof of life" video of Al-Taie. Ex. 21; Ex. 53 at 2; Ex. 65 at 47; Dkt. 53 at 142–47 (Gartenstein-Ross). Significantly, that video was held by Daqduq before it was released. Dkt. 53 at 142, 144–45 (Gartenstein-Ross).

Information about what happened next comes from 

remains in February 2012," Ex. 66 at 52, more than five years after his abduction. According to

the Iraqi Shia politician who supervised the negotiations for the release of Al-Taie's remains, "AAH acknowledged killing Al-Taie within a year of his abduction." *Id.*

2.    *The Hostage Taking, Torture, and Execution of Ahmed Al-Taie*

Al-Taie was born in Iraq and became a naturalized citizen of the United States while serving in the U.S. military. Dkt. 54 at 48–49 (H. Taie). By the time AAH released Al-Taie's remains, they were in a state of advanced decomposition. Dkt. 54 at 35–36 (Mallak). As a result, the Armed Forces Medical Examiner was able to reach only a limited set of conclusions. The cause of Al-Taie's death was a gunshot wound or wounds, and the manner of his death was homicide. Ex. 9 at 2–4; Dkt. 54 at 34–35 (Mallak). Al-Taie was shot twice, once in the torso and a second time in the neck. *Id.* at 38–40 (Mallak). The gunshot to his neck is consistent with an execution-style killing. *Id.* at 43–44 (Mallak).

The ▮▮ declaration sheds further light on Al-Taie's treatment at the hands of AAH. According to ▮▮ Al-Taie was "was beaten on a daily basis." Ex. 76 at 2 (▮▮▮▮▮▮▮▮). ▮▮ could hear "both the physical impacts" of the blows and Al-Taie's "cries of pain." *Id.* ▮▮▮▮▮▮▮▮▮▮▮▮ that "they had executed" Al-Taie. *Id.* at 4 (▮▮▮▮). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ "all of the other hostages had been killed" either because they "tr[ied] to escape" or because the captors believed the U.S. military was going to raid the house in which the hostages were being held. *Id.* The Court, accordingly, finds that Al-Taie was brutally beaten and was eventually executed. Based on ▮▮ declaration, moreover, the Court finds that Al-Taie suffered severe and persistent pain due to his repeated beatings. The Court also finds that Al-Taie was detained as a bargaining chip, which AAH sought to use to compel the release of the Khazali brothers and at least one other detainee.

3.    *Asaib Ahl al-Haq and Iran's Responsibility*

Although Al-Taie was initially abducted by JAM, AAH took and held Al-Taie shortly after he was kidnapped, and its members beat and eventually killed him. The evidence of AAH's role is compelling. The "proof of life" video was released by a front group for AAH, *see* Ex. 53 at 2; Dkt. 53 at 146–47 (Gartenstein-Ross), and Daqduq had the video before its release, Dkt. 53 at 144–45 (Gartenstein-Ross). In an interview with the *Islam Times* website, AAH's deputy leader, moreover, Akram al-Kabi, admitted that AAH did not release Al-Taie because he was "a U.S. soldier who was working directly with the U.S. military command in Iraq." Ex. 66 at 52.

████████████████████████████████████████████████████████

the "Khazali brothers" were "responsible for [Al-Taie's] abduction and captivity." Ex. 76 at 3 (███████████████). ████████████████████████████████ saw a ████ captive who fit Al-Taie's description. Ex. 76 at 2–3 (████████████████). The fact that Al-Taie's captors demanded the release of the Khazali brothers in exchange for Al-Taie's release, and the fact that AAH ultimately released his body, further support the conclusion that AAH held Al-Taie. Dkt. 53 at 137 (Garenstein-Ross).

The evidence that AAH held Al-Taie captive is also consistent with the group's modus operandi. Throughout its existence, AAH has focused on attacking U.S. and coalition forces, and, on multiple occasions, it has taken hostages. Ex. 66 at 55. In addition, after thoroughly investigating Al-Taie's abduction, the U.S. Army concluded that Qais Khazali and AAH were responsible, *see* Ex. 5 (CID Report); Dkt. 53 at 155–58 (Gartenstein-Ross), and Plaintiffs' expert, Dr. Gartenstein-Ross, opined that "AAH held Mr. Al-Taie," and "was responsible for his murder," Dkt. 53 at 158. The Court shares that view and, accordingly, finds that AAH was responsible for holding and beating Al-Taie and for his eventual murder.

Iran, for its part, supported AAH's actions. As explained above, Iran provided AAH with significant funding, supplies, training, and other support. As part of its general efforts to train Iraqi Shia militants, Iran instructed AAH on how to kidnap and move high-value targets. Dkt. 53 at 159, 170 (Gartenstein-Ross). In the words of Dr. Levitt, members of AAH "were trained for exactly this type of mission by Iran and by Hezbollah." Dkt. 53 at 16 (Levitt). There is also substantial evidence that the availability of Iranian "ratlines," and Iranian financial support, allowed AAH to evade the massive manhunt undertaken by U.S. and coalition forces in an effort to rescue Al-Taie. *See* Dkt. 53 at 138–42, 162–71 (Gartenstein-Ross). In particular, the fact that Al-Taie was moved frequently—including in broad daylight—demonstrates that his captors were receiving "intelligence from a service like Iran." Dkt. 53 at 139 (Gartenstein-Ross). The fact that Daqduq, a Hezbollah operative, had the proof of life video before it was released, moreover, further evidences Iranian support. *Id.* at 162 (Gartenstein-Ross). Based on all of this evidence, Dr. Gartenstein-Ross opined with "100 percent" confidence that Iranian support was used to hold Al-Taie. *Id.* at 169 (Gartenstein-Ross). Once again, the Court concurs in this conclusion and, accordingly, finds that Iran provided essential support to AAH and that it was foreseeable that AAH would use that support to hold, beat, and murder Al-Taie.

### III. CONCLUSIONS OF LAW

Under the Foreign Sovereign Immunity Act, 28 U.S.C. § 1604, a foreign state, including its instrumentalities, is immune from suit in state or federal court unless the case falls within an express statutory exception. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004). For present purposes, the sole relevant exception is found in the "state-sponsored terrorism exception," 28 U.S.C. § 1605A, which both confers subject matter jurisdiction on federal courts to hear certain terrorism-related claims, *see* 28 U.S.C. § 1330(a),

and recognizes a federal cause of action against those foreign states subject to the exception, *see Owens*, 864 F.3d at 764–65. The FSIA also addresses personal jurisdiction and specifies precise procedures that a plaintiff must follow—at times with the assistance of the clerk of the court and the U.S. Department of State—to effect service on a foreign state. 28 U.S.C. § 1608.

The Court must satisfy itself that an FSIA plaintiff has cleared each of these hurdles, even if the defendant fails to appear. First, because the FSIA deprives courts of subject matter jurisdiction in the absence of a relevant exception, a failure to appear does not waive the defense and the courts are "obligated to consider *sua sponte*" whether they have jurisdiction hear the case and to order any relief. *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012); *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 n.20 (1983) (even where a defendant foreign state does not appear, the Court "still must determine that immunity is unavailable"). Second, with respect to the substance of the Plaintiffs' state or federal law claims, as noted above, the FSIA precludes courts from entering a default judgment against a foreign state unless the court is satisfied that the plaintiff has established her right to relief. 28 U.S.C. § 1608(e); *see also Owens*, 864 F.3d at 784–86. And, because "the entry of a default judgment is not automatic," courts must "satisfy [themselves] that [they have] personal jurisdiction before entering judgment against an absent defendant." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005).

Each of these inquiries, in turn, implicates a slightly different standard of proof. To establish subject matter jurisdiction, an FSIA "plaintiff bears an initial burden of production to show [that] an exception to immunity, such as § 1605A, applies." *Owens*, 864 F.3d at 784. Having cleared this initial hurdle, however, "the plaintiff must still prove [her] case on the merits." *Id.* To do so, the plaintiff must "establish" her right to relief, which does not "relieve[] the sovereign of the duty to defend" but, nonetheless, requires that the plaintiff offer admissible

38

evidence sufficient to substantiate the essential elements of her claim. *Id.* at 785–86 (quotations omitted). Finally, to establish personal jurisdiction over a defaulting defendant, the plaintiff must make "a prima facie showing of [personal] jurisdiction." *Mwani*, 417 F.3d at 6–7.

As explained below, the Court concludes that it has subject matter jurisdiction over Plaintiffs' claim and personal jurisdiction over the Islamic Republic of Iran and the Islamic Revolutionary Guard Corps.[12] The Court also concludes that, for the most part, Plaintiffs have carried their burden of establishing a right to relief under the federal cause of action established in § 1605A. The one exception, as Plaintiffs concede, is that Bashar Al-Taie, one of Ahmed Al-Taie's brothers, is not a U.S. national, member of the U.S. armed forces, or an employee or contractor of the U.S. government acting within the scope of his employment, and, accordingly, is not entitled to relief under the federal cause of action. Moreover, the Court concludes that, at least on the present record, Bashar Al-Taie has yet to establish his right to relief under D.C. law. Finally, the Court will defer to the damages stage the determination of whether each of the plaintiffs has established the necessary familial relationship to recover individual damages and, if so, the damages to which each is entitled.

## A.      Subject Matter Jurisdiction and Liability for § 1605A(c) Claims

"[T]he [federal] district courts . . . have original jurisdiction" over "any nonjury civil action against a foreign state" asserting "any claim for relief in personam with respect to which the foreign state is not entitled to immunity under" the FSIA. 28 U.S.C. § 1330(a). The Court,

---

[12] Because the IRGC is itself a "governmental" entity, it is properly "considered the foreign state itself," and not merely an "instrumentality of the foreign state." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003); *see also TMR Energy Ltd. v. State Prop. Fund of Ukr.*, 411 F.3d 296, 300 (D.C. Cir. 2005) (explaining that "an entity that is an integral part of a foreign state's political structure is to be treated as the foreign state itself" for purposes of "determining the proper method of service under the FSIA" (internal quotation marks omitted)).

accordingly, has subject matter jurisdiction over the present "nonjury civil action" against Iran if, and only if, the conditions for the waiver of immunity found in 28 U.S.C. § 1605A are satisfied. As explained below, Plaintiffs have carried their burden of establishing the Court's subject matter jurisdiction.

Under the state-sponsored terrorism exception, 28 U.S.C. § 1605A(a)(1), a foreign state is not immune from the jurisdiction of the federal and state courts in cases in which

> [(1)] money damages are sought against a foreign state [(2)] for personal injury or death [(3)] that was caused by [(4)] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is [(5)] engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). The exception, moreover, applies only to suits in which two additional requirements are met. First, the claimant or victim must be a U.S. national, a member of the U.S. armed forces, or a U.S. government employee or contractor at the time the act of terrorism occurred. 28 U.S.C. § 1605(a)(2). Second, the foreign state must be designated as a state sponsor of terrorism both at the time the act occurred (or was so designated as a result of the act) and at the time the lawsuit was filed (or was so designated within the six-month period preceding the filing of the suit).[13] *Id.*; *see also Owens*, 864 F.3d at 763.

Most of the conditions for subject matter jurisdiction are easily addressed in this case. First, Plaintiffs seek only monetary relief and attorneys' fees. *See* Dkt. 9 at 22–33 (Am. Compl. ¶¶ 80–130). Second, although the claims brought by the estates of direct victims differ in certain

---

[13] Section 1605A(a)(2) also requires that the foreign state have received "a reasonable opportunity to arbitrate the claim," but only if the act of terrorism "occurred in the foreign state against which the claim has been brought." 28 U.S.C. § 1605A(a)(2)(A)(iii). That requirement is inapplicable to the facts of this case because none of the alleged acts of terrorism occurred in Iran.

respects from those brought by the victims' families, all of the claims seek to recover "for personal injury" or "death." Third, Iran was designated as a state sponsor of terrorism in 1984, *see* 49 Fed. Reg. 2836–02 (Jan. 23, 1984) (statement of Secretary of State George P. Shultz), and remains designated as a state sponsor of terrorism to this day, *see* U.S. Dep't of State, *State Sponsors of Terrorism*, available at https://www.state.gov/j/ct/list/c14151.htm (last visited August 1, 2018). Moreover, because the IRGC is properly considered "an integral part" of the "foreign state" of Iran, *TMR Energy Ltd.*, 411 F.3d at 300, and because § 1605A focuses on whether "the foreign state" was designated—and not whether each named defendant was separately designated—the Court concludes that the designation of Iran as a state sponsor of terrorism is sufficient to satisfy the designation requirement as to both defendants. *See* 28 U.S.C. § 1605A(a)(2)(A)(i)(I). Fourth, at the time the relevant acts occurred, all four victims were both U.S. nationals and members of the U.S. armed forces.

As a result, the only substantial jurisdictional question left for the Court is whether the injuries and deaths of the servicemen were "caused by . . . act[s] of torture, extrajudicial killing . . . hostage taking, or the provision of material support or resources" by an "official, employee, or agent of" Iran. 28 U.S.C. § 1605A(a)(1). For the reasons explained below, the Court concludes as follows: (1) AAH committed acts of "hostage taking," "torture," and "extrajudicial killing" within the meaning of the International Convention Against the Taking of Hostages and the Torture Victim Protection Act; (2) Iranian officials and their agents provided "material support or resources" for these acts within the meaning of 18 U.S.C. § 2339A; and (3) Iran's provision of material support caused the injuries and deaths of the four victims. Plaintiffs' claims, accordingly, fall within the state-sponsored terrorism exception of 28 U.S.C. § 1605A(a)(1).

41

1.    *Asaib Ahl al-Haq's Acts of Hostage Taking, Torture, and Extrajudicial Killing*

The state-sponsored terrorism exception to the FSIA defines the terms "hostage taking," "torture," and "extrajudicial killing" by reference to the Convention Against the Taking of Hostages, 1316 U.N.T.S. 205, and the Torture Victim Protection Act, 28 U.S.C. § 1350 note, respectively. The Court will address each of these concepts in turn.

a.    Hostage Taking

The FSIA's definition of "hostage taking" is borrowed from Article 1 of the International Convention Against the Taking of Hostages. 28 U.S.C. § 1605A(h). Under that treaty, "hostage taking" means

> *seiz[ing] or detain[ing]* and *threaten[ing] to kill, to injure or to continue to detain another person* . . . in order *to compel a third party*, namely, a State, an international governmental organization, a natural or juridical person, or a group of persons, *to do or abstain from doing any act* as an *explicit or implicit condition* for the release of the hostage . . . .

International Convention Against the Taking of Hostages, art. 1, Dec. 17, 1979, 1316 U.N.T.S. 205 (emphases added). The Convention further provides that anyone who "attempts to commit an act of hostage-taking" or who "participates as an accomplice of anyone who commits or attempts to commit an act of hostage taking likewise commits an offense for the purposes of [the] Convention." *Id.*

The Court concludes that AAH committed acts of "hostage taking" when it seized and (briefly) detained Fritz, Chism, and Falter. As explained in the Court's findings of fact, AAH attacked the Karbala PJCC and abducted Fritz, Chism, and Falter "in order to compel a third party"—namely, the United States and/or coalition forces—to release detainees "as [a] . . . condition of the release of the" abductees. *See supra* Part II.B.2; *see also* Ex. 87b at 3; Hrg. Tr. (April 11, 2018) at 111 (Rabena). The fact that AAH failed in this mission before it was able to

communicate its conditions for the release of the U.S. soldiers, moreover, does not undercut

Plaintiffs' claim. As the D.C. Circuit has explained:

> The plain text of the FSIA definition, explanatory commentary on the Convention, and precedent under the Federal Hostage Taking Act ("FHTA"), 18 U.S.C. § 1203, which defines the behavior proscribed in terms identical to the Convention, all reflect that a plaintiff need not allege that the hostage taker had communicated its intended purpose. Consistent with the plain text, the court in *Price* [*v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 94 (D.C. Cir. 2002)] explained that the intentionality requirement focused on the *mens rea* of the hostage taker. . . . The commentary . . . similarly explains that "demands" are not required to establish the element of hostage taking: "The words 'in order to compel' do not require more than a motivation on the part of the offender." Case law under the FHTA[,] [moreover,] reflects the same analysis.

*Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 360 (D.C. Cir. 2006)

(internal citations omitted) ("*Simpson II*"). Here, the evidence establishes that the three soldiers

were seized for the purpose of exercising precisely the type of "third-party compulsion" that the

Convention proscribes. *See Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d

230, 234-35 (D.C. Cir. 2003) ("*Simpson I*"). Nothing more is required.

The conclusion that AAH committed an act of "hostage taking" when it "detained" Al-

Taie is, if anything, even more clear cut. AAH was not responsible for Al-Taie's initial

abduction, but the evidence established that it held Al-Taie captive for an extended, if unknown,

period of time. *See supra* Part II.C.1; *see also* Ex. 53 at 2; Ex. 66 at 55; Dkt. 53 at 146–47

(Gartenstein-Ross). The language of the Convention is clear, and it applies to those who "seize"

*or* "detain" another person, and, regardless of whether the transfer of Al-Taie from JAM to AAH

constituted a "seizure," AAH certainly "detained" him. Moreover, unlike in the case of Fritz,

Chism, and Falter, AAH actually communicated its demands that coalition forces release certain

detainees in exchange for Al-Taie. *See supra* Part III.C.1–2; *see also* Ex. 53.

The Court, accordingly, concludes that AAH committed acts of "hostage taking" within the meaning of the International Convention Against the Taking of Hostages with respect to all four of the direct victims.

        b.    Torture

For the definition of "torture," the FSIA looks to the Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73, which defines "torture" as:

> [A]ny act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

*Id.* The Act defines "mental pain or suffering" as "prolonged mental harm caused by or resulting from . . . the intentional . . . or threatened infliction of severe physical pain or suffering; [or] . . . the threat of imminent death." *Id.* § 3(b). Accordingly, to establish that AAH "tortured" Fritz, Chism, Falter, and Al-Taie, Plaintiffs must show that members of AAH (1) intentionally inflicted severe pain or suffering on the soldiers, (2) while they were in AAH's "custody or physical control," (3) for a purpose "such . . . as" obtaining information or a confession, punishing the soldiers or others, or intimidating or coercing the United States, coalition forces, or others. *Id.*

Each of these elements poses one or more significant questions. To start, the meaning of the term "severe" is not self-evident. "The severity requirement is crucial to ensuring that the conduct proscribed by the . . . TVPA is sufficiently extreme and outrageous to warrant the universal condemnation that the term 'torture' both connotes and invokes." *Price*, 294 F.3d at 92. But determining "how much actual pain or suffering. . . . defendants [must] inflict before their conduct rises to the level of torture," *id.*, cannot be assessed based on any formula or

precise measure. The Court must, instead, consider the "intense" or "lasting" nature of the abuse, the cruelty and depravity of the assailant, and the frequency and duration of each assault. *Id.* at 92–93. On one extreme, we know that "[n]ot all police brutality, [or] instance of excessive force used against [a] prisoner[]" rises to the level of "torture." *Id.* at 93. And, on the other extreme, we know, for example, that "sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain" clearly cross the line. *Id.* at 92 (quoting S. Exec. Rep. No. 101-30, at 14 (1990)). But, between these poles, the Court is left with little guidance in assessing whether the act was "of an extremely cruel and inhuman nature, specifically intended to inflict excruciating pain or suffering." *Id.* at 93 (quoting same).

The "purpose" requirement poses yet a further set of difficulties, particularly in FSIA terrorism cases where "firsthand evidence and eyewitness testimony is difficult or impossible to obtain." *Owens*, 864 F.3d at 785. Although the list of purposes provided in the statute— "obtaining . . . information or a confession"; "punishing," "intimidating[,] or coercing" an individual or third-party; or inflicting pain "based on discrimination of any kind," 28 U.S.C. § 1350 note—is not exhaustive, it is illustrative. *Price*, 294 F.3d at 93. Each example, moreover, makes clear that "suffering alone is insufficient to establish a claim under the FSIA's terrorism exception." *Han Kim*, 774 F.3d at 1050. Nor is it enough to find that a defendant purposefully assaulted or injured the victim; torture requires a specific intent to inflict severe pain or suffering, and it further requires that the assailant inflict that pain or suffering for one of the purposes specified in the TVPA or for a similar purpose. 28 U.S.C. § 1350 note.

Finally, the custody requirement poses a further hurdle, particularly in cases—like this one—in which the victims are deceased, the assailants are not in U.S. custody, and there is little

eyewitness testimony. *Owens*, 864 F.3d at 785. Under these circumstances, the Court must do its best to determine which injuries were sustained after the victims were captured and taken into custody, and which injuries were sustained in the battle or assault leading up to their abduction.

The Court's findings regarding the abduction and murder of Fritz, Chism, and Falter highlight these at times overlapping difficulties. First, the evidence shows that a number of their most severe injuries were sustained before their capture. Most notably, there is evidence that all three soldiers were shot in the course of the attack and that Falter, in particular, was gravely injured during the first moments of the AAH's assault on the PJCC. There is also evidence, however, that all three were alive at the time they were captured and that they sustained numerous additional injuries while in custody. *See supra*, Part II.B.2; Dkt. 54 at 44–45 (Mallak). The question, then, is whether those further injuries were inflicted with the requisite intent to inflict severe pain and were sufficiently "extreme and outrageous to warrant the universal condemnation that the term 'torture' both connotes and invokes." *Price*, 294 F.3d at 92. Although a close question, the Court concludes that Plaintiffs have offered evidence satisfactory to the Court. 28 U.S.C. § 1608(e). Both the depravity of the abuse and the purpose for which it was inflicted suggest that the victims' injuries were the result of "torture" under the TVPA.

First, the extreme and gratuitous nature of the beatings the victims suffered were sufficiently "severe" to constitute torture. Fritz, Falter, and Chism were all shot in the course of their abduction. To be sure, this, in and of itself, does not suggest torture. Despite the substantial evidence regarding the pain the victims suffered as a result of their gunshot wounds, *see* Dkt. 53 at 30–31, 195–209, 224–29 (Mallak), there is no evidence that the militants shot their victims with the specific intent of causing pain or suffering—as opposed to their evident intent to subdue and then to execute the soldiers. There is substantial evidence, however, that the soldiers

were badly beaten while in custody and while handcuffed. Those beatings did not take place over an extended period of time, but they were severe, and given the state of the soldiers, they demonstrated an intent to cause extreme pain and suffering. Most strikingly, there is evidence that Chism was kicked in the face, while handcuffed, with sufficient force to cause bleeding in the back of the skull, the middle ear, and the spinal cord. Dkt. 53 at 221–24, 230 (Mallak). The evidence also shows that Fritz was likely kicked in the face, *id.* at 203 (Mallak), and that Falter suffered blunt force trauma to his head, Dkt. 54 at 29 (Mallak).

Taken together, this evidence supports the inference that all three men were kicked or otherwise beaten in the head while handcuffed and—significantly—while already suffering from severe gunshot wounds. Although not every beating of a person in custody rises to the level of severity or heinousness required to constitute torture, and while it does a disservice to the victims of torture to dilute the meaning of that concept, the Court is satisfied that kicking or beating someone in the face or head who is already suffering from a serious—and perhaps life threatening—gunshot reflects the type of depravity and enormous suffering that the TVPA and international law condemns. In some cases, the relative brevity of the victim's pain and suffering might counsel against a finding of torture. In others, including this one, the gratuitousness, intensity, and inhumanity of the assault permits a finding of torture, although the short period of time might bear on the assessment of damages.

Second, the Court concludes that this abuse was motivated by the types of invidious purposes encompassed by the TVPA. Specifically, the Court concludes that the soldiers were beaten for the purpose of punishing the United States and coalition forces for their presence in Iraq and to induce those forces to leave the region. In circumstances such as these, where the victims were violently abducted, it can be difficult to determine which abusive acts were carried

out for which purpose. One act of abuse may have been to ensure the total submission of the hostage, while another may have punished the victim for the United States' role in Iraq. Here, however, the record supports the conclusion that AAH abused the victims for a purpose "such . . . as . . . punishing" the soldiers or others, or "intimidating[,] or coercing" the United States, coalition forces, or others. *See* 28 U.S.C. § 1350 note. The circumstances of the Karbala attack, and the broader role of the AAH as an Iranian proxy to drive the United States out of the Gulf region, all suggest that AAH abused the victims for the purposes encompassed by the TVPA. *See supra*, Part II.A.3; *see also* Ex. 65 at 18 (describing Iran's overall goal to "humiliate[]" the United States in Iraq and "force[] [it] out of the region in disgrace" in order to deter it from "pursuing similar military interventions in the [Gulf] region in the future"). This evidence satisfies the demands of the TVPA's "purpose" requirement.

In reaching these conclusions, the Court recognizes that "[w]e cannot know with certainty precisely what occurred between" the soldiers' "capture and [their] deaths." *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 203 (D.D.C. 2017). But that is because Defendants have defaulted and because the assailants are not subject to process in the United States. As the Court of Appeals has observed, "[r]equiring a plaintiff to produce direct, firsthand evidence of the victim's torture and murder would . . . thwart the purpose of the terrorism exception" to the FSIA: "holding the state sponsor of terrorism accountable for torture and extrajudicial killing." *Han Kim*, 774 F.3d at 1045. In the present context, the Court concludes that there is sufficient evidence to support the inference that, while in the custody of the assailants, Fritz, Chism, and Falter were intentionally subjected to severe pain in order to punish them for the U.S. presence in Iraq and to send a message to the United States and other U.S. forces that they should leave the Gulf region.

The Court also concludes that Plaintiffs have offered evidence sufficient to show that Al-Taie was tortured. Unlike in the case of Fritz, Chism, and Falter, the evidence shows that Al-Taie was subject to severe beatings over an extended period of time. As described above, *see supra* Part II.C.2, Plaintiffs offered compelling evidence that Al-Taie was beaten "[o]n a daily basis" and that the physical impact of the blows and Al-Taie's "cries of pain" could be heard by another prisoner, held in a different room. *See* Ex. 76 at 2 (███████████████). Other decisions from this Court recognize that repeated beatings over an extended period of time may constitute torture within the meaning of the TVPA and the state-sponsored terrorism exception to the FSIA. *See, e.g., Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 152 (D.D.C. 2010) (holding that "beatings, unsanitary conditions, inadequate food and medical care, and mock executions" over 18 months were "torture"); *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 91, 92, 97 (D.D.C. 2003) (concluding that victim was "tortured" after he was "abducted at gunpoint . . . forced into an automobile, and blindfolded," "punch[ed]" and "kicked in the face while he was sleeping," and "beaten by his captors and threatened with death if he did not act exactly as they demanded" in the course of his 65-day captivity); *Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62, 65 (D.D.C. 1998) (finding "torture" where prisoners were "subjected to regular beatings on all parts of their bodies" over an 18-month period). Here, the evidence supports a finding of repeated and severe beatings, and the absence of further detail about precisely how many beatings Al-Taie endured, the exact period of time over which those beatings occurred, or the specific nature of the beatings and the injuries sustained can only be blamed on the fact that Al-Taie was killed—and thus cannot testify—and that eyewitnesses are unavailable to appear. *See Han Kim*, 774 F.3d at 1045.

The intent of Al-Taie's captors to inflict severe pain, and their purpose for doing so, can be readily inferred from the available facts. Al-Taie was subjected to repeated beatings while in captivity. And, as with the beatings of Fritz, Chism, and Falter, the evidence that Plaintiffs offered regarding Iran's use of Iraqi proxies, like AAH, to exert pressure on the United States to leave the Gulf region is sufficient to infer that Al-Taie was beaten to punish him for the presence of U.S. forces in Iraq and to "terroriz[e] and intimidat[e]" other American soldiers. *Foley*, 249 F. Supp. 3d at 202.

The Court, accordingly, concludes that AAH tortured Fritz, Chism, Falter, and Al-Taie within the meaning of the TVPA.

      c.     <u>Extrajudicial Killing</u>

The state-sponsored terrorism exception to the FSIA also looks to the TVPA to define "extrajudicial killing." 28 U.S.C. § 1605A(h)(7). Under the TVPA, "extrajudicial killing" means

> *a deliberated killing not authorized by a previous judgment* pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

TVPA § 3(a) (emphasis added). As the D.C. Circuit has explained, this definition "contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 770. Applying this test, the Court concludes that Fritz, Chism, Falter, and Al-Taie were all victims of extrajudicial killings.

As an initial matter, these killings "[c]learly" were not authorized "by a prior judgment affording judicial guarantees o[f] due process." *Foley*, 249 F. Supp. 3d at 202; *see Owens*, 864

F.3d at 770. Nor were they "lawfully carried out under the authority of a foreign nation." TVPA

§ 3(a). Moreover, unlike the definition of "summary executions" under Common Article 3 of the

Geneva Conventions, 6 U.S.T. 3113, 75 U.S.T.S. 85, the state-sponsored terrorism exception to

the FSIA does not require direct participation of a state actor; it is sufficient that a state actor

provided material support for an extrajudicial killing committed by a nonstate actor. *Owens*, 864

F.3d at 770–78. The nonstate actor, however, must have acted "deliberately." *Han Kim*, 774

F.3d at 1050–51.

　　As a result, the only element that requires additional analysis is the requirement that the

killings were "deliberated." "A 'deliberated' killing is simply one undertaken with careful

consideration, not on a sudden impulse." *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 263

(D.D.C. 2016) (citing Webster's Third New International Dictionary 596 (1993); 4 The Oxford

English Dictionary 414 (2d ed. 1989); Black's Law Dictionary 492 (9th ed. 2009)), *aff'd*, 864

F.3d 751 (D.C. Cir. 2017). The evidence Plaintiffs offered at the hearing satisfies this

requirement. The autopsy reports on the four soldiers abducted and killed in the Karbala attack

show that they sustained execution-style wounds. They were shot at a close range; they were

handcuffed at the time they received their final, life-ending wounds; and it appears that their

assailants moved the victims' body armor to inflict the deadly wounds. *See* Dkt. 53 at 211–12

(Mallak). The militants, moreover, had every interest in fleeing, but they took the time to kill the

servicemen—none of whom posed any danger to the assailants—before doing so.

　　The evidence also supports the conclusion that Al-Taie was executed. According to the

███████ declaration, Laith Khazali admitted that AAH "had executed the Iraqi-American U.S.

soldier" ██████████████████████. Ex. 76 (█████████████). █████████████

█████████████████████████████████ "all of the other hostages had been

51

killed either while trying to escape, or that they were" killed when their AAH captors mistakenly believed that the house at which the hostages were being held was the target of a raid by the U.S. military. *Id.* Because Al-Taie's autopsy showed that he was shot through the neck from the front, the evidence supports the conclusion that he was shot while in custody, and not while trying to escape. The fact that his captors mistakenly believed that the U.S. military was on the verge of rescuing Al-Taie does not diminish the evidence that they made a calculated decision to brutally end his life.

The Court, accordingly, concludes that Fritz, Chism, Falter, and Al-Taie were all victims of extrajudicial killings within the meaning of the TVPA.

2. *Iran's Provision of Material Support for Asaib Ahl al-Haq's Acts of Hostage Taking, Torture, and Extrajudicial Killing*

The Court further concludes that Iran provided AAH with material support for the acts described above. The FSIA's definition of "material support or resources" is borrowed from 18 U.S.C. § 2339A, which defines "material support or resources" in relevant part as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . , and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). The evidence set forth above demonstrates that Iran helped AAH attack coalition forces and kidnap U.S. soldiers. *See generally supra* Part II.A.3. Plaintiffs offered evidence that Iran provided support to AAH and other Iraqi Shia militias as part of a "deliberate policy to inflict casualties on U.S. forces"—a policy that was "approved by the [S]upreme [L]eader" of Iran and that was "executed very covertly . . . by the Q[u]ds [F]orce." Dkt. 52 at 14 (Casey); *see also* Ex. 65 at 39; Ex. 66 at 25–29. The evidence also showed that, pursuant to this policy, Iran provided weapons, financial support, training, and "expert advice

[and] assistance" to AAH. 18 U.S.C. § 2339A(b)(1); *see* Dkt. 53 at 41 (Gartenstein-Ross); Ex. 15 at 4.

Even more to the point, Plaintiffs offered compelling evidence that Iran provided material support for the specific acts of hostage taking, torture, and extrajudicial killing at issue in this case. With respect to the Karbala attack, Qais Khazali and Daqduq confessed that "senior leadership within the Q[u]ds Force knew of," "support[ed]" and "direct[ed]" the operation. Ex. 1 at 3–4. Daqduq, moreover, acknowledged that "the Iraqi [S]pecial [G]roups could not have conducted th[e] complex operation without the support and direction of the Q[u]ds Force." *Id.* at 3. The sophistication, knowledge, training, and skill exhibited in the attack, moreover, corroborates these statements. *See supra* Part II.B.1. In short, for the reasons explained above, the Court concludes that AAH could not have conducted the attack without the assistance of Iran. That assistance permitted AAH to take Fritz, Chism, and Falter hostage; to torture them; and to execute them.

A similar conclusion follows with respect to AAH's hostage taking, torture, and execution of Al-Taie. *See supra* Part II.C.3. Iran taught members of AAH how to kidnap U.S. soldiers and how to keep them hidden from coalition forces. *See, e.g.,* Dkt. 53 at 170 (Gartenstein-Ross). The evidence also showed that Iran provided AAH with intelligence and the use of its ratlines, which prevented U.S. forces from rescuing Al-Taie. *See id.* at 138–42 (Gartenstein-Ross). In addition, as Plaintiffs' experts testified, Iran provided AAH with significant, and perhaps complete, financial support, *see id.* at 166–71 (Gartenstein-Ross), and that Iranian financial support was essential to the group's ability to detain Al-Taie for an extended period of time. *Id.* at 169–70 (Gartenstein-Ross). Accepting that testimony, Iran clearly provided "material support" for the acts at issue in this case. But, even without

establishing such a direct nexus, Plaintiffs' proof would suffice. Because money is, of course, fungible and because "terrorist organizations can hardly be counted on to keep careful bookkeeping records," it is sufficient for Plaintiffs to have shown—as they have—that Iran provided AAH with substantial financial assistance, regardless of whether they have also shown that any payments were provided "directly for the specific act[s]" of hostage taking, torture, and extrajudicial killing at issue in this case. *Kilburn*, 376 F.3d at 1130.

Finally, the evidence showed that this material support was provided at the direction of Iranian officials or agents acting within the scope of their "office, employment, or agency." 28 U.S.C. § 1605A(a)(1). As described in the Court's findings of fact, Iran's Quds Force was responsible for cultivating proxies in other countries and did so with both the Lebanese Hezbollah and AAH. *See supra* Part II.A. The Quds Force is part of the IRGC, which is, in turn, an arm of the Islamic Republic of Iran. Those findings are sufficient to satisfy the scope of office requirement.

3.     *Causation*

The only remaining requirement for finding a waiver of sovereign immunity under § 1605A is a showing that the injuries and deaths at issue were "caused by" Iran's provision of material support to AAH. 28 U.S.C. § 1605A(a)(1). The D.C. Circuit has held that this statutory language, like the similar language that appeared in 28 U.S.C. § 1605(a)(7) (repealed), "requires a causal connection" as a jurisdictional prerequisite to suit. *Kilburn*, 376 F.3d at 1127; *see also Owens*, 864 F.3d at 794–99. An FSIA plaintiff, accordingly, need not show that the defendant state "specifically knew of or intended its support to cause" a particular terrorist act, *Owens*, 864 F.3d at 798, or that the defendants' material support was a "but for" cause of the victim's injury or death. *Kilburn*, 376 F.3d at 1128. Rather, the statute "require[s] only a showing of

54

'proximate cause.'" *Id.*; *see also Owens v. BNP Paribas, S.A.*, No. 17-CV-7037, 2018 WL 3595950, at *5 (D.C. Cir. July 27, 2018) (explaining that the Anti-Terrorism Act's "'by reason of' language demands a showing of proximate causation").

Under long-established law, proximate cause requires "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Kilburn*, 376 F.3d at 1128 (quoting Prosser & Keeton on the Law of Torts 263 (5th ed. 1984)); *see also Owens*, 864 F.3d at 794 (quoting same). The proximate cause inquiry "contains two similar but distinct elements." *Id.* First, Plaintiffs must show that Iran's provision of support to AAH was "a 'substantial factor' in the sequence of events that led to the" injuries and deaths of the four soldiers. *Id.* (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)). Second, Plaintiffs must establish that the injuries or deaths of the soldiers were "'reasonably foreseeable or anticipated as a natural consequence' of [Iran's] conduct." *Id.* (quoting *Rothstein*, 708 F.3d at 91).

The facts of this case easily satisfy this standard. The support that Iran provided to AAH was not only a "substantial factor" in the chain of events that culminated in the injuries and deaths of Fritz, Chism, Falter, and Al-Taie, it was a necessary ingredient. The evidence showed that, without Iran's support, AAH could not have successfully executed the PJCC attack, *see supra* Part II.B.3.b, and could not have successfully kept Al-Taie captive, *see supra* Part II.C.3. Likewise, the Court has no doubt that Plaintiffs' injuries were "reasonably foreseeable or anticipated as a natural consequence" of Iran's support to AAH. Even if Iran did not intend that the victims sustain the specific injuries at issue, the events that led to those injuries were a "reasonably foreseeable" consequence of Iran's actions.

In assessing reasonable foreseeability, moreover, the Court must consider "the broader context" of Iran's conduct. *Owens*, 864 F.3d at 797. In this respect, the evidence showed that Iran established a relationship with AAH as part of a comprehensive campaign to deter the U.S. from maintaining a presence in the Middle East by terrorizing and intimidating coalition forces. Ex. 65 at 18; Ex. 66 at 22–23. Iran actively supported AAH by providing funding, weapons, training, and intelligence, and it knew—and intended—that AAH would carry out attacks on coalition forces. *See supra* Part II.A.3; *see also* Ex. 66 at 55. That support included training on kidnapping and eluding U.S. and coalition forces. *See* Ex. 66 at 35. And, although specific intent is not required to establish causation, *Owens*, 864 F.3d at 798, the evidence shows that Iran helped plan the abductions of the soldiers from the Karbala PJCC. The fact that the soldiers were also tortured and killed was, by any reasonable measure, a foreseeable consequence of Iran's support. Ex. 1 at 3–4 ("[S]enior leadership within the Q[u]ds Force knew of," "support[ed]" and "direct[ed]" the attack); *id.* at 3 ("[T]he Iraqi [S]pecial [G]roups could not have conducted th[e] complex operation without the support and direction of the Q[u]ds Force."); *see Owens*, 864 F.3d at 795 (noting that the Sudan's "own actions . . . gave it knowledge of al Qaeda's capabilities and aims").

*     *     *

The Court, accordingly, concludes that the Islamic Republic of Iran and the IRGC are not entitled to foreign sovereign immunity, and the Court possesses subject matter jurisdiction over Plaintiffs' claims.[14] *See* 28 U.S.C. §§ 1330(a), 1605A(a)(1).

---

[14] The fact that most of the Plaintiffs in this case are "third-party claimant[s]" rather than "the legal representative[s] of [the] victim[s] [who were] physically injured" does not divest this Court of subject matter jurisdiction. *Owens*, 864 F.3d at 807. "Who in particular may bring a claim against a foreign sovereign is a question of substantive law, wholly separate from the question of [federal courts'] jurisdiction." *Id.*

4.    *Federal Cause of Action*

Having concluded that the Court possesses subject matter jurisdiction, little else is required to show that Plaintiffs are entitled to relief under the federal cause of action the Congress enacted as part of the National Defense Authorization Act. *See* Pub. L. No. 110-181, § 1083, 122 Stat. 338–44 (2008) (codified at 28 U.S.C. § 1605A(c)). Although the federal cause of action was added to the FSIA in 2008, "§ 1605A(c) operates retroactively" and "plainly applies . . . to the pre-enactment conduct of a foreign nation." *Owens*, 864 F.3d at 815. There is almost total "overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017), and a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law—with one minor exception: a foreign state is only liable to "a national of the United States," "a member of the armed forces," "an employee [or contractor] of the [U.S.] Government . . . acting within the scope of the employee's employment," or "the legal representative of " any such person. *Id.*

This one exception affects the claim of one of the plaintiffs in this case, Bashar Al-Taie, the brother of Ahmed Al-Taie. Although Ahmed Al-Taie was a U.S. national and a member of the armed forces, Bashar Al-Taie is neither. *See* Dkt. 38 at 8 n.9. For jurisdictional purposes, this fact is non-consequential, because the waiver of foreign sovereign immunity applies so long as "the claimant *or* the victim was, at the time of the" terrorist attack, a U.S. national, member of the armed forces, or government employee. 28 U.S.C. § 1605A(a)(2)(A)(ii) (emphasis added). The federal cause of action, however, is more restrictive and limits liability to those who are themselves U.S. nationals, members of the armed services, or government employees. 28 U.S.C.

§ 1605(c). If Bashar Al-Taie had sued as the administrator of Ahmed Al-Taie's estate, he would have had a cause of action in that capacity. But that role has fallen to Kousay Al-Taie, Ahmed's father. Ex. 46 (Estate Documents of Ahmed Al-Taie). Accordingly, the Court concludes—as Plaintiffs concede, *see* Dkt. 59-1 at 50—that Bashar Al-Taie's federal law claim fails as a matter of law. Subject to a showing that they suffer compensable losses, however, the remaining plaintiffs have, for the reasons described above, carried their burden on demonstrating that they are entitled to relief under § 1605A(c).

**B.    Personal Jurisdiction**

The Court also concludes that it has personal jurisdiction over both the Islamic Republic of Iran and the IRGC. Under the FSIA, the Court has personal jurisdiction over a foreign state "as to every claim for relief over which the [Court] ha[s] jurisdiction . . . where service has been made under section 1608." 28 U.S.C. § 1330(b). Thus, "[i]n order to sue a foreign state or one of its political subdivisions, a plaintiff must effect service in compliance with" 28 U.S.C. § 1608(a). *Barot v. Embassy of the Republic of Zam.*, 785 F.3d 26, 27 (D.C. Cir. 2015).

Section 1608(a) "provides four methods of service in descending order of preference:"

(1)    by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

(2)    if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

(3)    if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

(4)     if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services--and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).

The first two mechanisms of effecting service—by delivery of the summons and complaint either "in accordance with any special arrangement for service between the plaintiff and the foreign state" under § 1608(a)(1) or "in accordance with an applicable international convention on service of judicial documents" under § 1608(a)(2)—were not available to Plaintiffs in this case. *See* Dkt. 18 at 1. No "special arrangement" governs service between Plaintiffs and Iran, and "Iran is not party to an international convention on service of judicial documents." *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008) (internal citations omitted).

As a result, Plaintiffs attempted service under the third alternative, which requires service by mail from the clerk of the court to the head of the ministry of foreign affairs of the foreign state. 28 U.S.C. § 1608(a)(3). On November 30, 2015, Plaintiffs initiated service as to both Defendants under § 1608(a)(3). Dkt. 10. The clerk of court, accordingly, mailed the relevant documents to Iran on December 2, 2015. Dkt. 12. On February 9, 2016, Plaintiffs notified the Court that Iran had refused service. Dkt. 13.

Finally, Plaintiffs served Defendants under § 1608(a)(4). That provision requires service by mail from the clerk of court to the Secretary of State, who must then transmit the required material through diplomatic channels to the foreign state. 28 U.S.C. § 1608(a)(4). The

Department of State must then send "the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." *Id.* Plaintiffs provided the clerk with the relevant documents and requested service pursuant to § 1608(a)(4) on February 9, 2016. Dkt. 14. The clerk mailed these materials to the State Department the next day. Dkt. 16. On March 8, 2017, the State Department notified the clerk that the documents had been delivered to the Islamic Republic of Iran. Dkt. 19. As the Department explained, "[b]ecause the United States does not maintain diplomatic relations with the government of Iran," the documents were transmitted to the Embassy of Switzerland in Iran, which then transmitted the materials to the Iranian Ministry of Foreign Affairs on January 31, 2017. *Id.* at 1, 4. The Swiss Embassy reported that the Iranian Ministry of Foreign Affairs "refused" to accept the documents that same day. *Id.* at 4. After the Islamic Republic of Iran failed to respond, the clerk entered a default. Dkt. 23.

As for the IRGC, Plaintiffs noted in a status report that the diplomatic note from the Swiss Embassy referred to the Iranian Ministry of Information and Security, rather than the IRGC, due to "a possible clerical error" but that the underlying service materials "properly identifie[d] the IRGC as the second Defendant." Dkt. 20 at 2–3. In an abundance of caution, on September 12, 2017, Plaintiffs reinitiated service on the IRGC under § 1608(a)(4). Dkt. 25. The clerk transmitted the materials to the State Department on September 15. Dkt. 27. On January 24, 2018, the Department notified the clerk that the documents had been delivered to Iran via the Swiss Embassy on December 10, 2017, and, once again, the Iranian Ministry of Foreign Affairs refused to accept service the same day. Dkt. 30 at 1, 4. The IRGC failed to respond. On March 27, 2018, the clerk entered a default as to the IRGC. Dkt. 39.

Because Plaintiffs accomplished service under 28 U.S.C. § 1608(a)(4) on Defendants the Islamic Republic of Iran and the IRGC, the Court possesses personal jurisdiction over both Defendants. *See* 28 U.S.C. § 1330(b).

**C.** **Liability for State Law Claims**

In addition to suing under federal law, Plaintiffs assert several state law claims. As to most of the plaintiffs, these claims are redundant of their federal law claims and do not provide any additional right to recover. As noted above, however, Bashar Al-Taie is not entitled to recover under federal law. The fact that he is neither a U.S. national nor a member of the U.S. armed forces does not, however, foreclose him from seeking to recover under state tort law. *See Owens*, 864 F.3d at 809. Historically, the state-sponsored terrorism exception to the FSIA was not understood to create a federal cause of action against foreign states (as opposed to state officials) but, rather, to operate merely as a "pass-through" for state law claims. *Owens*, 864 F.3d at 764; *see also Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004). When Congress amended the law to provide a federal cause of action, *see* National Defense Authorization Act for Fiscal Year 2008 § 1083, it did not upset the prior law permitting plaintiffs to assert state law claims after clearing the hurdle of foreign sovereign immunity, *see Owens*, 864 F.3d at 807–09. Although most plaintiffs proceeding under the state-sponsored terrorism exception to the FSIA need not rely on state tort law, the "pass-through approach remains" a "viable" option for those who are unable to invoke the federal cause of action, such as "foreign family members" like Bashar Al-Taie. *Id.* at 809.

1.    *Choice of Law*

In the absence of a federal cause of action, the Court must first consider what law applies. Because "[t]he FSIA does not contain an express choice-of-law provision," the Court must apply

the choice of law rules of the forum state. *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009). The Court will, accordingly, apply District of Columbia choice of law principles.

The District of Columbia uses a choice-of-law rule that "blend[s] a 'governmental interest analysis' with a 'most significant relationship' test." *Id.* at 842 (quoting *Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 40–41 & n.18 (D.C. 1989)). Under the governmental interest analysis, the Court "must evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Id.* (quoting *Hercules & Co*). And, under the "most significant relationship test," the Court must consider the following four factors taken from the Restatement (Second) of Conflict of Laws: (1) "the place where the injury occurred"; (2) "the place where the conduct causing the injury occurred"; (3) "the domicil[e], residence, nationality, place of incorporation and place of business of the parties"; and (4) "the place where the relationship, if any, between the parties is centered." *Id.* (quoting Restatement (Second) of Conflict of Laws § 145(2) (1971)). Section 145 of the Restatement "also references the factors in Section 6 of the Restatement, which include the needs of the interstate and the international systems, the relevant policies of the forum, the relevant policies of other interested states, certainty, predictability and uniformity of result, and ease in the determination and application of the law to be applied." *Dammarell v. Islamic Republic of Iran*, No. CIV.A. 01-2224JDB, 2005 WL 756090 at *18 (D.D.C. Mar. 29, 2005) (citing Restatement (Second) of Conflict of Laws § 145 (1971)); *see also Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 154 (D.D.C. 2011), *aff'd in part and vacated in part on other grounds*, 864 F.3d. 751 (D.C. Cir. 2017).

Here, there are three potential sources of law that might govern Bashar Al-Taie's claims: the law of the forum state (the District of Columbia), the law of Bashar Al-Taie's domicile (Canada), or the law of the place of Ahmed Al-Taie's abduction, torture, and murder (Iraq). Plaintiffs contend that D.C. law should govern Bashar Al-Taie's claims, and the Court agrees.

This case does not raise a conflict between various domestic jurisdictions; rather, the Court must decide whether to apply D.C. law or the law of one of two foreign jurisdictions— Canada and Iraq. The sole nexus to Canada is that Bashar Al-Taie happens to live there. The nexus to Iraq, in contrast, is stronger because that is where Ahmed Al-Taie served, and it is where he was captured, tortured, and killed. He was, however, a U.S. citizen and member of the U.S. armed forces, Ex. 70 at 1 (Certificate of Death (Overseas) for Ahmed Al-Taie, Feb. 29, 2012), and, most importantly, he was targeted by AAH because he was a U.S. citizen and soldier.

In dicta bearing directly on the question presented here, the D.C. Circuit observed as follows in *Oveissi v. Islamic Republic of Iran*: "We have no doubt that the United States has a strong interest in applying its domestic law to terrorist attacks on its nationals, especially when, as was the case in *Dammarell* [*v. Islamic Republic of Iran*], the attacks are 'by reason of their nationality.'" 573 F.3d at 843. In *Dammarell*, in turn, the district court "applied the law of the American plaintiffs' state of domicile—rather than that of Lebanon—to a suit brought by American victims of the 1983 bombing of the United States Embassy in Beirut." *Id.* As the district court explained in *Dammarell* and the D.C. Circuit repeated in *Oveissi*, "the injuries in that case were 'the result of a state-sponsored terrorist attack on a United States embassy and diplomatic personnel[,] [and the] United States has a unique interest in its domestic law . . . determining damages in a suit involving such an attack." *Id.* (quoting *Dammarell*, 2005 WL 756090 at *20). That principle, moreover, found support in the Restatement (Third) of Foreign

Relations, which recognizes a country's "jurisdiction to prescribe law with respect to 'certain conduct outside its territory by persons not its national *that is directed against* the security of the state or against a limited class of other interests,'" and notes that "this principle is 'increasingly accepted as applied to terrorist . . . attacks on a state's nationals by reason of their nationality . . ." *Id.* (quoting Restatement (Third) of Foreign Relations § 402(3) & 402 cmt. g) (emphasis in *Oveissi*) (citation to *Dammarell* omitted).

Although expressing approval for this summary of the governing law, the D.C. Circuit declined to apply domestic law in *Oveissi*. Because, in that case, the victim of the assassination was not a U.S. national, there was no evidence that the assailants knew that the victim's grandchild—the plaintiff in *Oveissi*—was a U.S. national, and there was no evidence that "the United States or its nationals were in any other way the object of the attack." *Id.* at 374. The evidence, to the contrary, showed that the assassination occurred in France and was intended "to deter French intervention in Lebanon." *Id.* (emphasis omitted). In short, "if any country was the object of the attack, it was France." *Id.* The Court of Appeals, therefore, concluded that French law should govern.

Although not identical, the present case is closer to *Dammarell* than to *Oveissi*. It is, moreover, on all fours with *Owens v. Republic of Sudan*, where the district court applied the principles discussed above and held that D.C. law, rather than the law of the places of the tort (Kenya and Tanzania) or the place of the domicile of each plaintiff (including both U.S. and foreign locations), was appropriate. 826 F. Supp. 2d at 154. There, the court emphasized the "unique interest" of the United States in applying domestic law in terrorism cases, and it stressed the interest in applying the law of "the seat of the federal government" in a case involving an overseas attack on the United States. *Id.* at 155–56. The Court concludes that the same

considerations apply here and that D.C. law, rather than Canadian or Iraqi law, should govern. *See Owens*, 864 F.3d at 809 (noting that "[t]he district court held that District of Columbia law control[led]" the plaintiffs' state law claims); *id.* at 809–12 (discussing the application of D.C. law to plaintiffs' claims for intentional infliction of emotional distress).

    2.    *Liability*

Having concluded that D.C. law applies, however, the Court concludes that Plaintiffs have yet to establish that Bashar Al-Taie is entitled to recover under that body of law. The amended complaint asserts four state law claims on behalf of Bashar Al-Taie: (1) wrongful death, (2) intentional infliction of emotional distress, (3) conspiracy, and (4) aiding and abetting. Dkt. 9 (Am. Compl. ¶¶ 80–84, 105–10, 116–21, 122–27). But Plaintiffs offer no analysis of whether and how the elements of these claims might be satisfied here, and Bashar Al-Taie's right to recover under D.C. for his brother's death is far from clear. The D.C. wrongful death statute, for example, permits "the spouse or domestic partner and the next of kin of the deceased person" to recover, but it makes no reference to a sibling's right to recover. *See* D.C. Code § 16-2701(b). If some other authority exists that permits a sibling to recover for wrongful death under D.C. law, Plaintiffs have not directed the Court's attention to it. Nor have they pointed to any authority that recognizes an "independent tort action for civil conspiracy in the District of Columbia," *Wiggins v. Phillip Morris, Inc.*, 853 F. Supp. 470, 483 (D.D.C. 1994*)*; *Cockrum v. Donald J. Trump for President, Inc.*, No. CV 17-1370 (ESH), 2018 WL 3250445 *10 (D.D.C. July 3, 2018) (quoting *Wiggins*), or an independent action for "aiding and abetting," which is typically treated as a form of "secondary liability," *see Central Bank of Denver, NA v. First Interstate Bank of Denver, NA*, 511 U.S. 164, 184 (1994).

On seemingly stronger footing, Bashar Al-Taie also asserts a claim for intentional infliction of emotional distress. But, as the D.C. Circuit recognized in *Owens v. Republic of Sudan*, the D.C. courts have yet to decide whether "D.C. tort law requires a plaintiff to be present at the scene of a defendant's outrageous and extreme conduct in order to recover for" intentional infliction of emotional distress. 864 F.3d at 809–10. In light of this uncertainty, and given the importance of the question, the *Owens* court certified the following question to the D.C. Court of Appeals:

> Must a claimant alleging emotional distress arising from a terrorist attack that killed or injured a family member have been present at the scene of the attack in order to state a claim for intentional infliction of emotional distress?

*Id.* at 812. Until the D.C. Court of Appeals answers that question, it would be premature for this Court to determine whether Bashar Al-Taie—or any other plaintiff suing as a family member in this case—is entitled to recover under D.C. law for intentional infliction of emotional distress.

The Court will, accordingly, deny Bashar Al-Taie's motion for entry of a default judgment without prejudice.

## CONCLUSION

As discussed in the Court's prior order, Dkt. 86, Plaintiffs' motion for default judgment, Dkt. 64, is **GRANTED** in part and **DENIED** in part. The Court **GRANTS** default judgments against Defendants the Islamic Republic of Iran and the Islamic Revolutionary Guard Corps with respect to liability on the claims brought by the estates of each of the four direct victims and the U.S. national Plaintiffs under 28 U.S.C. § 1605A(c), subject to each showing the required familial relationship. The Court **DENIES** Plaintiff Bashar Al-Taie's motion for a default judgment with respect to his federal law claim and **DENIES** without prejudice his motion for a default judgment with respect to his state law claim. The Court has entered a separate order regarding the appointment of a special master to hear the damages claims of the estates of the four direct victims and the U.S. national plaintiffs and to report to the Court regarding the appropriate award. *See* Dkt. 87.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: August 2, 2018