# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NOALA FRITZ**, *et al.*,          ) | |
|                      ) | |
|       *Plaintiffs,*         ) | |
|                      ) | |
|        v.                ) | **Civil Action No. 15-456 (RDM)** |
|                      ) | |
| **ISLAMIC REPUBLIC OF IRAN**, *et al.*,    ) | |
|                      ) | |
|       *Defendants.*        ) | |
|                      ) | |

## REPORT AND RECOMMENDATION OF SPECIAL MASTER
## REGARDING COMPENSATORY DAMAGES

This case arises out of the kidnappings, torture, and murders of U.S. service-members Jacob Fritz, Johnathan Bryan Chism and Shawn Falter ("Karbala Direct Victims") near Karbala, Iraq on January 20, 2007, and the kidnapping of U.S. service-member Ahmed Al-Taie ("Baghdad Direct Victim") (collectively, the "Direct Victims") in Baghdad, Iraq on October 23, 2006 and his subsequent torture and murder. The Estates of Jacob Fritz, Johnathan Bryan Chism, Shawn Falter, and the Estate of Ahmed Al-Taie seek economic damages to compensate for the Direct Victims' lost earnings capacity and pain and suffering damages for the Direct Victims' abduction, torture, and murder. Family members of the Direct Victims – Jacob Fritz's mother, Noala Fritz, the estate of his father Lyle Fritz (who died following the events leading to this civil action), and his brothers, Daniel Fritz and Ethan Fritz; Johnathan Bryan Chism's mother, Elizabeth Chism; his father, Danny Chism, his step-mother, Vanessa Chism, and his sister, Julie Chism; Shawn Falter's father, Russell J. Falter, his mother Linda Falter, his sister, Marjorie Falter, his brothers Russell C. Falter, John Sackett and Jason Sackett, his step-sister, Marsha Novak; and his step-brothers, David Lucas, Tim Lucas, and Andrew Lucas; and Ahmed Al-Taie's father, Kousay Al-Taie, his mother Nawal Al-Taie, and his brother Hathal Taie (collectively, "Family Members") – seek solatium damages

relating to the deaths of the Direct Victims.[1]

By Order dated August 1, 2018, the Court appointed the undersigned as Special Master to provide a report and recommendation on the imposition of compensatory damages with respect to the U.S. National Plaintiffs.  (Dkt. 87).  The Order outlines the required responsibilities of the Special Master.  In fulfilling these responsibilities, I have reviewed relevant pleadings, the Court's order, the sworn testimony provided by the Plaintiffs, video depositions of Plaintiffs, testimony and autopsy reports regarding the nature of injuries and abuse suffered by the Direct Victims and the manner of their deaths, trial transcripts, the Court's Memorandum Opinion of August 2, 2018, and applicable case law.  My Report and Recommendation is based on the above-described information, evidence, and applicable case law.

## **BRIEF OVERVIEW**

This case was brought under the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(a).  The Court has found that the estates of the four Direct Victims and the U.S. National Plaintiffs (the Family Members) are entitled to relief under this federal cause of action.  Memorandum Opinion (Dkt. 89) at 57.  This report details the evidence relevant to damages and provides recommendations regarding the amount of compensatory damages for the relevant Plaintiffs.

Plaintiffs have provided extensive and detailed evidence of the kidnappings, torture and deaths of the Direct Victims and have further provided detailed testimony of the Family Members describing the events, their relationship with the decedents, and the effect on their lives of the

---

[1]  Ahmed Al-Taie's brother, plaintiff Bashar Al-Taie, also seeks damages. Pursuant to the Court's August 1, 2018 Order appointing me as Special Master (Dkt. 87), I am to consider all issues related to compensatory damages as to each claim made by Plaintiffs, with the exception of Plaintiff Bashar Al-Taie. *Id.* at 1.

deaths of the Direct Victims. The evidence demonstrates that in each case, the Direct Victim's death was not instantaneous but was preceded by captivity, torture, and circumstances designed to generate terror and fear in the victims. Each of the Family Members who testified was credible and articulate. In each case the testimony demonstrates ongoing grief, loss of companionship, emotional trauma and loss. The testimony of different members of each family is corroborated by the testimony of other members of the same family. As explained in more detail below, the evidence provides ample basis for an award of both economic and non-economic damages for the estates of each of the Direct Victims and solatium damages for each of the Family Members.

## FACTUAL FINDINGS

### I.      KARBALA DIRECT VICTIMS

Three of the Direct Victims – First Lieutenant Jacob Fritz, Private First Class Shawn Falter, and Specialist Johnathan Bryan Chism – were kidnapped from their assigned base, the Karbala Provincial Joint Coordination Center ("PJCC") in Iraq, on January 20, 2007. (To be clear, the Direct Victims were not engaged in a combat situation.). The record shows that they were the victims of a well-planned attack and were taken alive and transported together from the site of the abduction. The United States Army's investigation determined that Jacob Fritz, Shawn Falter, and Bryan Chism were abducted, handcuffed, and ultimately executed. Testimony of Col. W. Rabena (ret.), April 11, 2018, 85:1-86:3; 87:18-22. Fritz, Chism, and Falter each suffered numerous gunshot wounds and blunt force injuries, which were sustained while they were still alive. Memorandum Opinion (Dkt. 89) at 25. Each victim was subjected to severe beatings at the hands of the captors, before being executed while handcuffed. *Id.* at 25-28. Expert testimony and autopsy documents demonstrate that Fritz died of multiple gunshot wounds and that he was shot and beaten while alive and that the wounds he suffered while alive would have caused severe pain.

Memorandum Opinion (Dkt. 89) at 26-27; Testimony of C. Mallak, Evidentiary Hearing, April 12, 2018, 196:3-197:1; 203:6-206:9 (Dkt. 53). The evidence shows that Fritz was conscious while wounded, suffered a non-fatal gunshot wound initially that would have caused extreme pain, and that he wrote his name in blood on the inside of the vehicle in which he was transported. Memorandum Opinion (Dkt. 89) at 26; Testimony of C. Mallak, Evidentiary Hearing, April 11, 2018, 84:4-16 (Dkt. 52).

Bryan Chism also died from multiple gunshot wounds and he also sustained contusions and injuries consistent with being beaten and kicked before death and while conscious. Memorandum Opinion (Dkt. 89) at 27. One of the gunshot wounds caused him to asphyxiate. Testimony of C. Mallak, Evidentiary Hearing, April 12, 2018, 215:23-216:18 (Dkt. 53). These wounds would have caused severe pain according to the expert testimony. *Id.* at 218:4-219:5. Falter also died from multiple gunshot wounds. Shawn Falter received a severe wound during the abduction but the evidence confirms that he was alive at that time and that he suffered blunt force trauma to the head and various contusions and hemorrhaging around his face, neck, torso and extremities while alive. Memorandum Opinion (Dkt. 89) at 22; Testimony of C. Mallak, Evidentiary Hearing, April 13, 2018, 25:14-26:8, 28:9-29:21 (Dkt. 54). These wounds also would have caused severe pain prior to death. Testimony of C. Mallak, Evidentiary Hearing, April 13, 2018, 30:3-31:15 (Dkt. 54).

## II.        AL-TAIE ABDUCTION

On October 23, 2006, Staff Sergeant Ahmed Al-Taie was serving in Iraq as a translator for the Provincial Reconstruction Team. He was abducted while visiting family in Iraq by members of JAM Jaysh al-Mahdi ("JAM"). Memorandum Opinion (Dkt. 89) at 12, 33. He was later turned over to Asai'b Ahl al-Haq ("AAH") (also known as "the Khazali Network") *Id.* at 34; Evidentiary

Hearing, April 11, 2018, (Dkt. 52) 213:7-9.   AAH sought to exchange Ahmed for the release of

certain prisoners.   On February 14, 2007, an AAH group released a "proof of life" video.   A witness

testified that he learned that Al-Taie had been killed during conversations in June or September,

2009.   Declaration of ███████, Ex. 76, ████████████████, Evidentiary Hearing, April

13, 2018, Sealed Proceedings 13:14-15:24.   Ahmed's remains were provided to U.S. forces on

February 22, 2012.   Memorandum Opinion (Dkt. 89) at 35. Ahmed's family did not know whether

he was alive or dead until the remains were released in 2012.   K. Al-Taie Dep., April 2, 2018,

21:5-17 (Dkt. 80-6). According to the testimony of Dr. Mallak, Ahmed was probably killed within

one to three years of the date his remains were returned – which means he was killed between

February 22, 2009 and February 22, 2011.   Testimony of C. Mallak, Evidentiary Hearing, April

13, 2018, 37:18-38:1 (Dkt. 54).   The autopsy shows that death was caused by gunshot wounds –

and that one of the wounds was consistent with an execution.   Memorandum Opinion (Dkt. 89) at

35.   The Declaration of ████████, a witness, confirms that Ahmed was beaten repeatedly while

held a captive.   Declaration of ████████, Ex. 76, ████████████████, Evidentiary Hearing,

April 13, 2018, Sealed Proceedings 12:15-21).   The Court found that Ahmed suffered severe and

persistent pain during his captivity.   Memorandum Opinion (Dkt. 89) at 35.

The evidence presented thus confirms that each of the Direct Victims was kept alive for a

period of time during captivity, that each suffered grievous injuries including persistent beatings

and gunshot wounds during their captivity, and that each was eventually murdered by their captors.

It is also clear that each of the Direct Victims likely did not know how long the beatings and

captivity would last, and also knew and understood the likelihood that they would be killed by

their captors.   The fact that one of the Direct Victims wrote his name in blood on the inside of the

vehicle indicates that the Direct Victims feared that they would be killed and that no-one would

know their fate.  The Court has found that the nature, severity, and circumstances of the beatings "demonstrated an intent to cause extreme pain and suffering."  Memorandum Opinion (Dkt. 89), at 46-47.  The Court further found that the "gratuitousness, intensity and inhumanity of the assault permits a finding of torture…"  *Id*. at 47.

## III.   FAMILY MEMBERS

All of the individual Family Members have provided detailed testimony about their experience, their relationship with the Direct Victims, their emotional injuries, and the effect of the kidnappings, torture, and murders of the Direct Victims on their daily lives.  Members of the Fritz family have also provided testimony relevant to Lyle Fritz, the deceased father of Jacob Fritz.  I have summarized certain pertinent portions of the testimony below.

### A.   Family of Jacob Fritz

#### 1.   Noala Fritz – Mother of Jacob Fritz

Jacob was Noala Fritz's eldest son. N. Fritz Dep., March 2, 2018, 5:19 (Dkt. 71-7).  Noala testified about their family life when Jacob was a child.  They sang together when he was in grade school.  *Id*. at 27:7-12.  They also went to church together as a family every week.  *Id*. at 29:12-13.  When Jacob left to attend West Point, Noala told him that he would meet people who had much more than he had growing up, but that he had a farm and a "family that loves [him]."  *Id*. at 21:4-10.  When Noala learned that Jacob had been killed, she felt that her "world had just ended."  *Id*. at 37:5-7.  She testified that "[s]leep was non-existent.  You couldn't sleep.  You couldn't sleep because at night you would close your eyes, and once – probably the next day when we found out what had happened, that he had been abducted or handcuffed and shot, driven to – you can't sleep.  You can't sleep. I asked God, I would say please explain this to me.  Please promise me my son didn't suffer."  *Id*. at 37:22-38:4.  She still feels grief, over a decade after his death.  *Id*. at 38:11-

14.

Noala keeps many pictures of Jacob in her home, from when he was in kindergarten to when he graduated from West Point. *Id.* at 45:11-46:10. There are also pictures of Jacob in various places in her community, such as the library and local hardware store. *Id.* at 47:2-10. Noala is the spokesperson for Remembering our Fallen. *Id.* 51:24-52:4. While she "mourn[s] Jake 24/7," she also "celebrate[s] his life and those of other soldiers." *Id.* at 53:2-5. Her younger son, Ethan, is "a field artillery officer like his brother Jake." *Id.* at 53:13-14. Because of Jacob's death, she is worried about Ethan. *Id.* at 53:21-25.

Noala described Jacob as a future farmer who intended to return to his hometown after completing a military career. *Id.* at 22:14-23:6, 35:12-15. Jacob was described by his family and by others as a leader who has an infectious smile. *Id.* at 34:15-21; Testimony of █████, Hearing Transcript April 13, 2018, 115:13-18 (Dkt. 54).

### 2. Lyle Fritz – Father of Jacob

Lyle was Jacob's father. Lyle was a farmer and Jacob worked with his father and helped with the farm. N. Fritz Dep., March 2, 2018, 18:3-6 (Dkt. 71-7). Lyle "took his boys with him everywhere. If the boys could be with him, they went with him." *Id.* at 32:3-4. From the time Jacob could eat solid foods, Lyle regularly made homemade breakfast for the entire family. *Id.* at 8:25-9:12. According to Jacob's brother Daniel, Jacob's relationship with the entire family, including Lyle, was "fantastic…. I think he was the – for my dad, Jake being the firstborn son working on the farm, my dad was very proud." D. Fritz Dep., March 2, 2018, 11:15-22 (Dkt. 71-8).

Noala testified that Jacob's death was difficult for Lyle. Several years before Jacob's death, Lyle developed lung problems. In 2005, on the same day Jacob graduated from West Point, Lyle

7

learned that he was put on a list for a lung transplant.  As Noala testified, "[h]e got that lung, and he was doing great.  And when he lost Jake, it was like it just – we lost Jake in 2007, we lost Lyle in 2011…. And I think Lyle was so worried and broken from losing Jake, and then Dan leaving, and he said – he told one of my friends, he goes, I'm tired.  I'm tired."  N. Fritz Dep., March 2, 2018, 38:25-39:16 (Dkt. 71-7).

Daniel testified that Lyle "took it very hard.  He was – like I mentioned earlier, Jake was his firstborn son, the first guy to help him on the farm, and he lost that.  He lost his firstborn son."  Fritz Dep., March 2, 2018, 31:9-14 (Dkt. 71-8).  As to Lyle's health, Daniel said that he was "not well at that time, and I think the stress – the stress [of] losing his firstborn son exponentially made his health decline faster."  *Id*. at 31:20-23.  Daniel does not recall his father ever crying during his childhood, but it became a "common occurrence" after Jacob died.  *Id*. at 32:2-7.

Jacob had always wanted to return home and build his own house on a plot of land across from his childhood home.  After Jacob died, Lyle purchased that land.  There is a stone on the land that says "Jake's Farm."  E. Fritz Dep., March 2, 2018, 47:20-49:21 (Dkt. 71-9).

### 3.      Daniel Fritz – Jacob's Brother

Daniel was three years younger than Jacob.  D. Fritz Dep., March 2, 2018, 6:9-13 (Dkt. 71-8).  Growing up on a farm, the brothers played together and spent a lot of time together.  *Id*. at 6:19-7:21, 8:15-9:25.  They lived in a rural area, so there were not many other kids around.  *Id*. at 10:1-5.  They had "limited exposure with other people," but they had each other and their family.  *Id*. at 10:25.

Daniel saw Jacob as a "role model" and "idol."  *Id*. at 10:7-21.  As Daniel testified, "he was my leader.  He was the guy that I followed.  He was the guy that I wanted to be because outside of my dad he was my role model for…what I should be as I grew up through grade school, junior

high, and high school." *Id.* at 10:16-21.  Jacob also "provided emotional support" for Daniel and was a mentor.  *Id.* at 15:22, 16:6-7.

Daniel followed in his brother's footsteps, attending West Point.  *Id.* at 6:22-25.  According to Daniel, Jacob inspired him to attend college.  *Id.* at 17:23-18:1.  He testified that "had it not been for Jake speaking with the track coaches and then spurring their interest in me, I can confidently say that I would not have gone to West Point, and I would not be on the path that I'm on right now in life."  *Id.* at 19:22-20:1.

Daniel learned about Jacob's passing while he was at West Point, celebrating his 500th night at the academy.  *Id*. at 23:24-24:4.  He testified that it went from one of his best days at the academy to the "worst thing in [his] life."  *Id*. at 25:16-20.  "[I]t was unimaginable."  *Id*. at 25:15.  Daniel had to take some time off from West Point and his grade suffered.  *Id*. at 26:9-23.  Upon his return, he felt ostracized and like the other cadets were afraid to talk to him.  *Id*. at 39:6-25.  Yet, he pressed on, graduated from West Point, and served in Iraq, just like his older brother did.  *Id*. at 40:4-12.

But because of what happened to Jacob, Daniel was scared—he did not want his mother to get "another phone call."  *Id*. at 42:19-25.  Eventually, Daniel left active duty service.  Jacob wanted to be a colonel and Daniel believes that "if Jake had been able to pursue his goals… [he] would have followed him and stayed on active duty and pursued goals similar to his."  *Id*. at 45:2-9.  Daniel is now in the Nebraska National Guard, where he can be close to his family.  He believes that what happened to his brother has limited his chances of being successful.  *Id*. at 45:10-46:1.

Outside of the military, Daniel felt that without Jacob, his family would rely on him more, and he did not "feel ready to fill the role that Jake had filled."  *Id*. at 28:10-16.  He does not believe that he is able to fill the role Jacob played for their younger brother, Ethan.  *Id*. at 57:1-10.  To this

day, it hurts Daniel to think about the circumstances of his brother's death.  *Id*. at 34:22-23.  As he

testified, "[i]t's unbearable to think [about] the stress that he went through" during the abduction.

*Id*. at 35:4-5.

### 4.      Ethan Fritz – Jacob's Brother

Ethan was 11 years younger than Jacob.  E. Fritz Dep., March 14, 2018, 8:5-6 (Dkt. 71-9)

Despite the age gap, Jacob spent a lot of time with Ethan and took him to a lot of activities when

they were both at home in Nebraska.  *Id*. at 9:19-10:9.  The two shared a bedroom growing up, and

Ethan saw Jacob as his "protector."  *Id*. at 11:9-15.  All three brothers spent a lot of time together.

*Id*. at 14:20-15:22.  The entire family always ate meals together.  *Id*. at 17:11-14, 18:22-19:1.

When Jacob left for West Point, Ethan was devastated.  He cried himself to sleep some nights,

because the other bed in his room was empty.  *Id*. at 27:6-28:2.  When Jacob visited home from

West Point, he and Ethan would talk about music.  Jacob always brought Ethan a new CD.  *Id*. at

33:8-19.  In fourth grade, when assigned to draw a picture of what he wanted to do when he grew

up, Ethan drew Jacob in a military uniform and wrote, "I want to be a soldier."  *Id*. at 29:10-16.

Eventually, he, too, joined the military.  *Id*. at 80:19-22, 89:12-15.

Ethan was 14 years old the night the family was informed of Jacob's death.  His parents

were out for the night, and he was at home alone, watching a movie.  *Id*. at 50:17-51:14.  He heard

a knock at the front door.  *Id*. at 51:17-18.  This was not typical—everyone in the area knew to use

the back door.  *Id*. at 51:19-52:8.  When Ethan went to see who was at the door, he saw a colonel

and chaplain.  *Id*. at 53:19-20.  When Ethan told them that his parents were not at home, they

discussed amongst themselves whether they should tell Ethan about his brother.  They ultimately

told him.  *Id*. at 54:4-55:4. He then called his mother and told her that she needed to come home

as soon as possible.  While his parents were on the way home, the colonel and chaplain were sitting

at the dining room table. *Id.* at 56:2-58:15. As soon as his parents came home and his mother saw the two gentlemen in the dining room, she collapsed. *Id.* at 61:11-62:3.

At the time, Ethan was "emotionless" and "didn't know how to react." *Id.* at 66:3-7. For years, he was in disbelief that this could happen to his "hero, the guy that [he] looked up to." *Id.* at 66:11-20. He had difficulty sleeping at the time and, to this day, there are still some nights when he cannot sleep. *Id.* at 67:15-68:2. He misses "talking to him, sitting down and spending time with him." *Id.* at 102:16-18.

**B.    Family of Johnathan Bryan Chism**

**1.    Elizabeth Chism – Mother of Johnathan Bryan Chism**

Elizabeth Chism is Bryan's mother. E. Chism Dep., March 16, 2018, 6:13-14 (Dkt. 74-5 at 7. (Elizabeth testified that Jonathan preferred to use his middle name - Bryan. *Id.* at 6:16-20.) According to Elizabeth, Bryan loved people. *Id.* at 25:5-12. She testified that he "took care of people. If you had a car problem, he took care of that. He may have hidden his soft heart, but…he was there for everybody." *Id.* at 26:4-7. When Bryan was growing up, the family regularly ate breakfast and dinner together. *Id.* at 7:22-25. Bryan was involved in many activities and Elizabeth supported his interests. They went on family trips. *Id.* at 9:19-10:14, 12:4-17, 21:3-6,

Elizabeth testified as to the long term effect of Bryan's death on her emotional well-being. When Bryan was killed, Elizabeth "asked for a copy of everything and sat and read everything, so [she] [knew] how he was killed." *Id.* at 18:8-10. She testified several times that "it was murder." *Id.* at 18:5-11, 20:22-23. She does not remember the first few weeks after she learned about Bryan's death. *Id.* at 18:19-19:3. She was prescribed Prozac for depression, visited with an army social worker, and participated in the Tragic Assistance Program (TAPS), a support group for family members of fallen soldiers. *Id.* at 19:15-20:11. She still participates in TAPS to this day.

*Id*. at 20:12-14.  She still experiences depression to this day.  *Id*. at 20:25-21:1.  She visits Bryan's grave and has maintained Bryan's bedroom.  She sometimes sleeps in his bed because she misses him.  *Id*. at 22:4-9.  She also testified about the difficulty of facing family events like Thanksgiving without Bryan.  *Id.* at 21:2-11.

### 2.    Danny Chism – Father of Bryan Chism

Danny is Bryan's father.  D. Chism Dep., March 16, 2018, 8:4-5 (Dkt. 74-6).  When Bryan was growing up, he went hunting and fishing with Danny.  The two participated in Boy Scouts together, along with many other outdoor activities.  *Id*. at 11:25-12:21.  Danny testified that although he and Elizabeth divorced, the family remained tight knit.  *Id*. at 26:12-18.  Bryan was the best man at Danny's marriage to Vanessa Chism. V. Chism Dep., March 16, 2018, 10:24-25 (Dkt. 74-7).

According to Danny, Bryan's death has been "[v]ery, very tough. It's the worse anything can ever happen in your life, this is it. It's been tough."  D. Chism Dep., March 16, 2018, 24:1-4 (Dkt. 74-6).  Danny also testified that he feels he is "more withdrawn since this happened.  There – your intimacy life is not there anymore. I'm not as intimate as I used to be."  *Id*. at 24:7-9.  Danny also developed high blood pressure within two months of Bryan's passing.  He was prescribed medication as a result.  *Id*. at 24:10-19.  He also had difficulty sleeping and became depressed shortly after Bryan's death.  *Id*. at 25:18-26:2.  Because of "the way [Bryan] was killed," Danny does not hunt anymore.  *Id*. at 28:8-13.  He visits Bryan's grave every two to three weeks.  *Id*. at 30:2-5.  Of his son, Danny says that "he was a good person.  Like I say, and if you met him, he was your friend.  Until you proved different, he was your friend.  You had to make him not like you."  *Id*. at 31:9-14.

Danny initially learned of Bryan's death shortly after the event but did not learn of the

details of the kidnapping and torture until days later.  Danny testified that it was difficult to learn of these details after the first report.  *Id*. at 22:2-23:13.

### 3.      Vanessa Chism – Step-Mother of Bryan Chism.

Bryan was Vanessa's stepson. They first met in 2002, when Bryan was 17.  Bryan's father Danny married Vanessa in 2003.  V. Chism Dep., March 16, 2018, 6:10-24 (Dkt. 74-7).  On average, during the three years leading up to his deployment, Bryan would stay with his father and Vanessa about one week per month.  *Id*. at 7:11-8:10, 24:17-19.  They always ate together as a family during those times.  *Id*. at 13:23-14:4.  According to Vanessa, Bryan "respected [her] immensely.  And he was easy to love, very easy to love."  *Id*. at 18:19-20.  Vanessa also testified that Bryan confided in her and asked her for advice.  *Id*. at 18:21-23.  Bryan has his own room in the same hallway as Vanessa's biological sons.  *Id*. at 8:15-9:6.

Vanessa recalls that after Bryan's death, the family meals had ceased and "everybody just kind of went their own way."  *Id*. 25:4-6.  She regards Bryan as "one of [her] kids" and misses him.  *Id*. at 32:19-20.  She believes that Bryan's death affected her marriage with Bryan's father, especially because his health deteriorated after Bryan's death.  She feels like she went from being a "newlywed couple to an old couple really fast."  *Id*. at 37:20-38:11.

### 4.      Julie Chism - Bryan's Sister

Bryan was Julie's younger brother.  J. Chism Dep., March 16, 2018, 6:16-17 (Dkt. 74-8).  Growing up in Prairieville, Louisiana, there were few other children around, so they "relied on each other as playmates" and spent a lot of time together playing outside and riding bikes.  *Id*. at 7:18-8:4.  They also went hunting together with their father.  *Id*. at 11:13-23.  They also attended high school together.  Julie even brought Bryan to a homecoming dance so he could meet her friends and introduce him to high school.  *Id*. at 7:4-6, 13:8-16.  They also ran cross country

together. *Id*. at 13:18-19. Julie testified that Bryan "didn't have any enemies. Everybody liked him. Everybody got along with him." *Id*. at 16:1-3. The two were "very close" and "best friend[s]." *Id*. at 16:15-18.

Julie was a paralegal in the Army JAG Corps. *Id*. at 18:2-19:2. When Bryan went to her basic training graduation, "he caught the military bug" and "wanted to join right then and there." *Id*. at 20:1-3. Eventually, the two served in Iraq at the same time. *Id*. at 29:5-23. Julie was actually stationed at the hospital where Bryan was taken after the killing. Julie first learned of Bryan's death when their father called her on her Iraqi cell phone. *Id*. at 32:21-34:7. As soon as she found out, she grabbed her Kevlar, flak jacket, and weapon to go "hunting" for the people who killed Bryan, but other soldiers stopped her at the gate of her base. *Id*. at 34:8-21. Julie had to break the news to Elizabeth. *Id*. at 35:2-13.

Julie had planned to make a career in the Army, but she changed her mind when Bryan died. *Id*. at 38:12-39:3. After leaving the military, Julie married, but the "marriage failed because of all of the issues with Bryan and what [she] later learned was PTSD." *Id*. at 40:18-22. Julie was treated for PTSD by the VA. At first, she was prescribed a variety of drugs, but the drugs had significant side effects. *Id*. at 41:14-22. She then tried working with a service dog, which she still has today. *Id*. at 41:23-42:12. She began getting acupuncture in 2014 and still gets it every other week. *Id*. at 42:13-20. Because insurance does not cover acupuncture, she pays $100 out of pocket for each treatment and estimates that since 2014, she has spent $10,000 on acupuncture. *Id*. at 47:8-14. She also had to pay about $5,000 out of pocket for training and obtaining the service dog. *Id*. at 47:13-16. The symptoms of her PTSD include severe anxiety, depression, and insomnia. Bryan's death was one of the causes of Julie's PTSD. *Id*. at 44:2-19. She still suffers from those symptoms today. *Id*. at 49:20-23. When asked what she misses most about Bryan, Julie responded

that she "miss[es] [her] best friend.  I miss the one person I could go to about anything and not feel judged or get the advice I need, even if sometimes it wasn't what I wanted to hear.  I miss what could have been for him."  *Id*. at 58:7-15.

Julie also testified about the effects of Bryan's death on her parents.  She testified that Bryan's death 'aged' her parents and put her mother Elizabeth into depression.  *Id.* at 36:24-37:9.

C.     **Family of Shawn Falter**

The family of Shawn Falter includes Shawn's father, his step-mother, four half-siblings and four step-siblings.  Each of these individuals provided deposition testimony relevant to the issue of damages.  Collectively, the testimony establishes that the various "groups" comprising the Falter family came together as a family and that Shawn was considered by all to be the "son" and the "baby" of the family.  All members of the Falter family were significantly affected by Shawn's death and the manner of his death.

1.     **Russell J. Falter – Father of Shawn Falter and Representative of the Estate of Shawn Falter**

Russell Falter is Shawn's father.  He had full custody of Shawn from the time Shawn was 3 years old.  R. J. Falter Dep., February 28, 2018, 7:13-15 (Dkt. 77-7).  When Shawn was younger he spent most weekends in the summer with his father at a camp.  *Id.* at 9:24-10:2.  The family participated in 'fish fries' at the Elks Club on Friday nights along with Shawn and the other boys - who would help.  *Id.* at 12:15-13:10.

Russell testified that he turned to alcohol to deal with his emotions after Shawn's death, as he "would just start breaking right down and crying."  *Id.* at 34:22-35:10.  "There are -- there's times when I like to just be by myself and kind of -- I always say I'm feeling sorry for myself, that I wake up and try to -- you know.  That's what I did for -- for a while when I was drinking too

much, and because I was blaming it because of Shawn passing away.  And -- and I decided that it wasn't good for my health and for my -- my family, my kids, my grandkids, and I decided that it would make Shawn happy too knowing that I straightened myself out.  And I did it for him and for the family.  And it – it's worked out fine." *Id.* at 29:6-20.

"It was like I didn't want to walk out to the mailbox because it would be something in there – somebody sending me a card and … a sorry – sorry about your loss … which was nice, it was really nice, but yet, it would make me break right down.  And I was home alone, I was retired, and she was -- my wife would working.  And -- and this would be, like, all the time.  Or if we'd go to the grocery store, being a small town like it is, you go to the grocery story, somebody runs up to you and gives you a hug, 'Oh, I'm so sorry.'  And, you know, they meant well.  I appreciated it, but yet, it would -- it would get me again, you know.  And there is -- just hard.  It was hard for me because sometimes I'm too emotional, I guess." *Id.* at 30:5-18.

He keeps Shawn's picture on his phone when he opens it and above his TV. *Id.* at 36:12-15.  He thinks about him every day – I miss him so -- so much." *Id.* at 37:8-10.  When they came to the door at night to tell them Shawn had died, "I just didn't want to live.  I just didn't." *Id.* at 38:16-19.  And then " the casualty officer -- … got the other message that -- what really happened, that he was shot and dragged off and held hostage, and which we weren't told at the beginning.  And Ray had to come back and tell -- tell the whole family that again.  I think that was terrible, really terrible.  They don't – you don't know what it does to people.  My wife didn't need that.  I didn't need it.  My family didn't need it." *Id.* at 38:20-39:9.

### 2.    Russell, Sr's Testimony Regarding Other Family Members

Russell testified that Shawn got along well with his step-siblings "[l]ike family, you know. They were -- he got along with David even closer, David Lucas." *Id.* at 7:20-22.  Shawn viewed

Dave, Tim, Marsha and Drew all as brothers or sisters.  *Id.* at 8:1-11.  Shawn and David Lucas "were the closest of all the kids because of their age.  And Dave was still living at home, of course, and -- and they did a lot of things together." *Id.* at 24:25-25:8.

The family would spend a lot of time together at a camp they went to on weekends.  "And we spent a lot of time at the camp as a family with Marsha and Tim.  And not much -- Drew was in -- in the service and he wasn't around much, Andrew.  But David and Shawn and Tim and Marsha, and sometimes Jason and Johnny Sackett, they would be up there." *Id.* at 8:23-9:2.

He would drop Shawn at his grandmother's house (Shawn's mother's mother) so he could spend time with John and Jason Sackett.  *Id.* at 19:6-14 "[H]e always wanted to go see his brothers. And that was fine, even to the point where his -- his brother's father, he lived in Homer also, and there was times when they were living with -- with their father and -- and I would drop him off over there to – to stay with -- with them.  Sometimes they would stay overnight, have an overnight. And they were real, real close." *Id.* at 19:19-24.

### 3.      Linda Falter – Step-Mother of Shawn Falter

Linda testified about her relationship with Shawn and the effect of his death on her and the family.  When Linda married Russell, she moved in with Shawn and Russell.  L. Falter Dep., February 28, 2018, 10:13-20 (Dkt. 77-8).  It was a "close knit family." *Id.* at 15:6-7.

Linda was Shawn's primary caregiver; she went to all of the school conferences and attended his football and baseball games, put him to bed and read him books at night, took him to doctor appointments, and took him to the hospital when he had appendicitis.  *Id.* at 24:3-26:13. "[W]hen I first moved in, it was just a natural role for me to roll over from what -- I had raised five children and it just continued on with him … I did everything with him.  It was just like David or Marsha or -- that was my role." *Id.* at 26:16-28:12.  She thinks he started calling her Mom

within four weeks after she moved into the house.  *Id.* at 29:17-19.

The day they learned of Shawn's death was the same day they had earlier buried Russell's grandson (son of his daughter Cindy – who died of cancer).  *Id.* at 50:6-19; 9:11-14.  That night they saw news about an incident in Karbala and then they heard a car and knock on the door, "[a]nd I looked at this guy, and I just went (witness shakes head) and he went (witness nods head)."  *Id.* at 51:13-20.  She was hysterical and crying.  *Id.* at 52:15-53:2.

When she later learned how he died, "it was like you just lost him all over again.  It was bad enough to lose him, but to find out that he had been abducted, drugged through this, shot in the head shot and shot in the back and handcuffed and left in a vehicle."  *Id.* at 57:18-22.

### 4.    Linda's Testimony Regarding Other Family Members

Dave (Shawn's step-brother) was like Shawn's natural brother:  "I remember one time, [Shawn] said, 'Well, you know, I'm only your step-brother.'  And David said, 'If you say that one more time ever, I'm taking you out.  You're my brother.  That's how it is.  That's how it's always been.  End of discussion.'  And it was never said again."  *Id.* at 18:7-13.

David had the hardest time of the siblings after Shawn's death "probably because they lived together ….  [H]e still does have the hardest time with it."  Linda testified that David is very angry about the whole thing.  *Id.* at 81:20-82:3.

Linda testified that Andrew would see Shawn as much as he saw Linda because when he visited he stayed with them.  *Id.* at 20:13-21.

She testified that Tim isn't very verbal but "suffered with it and the loss."  *Id.* at 82:8-11.

She testified that Marsha "struggles a lot."  *Id.* at 82:7.

She testified that it took Russell, Sr. a year to come back to normal.  *Id.* at 60:6-8.  He couldn't "get beyond it.  And so the drinking increased and increased…. and as soon as he started

drinking, he would start crying." *Id.* at 74:1-6.  His drinking got much worse after Shawn died. *Id.* at 73:18-74:14.  He had an accident in a golf cart they had and hurt his legs and was in the hospital in intensive care for 10 days, and then he stopped drinking.  *Id.* at 74:22-75:18.

She testified that Russell C. Falter (Shawn's brother) 'internalized' his grief.  Id. at 82:14-16.

### 5.    Marjorie Falter – Shawn's  Sister

Marjorie was 19 or 20 when Shawn was born and lived in the same residence for a few months after he was born, and then moved about 15 miles away.  Marjorie saw Shawn once a month or more.  M. Falter Dep., February 27, 2018, 8:15-25, 10:4-9, 11:21-25 (Dkt. 77-9).  Her son was a couple of years older than Shawn and the two boys were close.  *Id.* at 10:18-11:8.  In 1993, she moved about 2 hours away and only saw him three or four times a year.  *Id.* at 16:22-17:10.  Marjorie testified that she had trouble sleeping after Shawn's death and that to this day still feels emotional harm.  *Id*. at 25:24-25, 34:19-23.  She stated that certain events such as Veteran's Day and her son's birthday cause her to think of Shawn and triggers sleeplessness.  *Id*. at 36:7-37:21, 42:19-44:12.  She says that family holidays seem empty.  She feels a void in her life.  *Id*. at 45:10-47:9.

### 6.    Russell C. Falter – Shawn's Brother

Russell lived with Shawn shortly after Russell graduated from high school.  He remembers watching Shawn when Shawn was a young child.  R. C. Falter Dep., February 27, 2018, 6:10-15, 9:10-20 (Dkt. 77-10).  They spent every summer together at their summer camp.  *Id.* at 8:11-10:16. Russell recalls happy times during those summer gatherings.  *Id*. at 10:19-11:2.

Russell accompanied the family to pick up Shawn's body from the airport.  Russell felt that picking up the flag draped casket really made him realize he would never see Shawn again.  *Id.* at

17:22-20:8.  Russell expressed concern about the effect of Shawn's death on his father.  *Id*. at 22:10-19.

### 7.   John Sackett – Shawn's Brother

John is Shawn's half-brother on his mother's side. John Sackett Dep., February 28, 2018, 19:6-25 (Dkt. 77-11).  Shawn lived with John and his other half-brother Jason until Shawn was about 3 or 4.  After Shawn's father gained full custody of Shawn, Shawn's father ensured that the brothers remained in contact.  The brothers frequently spent time together at their grandmother's house.  In fact, Shawn's father testified that while they did not live together, John, Jason and Shawn were "real, real close."  R. J. Falter Dep., February 28, 2018, 19:6-25 (Dkt. 77-7).

Although Shawn was younger, "he always wanted to be in amongst everything that was going on." J. Sackett Dep., February 27, 2018, 14:5-7 (Dkt. 77-11).  They played at their grandma's house, watched cartoons, built snow forts and "did just kid stuff."  *Id*. at 14:13-16.  He would also see Shawn at Friday night fish fries at the Elks Lodge sometimes every week and sometimes every other week.  *Id*. at 6.  Shawn was about 8 when John signed up with the Marines in 1990 after he graduated high school.  *Id*. at 14:25-15:15.  John enjoyed spending time with Shawn.  *Id*. at 17:11-18.  He had no problem with Shawn calling him brother and he "was happy to call him my brother. Proud of him."  *Id*. at 17:19-22.

After John joined the Marines in 1990, he would see Shawn whenever he came home, making a point of seeing him.  *Id*. at 17:23-18:19.  And his Mom "made a point to bring him out. Russ would bring him out. I'd see him in Cortland or in Homer" and he would come back a few times a year.  *Id*. at 18:17-19:3.  Shawn also came to visit John and they went to Camp David (he thinks in 2004).  *Id*. at 19:21-21:9.  That was the last time he saw Shawn.  *Id*. at 24:20-22.

He learned about Shawn's death when his mother called him late at night after he just got

back from Fallujah. *Id.* at 24:24-25:5. He got right in his car and drove from North Carolina. *Id.* at 25:9-20. He was mad and sad. *Id.* at 25:21-26:2. He thinks learning that Shawn had been kidnapped and executed, had an additional emotional impact on him. *Id.* at 28:16-19. He understood the risks of being killed in Iraq but "[t]here's not too many scenarios where they drive Suburbans into your compound and kidnap American service members and take them away. That's out of the ordinary. I couldn't believe it. I was -- I was embarrassed. I was ashamed. I was sad. I was mad. All of those things. Just to imagine what he had been through to the one -- you know, be there when they opened the gate and all hell broke loose, and then to know that, you know, how long from point A to point B did -- what transpired, it's just unimaginable." *Id.* at 28:19-29:17.

About six or eight months after Shawn died, John went back to Fallujah for the second time. *Id.* at 33:4-7. He carried a lot of anger with him on his second tour. *Id.* at 34:11-35:2. When he got back he went to a counselor and talked about his drinking and other issues, and some of his issues he attributes to Shawn. *Id.* at 38:4-17, 40:15-41:5, 42:6-12. He has a picture of Shawn in his living room. "I have the box, his flag box that the Army gave in my living room. I have a memorial for him. I see him every day. The hat that he wore when he was a kid is in my living room. So, yeah, I get triggered about it every day. … I think about him often. I go through my book, memorial book, cards and newspaper clippings and Time magazine articles, and I think about him all the time." *Id.* at 42:20-43:10. He still feels the loss in his life. *Id.* at 43:11-13.

**8.      Jason Sackett – Shawn's Half-Brother**

Jason Sackett is Shawn Falter's half-brother. Jason Sackett Dep., February 27, 2018, 6:12-14 (Dkt. 77-11). Jason lived with Shawn from the time Shawn was born until Shawn was approximately 5 or 6. *Id.* at 6:15-17. Shawn then moved to live with his biological father but they continued to see each other 'all the time". *Id.* at 7:2-5. They played together and interacted almost

"daily". *Id*. at 8:12-18.  Jason then moved to his father's house which was farther away and for a three year period would see Shawn 2 to 4 times a month. *Id*. at 8:20-9:15.  Jason then moved to his grandmother's house and then was able to see Shawn "all the time". *Id*. at 9:19-10:6.  Jason learned of Shawn's death from his mother. *Id*. at 12:10-16.  Jason testified that it really "shook" him. *Id*. at 12:17-19.  Jason was also serving in the military at the time and testified that he was very upset about the manner of Shawn's death – particularly because he was on guard duty. *Id*. at 13:22-14:2.  Jason was deployed to Iraq a few weeks after Shawn's death. *Id*. at 14:3-18.  He testified that he felt Shawn's death caused him to be more anxious and he started to volunteer for missions so that he would not have time to think. *Id*. at 14:19-15:4.  He testified that he had some depression, that it is hard to talk about Shawn and that it has been "rough". *Id*. at 14:3-13, 17:21-24.

### 9.    Marsha Novak – Shawn's Step-Sister

Marsha's mother is Linda Falter – Shawn's step-mother.  When Linda married Russell in June 1988, Marsha moved into the same house – with Shawn – and lived there until she went to college in August 1988.  She would return to the house and lived with them during breaks.  Then after a year she moved back in the summer of 1989 when she went to college locally, and stayed there until late summer or early fall of 1991 when moved to Ithaca (20-25 minutes away).  M. Novak Dep., February 27, 2018, 6:13-8:23 (Dkt. 77-13).  While they lived together, "she was like the "older sister. … So a lot of times I picked him up and brought him to his grandma's or -- kind of was babysitter like, and practices and homeworks and, you know, that kind of sibling, older sibling, responsibility." *Id.* at 9:6-9.  They went on vacations and camping together. *Id.* at 10:3-14.

When she moved to Ithaca in 1991, she would come back 2-3 times a month or weekly,

and sometimes would stay over at night.  *Id.* at 11:13-21.  She moved to California in 1996 and then would come back to New York 2 or 3 times a year (holidays and 10-12 days in the summer). *Id.* at 12:14-13:3.

Since Shawn was young when her mother started dating his father, Shawn "pretty much was just part of our life from then on.  And I think just his age and his kind of cuteness and little boy just -- he just instantly became our family.  It wasn't like, "Oh, we're going to" -- "this is my stepbrother and" -- you know, just was part of the family. …  And it wasn't something that I looked at, like, Dave differently than Shawn.  They were just my brothers and together."  *Id.* at 28:21-29:16.

She learned of the abduction from her husband doing online research, and she made a military officer "come down, because I thought that was the one thing I couldn't really tell my parents about personally.  So it was just another level of -- it just made it worse for us, because he was, you know, like killed again almost in our eyes.  It changes the way that we think of the scared moments and stuff of that abduction, different than an instant thing.  And that's not something that I -- so I had to tell my parents.  I was the one that told them."  *Id.* at 21:3-24.

The first year after he died "was very stressful for me, and I got depressed and anxious. There was a lot of community interest in our family at the time, and so I came back probably two or three times that year.  But it was stressful for me because I'm the fixer of the family and the helping hand, and to have them all be here and distressed and not be able to help and guide and comfort, it was really hard for me.  So I think that was part of my grief with Shawn is just knowing I couldn't fix him or fix the family and make it easier.  So I had some anxiety and depression issues for about a year after."  *Id.* at 27:8-28:2.  She testified that she had to use an antidepressant for 18

months to 2 years.  *Id.* at 28:3-6.

**10.    Marsha's Testimony Regarding Other Family Members**

Marsha testified that Shawn's father "kind of shut down right away.  He just was -- he literally cried a lot, and we just were like concerned for him and trying to get him to eat and rest.  And he was just very agitated and crying and distressed, like very distressed.  And so he really -- so really he wasn't even able to make decisions because he was so just beside himself with grief."  *Id.* at 20:2-11.  Her mother was "The same way.  Very like -- she was very distressed and worried."  *Id.* at 20:12-17.

There was a lot of community pressure for Shawn's father to go out in public, and strangers would "come up to him and hug him and console him.  Because every moment that they went out and did that, it was like scraping the scab off a wound, and they had to kind of relive that over again and kind of let that bleed again … they wanted Shawn's memory to be part of the community and knew how much that meant to them.  But it was very stressful on them and he really started self-medicating with alcohol and then got pretty sick towards the end of the year and ended up in the hospital".  *Id.* at 38:24-39:13.

Her mother would go to events honoring Shawn and "then she'd come back and she'd be so upset and crying.  But when she was there, of course, she's all like 'I'm doing this for Shawn' and 'Thank you so much,' and then it was a very stressful time afterward."  *Id.* at 40:5-22.

"Dave and Shawn were close.  They lived together the most consistently, I think, for the five years, and then afterwards.  So they were very close growing, you know -- especially later, I think, because they were the ones still here, and they just were -- they were close friends.  They were friends too, not just brothers."  *Id.* at 15:11-17.  David was so distraught at Shawn's private

viewing for the family that he had to be led away.  *Id.* at 24:7-11.

### 11.    David Lucas – Shawn's Step-Brother

David testified Shawn was his stepbrother but he "absolutely" saw him as his brother.  D. Lucas Dep., February 27, 2018, 6:2-6 (Dkt. 77-14).  He lived with Shawn for about 9 years. *Id.* at 6:16-18.  He coached Shawn's soccer team for 2 years.  *Id.* at 7:5-10.  He described the household as the "core four" of him, Shawn and their parents.  *Id.* at 7:22-8:8. They went on vacations and to the camp in the summer.  *Id.* at 7:11-8:5.  David moved out of the house when he was 19 or 20, but Shawn would stay with him "every now and then, you know, so we were still very close after I left. Lived in the same town still."  *Id.* at 9:11-19.  Shawn stayed with him a couple of weeks before Shawn went to boot camp.  *Id.* at 11:8-11.

The days after learning of Shawn's death were "unbearable. You can't put those into words."  *Id.* at 12:10-15.  David feels guilty because he couldn't protect him as his older brother. *Id.* at 14:14-21.  David underwent counseling for close to two years and went through depression. *Id.* at 14:24-16:8.  More than ten years later, David continues to struggle with sleeping.  *Id.* at 16:2-3.  He underwent treatment in 2014 and 2015 to address his feeling over Shawn's death.  *Id.* at 15:3-22.  David misses Shawn and being his older brother.  *Id.* at 22:15-19.

### 12.    Tim Lucas – Shawn's Step-Brother

Tim refers to Shawn as his brother because "when my mom and Russ got married, he was so little that we just took him in as our brother, and, you know, we just assumed him always to be our brother.  He was just little.  And we were all living together, so we just kind of meshed as a family."  T. Lucas Dep., February 28, 2018, 8:3-13 (Dkt. 77-15)

Shortly after his mom and Russ got married in 1988, they moved in with Russ and Shawn. *Id.* at 9:9-13.  He lived there 2-3 years.  *Id.* at 13:2-6.  Tim was working down the road and would

be there every day and see Shawn.  *Id.* at 13:7-12.  He and Shawn would play together and go to camp.  *Id.* at 15:17-16:25.

Then Tim moved to a house that was a 5 minute walk away (15 houses away) and lived there for two and a half to three years.  *Id.* at 17:3-18.  He would still see Shawn a couple of times a week.  *Id.* at 18:18-22.  Even after he moved to Little York Lake, he would see Shawn on the weekends and holidays and at the Elks Club where they were working.  *Id.* at 28:20-29:8.  Then Tim moved back in again with his parents and Shawn for a brief period of a couple months around when Shawn was a senior in high school.  *Id.* at 24:1-5.  He saw Shawn the same way he saw his biological brother Dave:  "I didn't see any difference, you know, as far as Shawn and my little brother Dave, you know.  And there's times I was closer to Shawn than probably Dave, you know, I mean, growing up, you know.  I don't really know how to -- I don't -- I mean, he was more around than my little brother Dave.  Like, Dave would be in high school, you know, he'd be going off doing his own things with his buddies.  But Shawn was at the age where he was still young.  And he'd be home every night, you know, so I would still see him, to where Dave would be off doing his thing, you know, so in that time frame."  *Id.* at 21:2-17.

They also worked together at a commercial pipe company.  *Id.* at 29:12-32:15.

When Tim heard what had happened to Shawn, he was "overwhelmed."  *Id.* at 37:10-14.  He missed 2 weeks of work and could not sleep.  *Id.* at 40:19-25.  He would drink with his father "so he'd have somebody with him to console" and "that way I could kind of watch out for him too."  *Id.* at 41:1-15.

### 13.   Andrew Lucas – Shawn's Step-Brother

Andrew was 21 or 22 when Shawn entered his life.  T. Lucas Dep., February 28, 2018, 8:6-8 (Dkt. 77-16).  Andrew was in the Air Force at the time. He would see Shawn when on leave or

if his mother and Russell would bring Shawn to visit him when he was stationed in Florida. *Id.* at 8:12-9:8, 10:9-11:5. He would get leave 2-3 times a year, typically 10-14 days. *Id.* at 11:16-20. He would stay in the bedroom next to Shawn's when he was home on leave. *Id.* at 13:6-14. He would pick up Shawn from school, help him with his homework, go to his Little League games and do activities with Shawn when they were at the camp in summer. *Id.* at 13:20-14:18. He considered Shawn to be his kid brother. *Id.* at 14:19-15:2. When they came to Florida to visit him, they would go to the beach and went to Disney World. *Id.* at 15:3-18. Shawn would say at his house there off-base where Andrew lived with his own wife and daughter. *Id.* at 16:3-10.

In the period after Shawn's death, he had some depression. He admitted, "I was probably self-medicating with alcohol more than I should have." *Id.* at 22:7-9. He sought grief counseling to work through the depression. *Id.* at 22:9-15.

### D.   Family of Ahmed Al-Taie

#### 1.   Kousay Al-Taie – Father of Ahmed Al-Taie and Representative of the Estate of Ahmed Al-Taie

Ahmed was the eldest son. The family lived in various countries and traveled together extensively. Ahmed moved to the United States and helped his family adjust when they later joined him.

They found out Ahmed had been abducted from a friend in Iraq. A few hours later members of the military came and informed the family of the abduction. Kousay described this meeting as "disaster, really, that time for us. Then there is a sergeant with another two militaries they knocked our door and they tell us that… this is true." K. Al-Taie Dep., April 2, 2018, 17:14-22 (Dkt. 80-6). They believed that he was alive, and they were showed a video, "he was in the very bad position, really, because I think they hit him in his eye. It was… very, very sad. … He

looked very tired.  He looked like he was beaten up and he couldn't talk. … very bad position, really. I was so sorry." *Id.* at 18:19-19:12.

It was then several years until he learned that Ahmed had been killed.  *Id.* at 19:18-21.  His wife made a video begging them to release her son. *Id.* at 20:3-8.  The years of not knowing what happened and if he was alive or dead was "a disaster for the whole family" and for him it was a very difficult situation.  *Id.* at 22:1-7.

Kousay took antidepressants and sleeping pills to cope with the grief and uncertainty.  *Id.* at 22:8-16.

"We miss him. …. It was -- had a big [e]ffect on the family because we were always sad and crying." *Id.* at 24:9-15.  "[M]e and my wife will always be saddened by losing him." *Id.* at 30:4-5.

### 2.    Kousay's Testimony Regarding Other Family Members

Kousay testified that Ahmed was very close to his brothers. *Id*. at 9:25-10:11.  He testified about the video Ahmed's mother made begging the terrorists to release her son. *Id.* at 20:3-8.  The years of not knowing what happened and if he was alive or dead was a "disaster for the whole family" and Nawal "was constantly crying…  She always prayed that one day he will come back. Yeah, it was very bad time." *Id.* at 22:1-7.  She took sleeping pills and antidepressants also. *Id.* at 23:11-17.

### 3.    Nawal Al-Taie – Mother of Ahmed Al-Taie

Nawal testified that Ahmed was 10 or 11 when they left Iraq and moved to London where she and her husband lived with Ahmed and his brothers Bashar and Hathal.  N. Al-Taie Dep., April 2, 2018, 6:22-7:13 (Dkt. 80-7).  After a year and a half, they all moved to the UAE.  *Id.* at 7:14-21.  In 1984, they moved back to Baghdad but without Ahmed "because it was war in Iraq, so I

didn't -- I'm afraid to use his studying or something like that, so he stay in Emirates.  *Id.* at 8:4-10.

When Ahmed moved to the United States after high school when he was 18, he split his time

between both brothers - one in Boston and one in Michigan.  *Id.* at 9:10-17.  When Nawal and

Kousay moved to the United States, Ahmed lived with them.  *Id.* at 9:18-10:4.

Ahmed was "very close to his dad and me, because he was the oldest one, the first born."

*Id.* at 10:5-8.  She used to shop with him and go to the movies.  *Id.* at 13:2-7.

A friend who had been trying to call Ahmed found out he had been kidnapped and told her,

and "we were very upset and we start yelling, screaming, crying and we were ready to go to the

mosque for the holiday prayer but everybody was crying.  *Id.* at 18:4-19:10.  She "used to cry all

the time, pray all the time, and in those days I would never sleep at night; I would spend the whole

night just crying and praying…. I just stay up all night thinking about what happened to him. I'm

quite sure that he was tortured."  *Id.* at 19:17-20:4.  After about 4 months she was watching Iraqi

news and saw her son in a video.  *Id.* at 20:5-16.

The United States government had her make a video to show the terrorists and she "begged

them and asked them to release my son and I was crying but I did the video."  *Id.* at 22:7-21.

In the period when his whereabouts were unknown, she and her husband couldn't sleep at

night. *Id.* at 25:15-26:2.  Nawal was devastated when she learned of Ahmed's death.  "My husband

and I were just devastated and our life changed to the point that even going out for fun or going to

a party we don't do that anymore.  We don't celebrate anything.  We're suffering and we feel like

we're done." *Id.* at 27:10-17.

Nawal would go visit the grave and "sit there and I cry."  *Id.* at 26:10-11.  She and her

husband were depressed, she was prescribed antidepressants, and he was given medicine also.

They were both given sleeping pills.  *Id.* at 26:22-24.  Nawal stopped taking the medication

because she was getting headaches but her husband still does and sometimes she just has to still take it.  *Id.* at 29:4-15.

When Ahmed's remains were found, Nawal was shaken to find out that all that was left was a skeleton.  "When I begged them that to see my son, they said we're going to bring him home and you can see him but when they brought him it was just only the bones, the skeletons."  *Id.* at 24:5-19.  She was "so shaken" and crying when she learned he had been killed.  *Id.* at 24:20-22.

### 4.      Hathal K. Taie – Brother of Ahmed Al-Taie.

Ahmed was about 10 years older than Hathal.  H. Al-Taie Dep., April 2, 2018, 10:11-12 (Dkt. 80-7).  He describes Ahmed as his closest friend.  *Id.* at 16:17-17:5, 26:3-5.

He used to go out with Ahmed and they had fun together.  *Id.* at 8:1-6.  Ahmed took him flying.  *Id.* at 8:8-22.  In childhood, "the most I remember was in Niagara Falls we went to Canada and also the helicopter we did the tour, you know, and I remember this very well because I was one of the first experiences with him and also before that maybe also I remember in London he used to take me all the time to judo and karate. He has a black belt, so I used to play with him; I was like five six years old.  *Id.* at 9:21-10:3.  "[W]when I came [to the U.S.] in 2000 he was like a friend now because, I mean, the ages when you're 30 and your brother is 20 it's not like you're 15 and he's 5.  It's a big difference, so we used to go clubs to meet his friends, his girlfriends."  *Id.* at 10:19-23.

In 2006, they found out Ahmed had been captured – first from a friend and shortly after the military confirmed it.  *Id.* at 11:13-12:3.  In the 5 year period following, they believed he was alive "because there was no evidence that … for example, all those terrorist groups when they kill someone they show it on video like on YouTube all the time like those all beheadings and stuff. We were all watching these type of videos, unfortunately, to see -- even my mom.  I mean, she

doesn't like to watch these videos but she used to watch it when someone shows up 'cause hopefully it's not my son. I mean, it's bad but that's reality; that's what my mom was doing." *Id.* at 12:17-13:3. They had several false alarms when they thought he had been killed. *Id.* at 13:4-25.

After Ahmed's death, Hathal testified that he and his family "have all this type of nightmares if you talking about -- I mean, we always think like how he died and, I mean, we used to imagine a lot of -- especially I saw all these type of videos of beheading and all that stuff so of course it's very hard. I mean, every day -- I don't know if it's every day -- but I used to dream a lot having nightmares about how they killed him or they torturing him. And whether they killed him or not we didn't know. For five years we didn't know." *Id.* at 21:4-13.

"[Ahmed's death] affected me … when I came here to the U.S. in 2000 he used to be my closest friend because at that period of time Bashar was in Canada, so he's the only brother I have here and we used to go out all the time and he showed me everything here…. So he talk taught me a lot of stuff. He was like my closest friend." *Id.* at 16:21-17:5. "[O]ne of the reasons I became successful today because he got me adjusted." *Id.* at 22:1-2.

Hathal testified that the period of uncertainty had a big impact on his parents' health. For example, "my mom has -- we don't have any diabetes, in the history of the family; my mom got diabetes once a day -- the day she heard that Ahmed was kidnapped because of the shock and since then, I mean, depression, diabetes all this type of diseases that comes with someone when you get hurt or something." Dkt. 80-8 at 6.

His parents "were more fun before. They used to go out." *Id.* at 14:15-22. Since this incident happened, "my dad is always sitting on the kitchen table watching computer; he never goes out. He never even walks." *Id.* at 15:14-21.

### DETERMINATION OF AMOUNT OF COMPENSATORY DAMAGES

### I.     ECONOMIC LOSS DAMAGES – ESTATES OF DIRECT VICTIMS

"Section 1605A explicitly provides that foreign state-sponsors of terrorism are liable to victims for economic losses stemming from injuries or death sustained as a result of the foreign state's conduct." *Thuneibat v. Syrian Arab Republic,* 167 F. Supp. 3d 22, 48 (D.D.C. 2016) (Syrian Arab Republic was liable to citizens' estates and families, under FSIA, for economic losses) (citing 28 U.S.C. § 1605A(c)). *See also Roth v. Islamic Republic of Iran,* 78 F. Supp. 3d 379, 402 (D.D.C. 2015); *Valore v. Islamic Republic of Iran,* 700 F. Supp. 2d 52, 83 (D.D.C. 2010).

Such damages may be proven by the submission of a forensic economist's expert report. *Roth*, 78 F. Supp. 3d at 402 (citing *Belkin v. Islamic Republic of Iran,* 667 F. Supp. 2d 8, 24 (D.D.C. 2009)).   "In considering an award for lost future earnings, the Court shall take account of the reasonableness and foundation of the assumptions relied upon by the expert." *Roth*, 78 F. Supp. 3d at 402 (citing *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012)); *see also Thuneibat*, 167 F. Supp. 3d at 48-49 (finding satisfactory evidence to support economic loss award in expert reports from forensic economists that were based on data provided by the National Center for Health Statistics, information submitted by the immediate family members of the two victims, and his own expertise, which calculated the "loss of wages and employee benefits" for the victims and then offset the potential income and benefit streams with estimates of personal consumption, using a study based on data from the U.S. Department of Labor, Bureau of Labor Statistics, all of which was then discounted —at a rate of 1.25 percent per year, "based on the rate of return on U.S. Treasury Bills based on Historical H.15 data from the Board of Governors of the Federal Reserve System"); *Belkin*, 667 F. Supp. 2d at 24 (awarding economic damages based on conclusion that expert testimony was based on reasonable assumptions about plaintiff's likely

earnings if she had survived, including the length of time she would have worked and received retirement benefits).

Plaintiffs have submitted economic loss reports for each of the Direct Victims. The economic loss reports were prepared by Dr. James Markham, a senior economist at the Center for Forensic Economic Studies ("CFES"), and Chad Staller, President and Senior Economist at CFES. Courts have previously accepted reports prepared by CFES to establish damages in cases under the state sponsored terrorism exception to the Foreign Sovereign Immunities Act. *See, e.g.*, *Roth*, 78 F. Supp. 3d at 404-405; *Osongo v. Republic of Sudan*, 60 F. Supp. 3d 144, 149 (D.D.C. 2014), *aff'd in part and rev'd in part on other grounds sub nom Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017)). Dr. Markham's and Mr. Staller's experience and expertise in the field of forensic economics are well-documented. Both have testified as experts in state and federal courts nationwide. These individuals are qualified to analyze and opine on economic loss.

I have reviewed the reports prepared by CFES and find that the calculations are reasonable, consistent with generally accepted practices, and apply appropriate assumptions based on reasonable and well-documented sources.[2] CFES has appropriately applied deductions to account for personal consumption and taxes. The economic loss computations are based on the military pay status of each of the victims as of the date of death and apply the reasonable assumption that each would have continued in the military until the military pension would vest and then would

---

[2] The economist reports rely on the following sources for military pay scales and benefits, expected worklife and standard expected life span. United States Department of Defense, Defense Finance and Accounting Service, https://www.dfas.mil/militarymembers/payentitlements/military-pay-charts; http://militarypay.defense.gov/Pay/Retirement.aspx; Skoog, Ciecka and Krueger. *The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape Percentile Points, and Bootstrap Standard Errors*. Journal of Forensic Economics 22(2), 2011, pp. 165-229.; http://www.ssa.gov/pubs/ageincrease.htm; Arias E. *United States Life Tables, 2011. National vital statistics reports; vol 64 no 11*. Hyattsville, MD: National Center for Health Statistics, 2015.

proceed into civilian employment.  This assumption is generally consistent with economic loss analysis involving members of the military and with the experience of members of the military in general.  CFES has provided two estimates of future economic loss in each case:  one computes loss until the end of "statistical worklife" and the other computes loss until social security retirement age.  Current trends indicate that individuals are more likely to work beyond the average work life and therefore I find that the future income stream based on a later retirement age is, in each case, appropriate.  *See Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 70 (D.D.C. 2008).  CFES has included loss of household services in the loss analysis for the Estate of Ahmed Al-Taie.  Because the victim was helping with his parents' needs, Dkt. 80-10 at 7, it is appropriate for CFES to include this loss as a loss to the estate.  CFES applied reasonable and generally accepted data on household services and their value in making this computation and carried out the computation through the statistical life span of Ahmed's mother.  *Id.*  Accordingly, I find that this additional loss is appropriate and reasonable in these circumstances.  The CFES reports state that the future values are discounted to present value.  I therefore recommend adopting the economic loss calculations provided by CFES as follows:

**Estate of Jacob Fritz:  $2,594,660**[3]

**Estate of Bryan Chism:  $1,059,404**[4]

**Estate of Shawn Falter:  $951,882**[5]

**Estate of Ahmed Al-Taie:  $1,513,717**[6]

---

[3] Report of CFES re Estate of Jacob Fritz, May 23, 2018 (Dkt. 71-10 at 8).
[4] Report of CFES re Estate of Johnathan Bryan Chism, May 23, 2018 (Dkt.74-9 at 8).
[5] Report of CFES re Estate of Shawn Falter, May 23, 2018 (Dkt. 77-17 at 8).
[6] Report of CFES re Estate of Ahmed Al-Taie, May 23, 2018 (Dkt. 80-10 at 8).

II.      **NON-ECONOMIC DAMAGES: ESTATES OF DIRECT VICTIMS**

In evaluating the recommended amount of 'pain and suffering' damages for the estates of the Direct Victims, I am guided by multiple prior decisions in this district awarding damages to victims of terrorism and recognizing that damages awards should be generally consistent to the extent the circumstances can be appropriately characterized as similar. *See, e.g., Wamai v. Republic of Sudan,* 60 F. Supp. 3d 84, 91 (D.D.C. 2014). As the courts have recognized, it is difficult to place a dollar value on pain and suffering in any situation. It can be particularly difficult in the case of terrorist attacks where one must often infer from autopsy evidence the nature of the pain and suffering inflicted while the victim was alive. Decisions in previous cases provide guidance, but, of course, the circumstances of each death are different and these differences must be taken into consideration. I start with certain guideposts:

First, multiple cases in this district have recited a 'baseline' award for persons who are injured but not killed in terrorist attacks. That baseline amount – generally $5 million (*see, e.g., Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 37-39 (D.D.C. 2012); *Cohen v. Islamic Republic of Iran*, 268 F. Supp. 3d 19, 24 (D.D.C. 2017) ("*Cohen II*")) serves as a starting point – and is adjusted upward or downward as the condition of the victim warrants. It is appropriate to consider the amounts that have been awarded in the case of injury – which are based on physical and emotional pain and suffering and distress – in evaluating the pain and suffering and distress experienced by a decedent before death. There are multiple examples of awards greater than $5 million: *Cf., e.g., Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 55-56 (D.D.C. 2007) ("*Peterson II*") (bomb survivor awarded $7 million in pain and suffering damages in addition to more than $1 million in lost wages after suffering "a torn ear, broken leg, damaged foot, . . . cuts from shrapnel from the attack[, with] lasting and severe psychological problems from the attack");

*Massie v. Government of Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 77 (D.D.C. 2008) (awarding per diem amount of $3,350,000 for 335 days in captivity, plus $13,400,000 lump sum for pain and suffering for each of three victims where one victim suffered beatings and torture resulting in PTSD, ongoing pain, ringing in the ears and impotency, another victim suffered beatings and torture resulting in PTSD and permanent injuries to his back, ankles, and knees and ringing in his ears, and another victim suffered beatings, torture, and constant mental and psychological terror on a daily basis, resulting in severe and permanent physical injuries, including arthritis in his back and shoulders, deteriorating disks, and severe pain in his feet and ankles, as well as PTSD).

Second, courts have recognized that the fear and distress a decedent experienced knowing that death is imminent in the context of a terrorist attack is a reasonable component of damages. *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 81–82 (D.D.C. 2011) ("Courts have been influenced not only by the length of time that the victim endured physical suffering, but by the victim's mental anguish stemming from the knowledge that death was imminent."); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 157 (D.D.C. 2010) (Victim was "entitled to additional compensation in the amount of $1,000,000 for the portion of his life that he spent facing certain death alone"); *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002) (award of $500,000 to the estate of the executed victim "for the pain and suffering he endured prior to being singled out for execution" and an additional $1 million for "the several minutes of anguish and pain [the victim] endured as and immediately after being shot by [a terrorist] and thrown from the [air]plane").

Third, while courts have considered duration of the pain and suffering in determining damages for pain and suffering before death, duration of pain and suffering is not the sole relevant

factor. Once there is evidence of conscious pain and suffering before death, the amount of damages is based on multiple factors including the duration of the pain and suffering, the nature and extent of the injuries, the fear and terror experienced by the victim, and the circumstances surrounding the death. *See Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 5, 8 (D.D.C. 2000) ($1 million for pain and suffering endured in the several minutes between the suicide bombing of a passenger bus and the victim's death); *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 112-13 (D.D.C. 2000) ($1 million for pain and suffering endured while victim of assassination fought with his attacker, a period of less than four minutes); *Peterson II*, 515 F. Supp. 2d at 53, and Report of Special Master Pursuant to Order of Reference Concerning Counts CXCVII-CC (197-200), *Peterson II* Dkt 78 at 5-6 (award of $7 million for victim who was not held captive but suffered burns and traumatic skull injury in an attack and remained alive for 7 days); *Wultz*, 864 F. Supp. 2d 24, 38 ($8 million awarded for victim injured in a bombing attack and who lived for four weeks); *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 221, 266 (D.D.C. 2008) ($18,000,000 in pain and suffering damages to victim who survived just a few minutes after a plane bombing); *Foley v. Syrian Arab Republic*, 281 F. Supp. 3d 153, 156 (D.D.C. 2017) and Report of Special Master RE: Private First Class Kristian Menchaca, *Foley* Dkt 83 at 1 ($30 million in pain and suffering damages where victim was captive for approximately three days and suffered "various blunt force injuries, strangulation, and the removal of his eyes and tongue before his death."); *Gates*, 580 F. Supp. 2d at 72-74 (D.D.C. 2008) (in this extreme case, the Court awarded $50,000,000 for pain and suffering to each of two victims who were publicly decapitated – but slowly so that "each man suffered unimaginable mental and physical agony.").

A.      **Karbala Direct Victims**

The Plaintiffs have requested a pain and suffering award of $5 million for each of the three victims of the Karbala attack (Fritz, Chism and Falter.)  Each of these three victims was held captive in a vehicle fleeing the site of the initial attack and suffered serious and painful injuries in the period of approximately 2 to close to 3 hours.  The nature and extent of the injuries indicates that they were subjected to frequent or continuous abuse while captive and had every reason to be in fear of imminent death for the entire period of captivity.  The testimony detailing the sequence and nature of injuries demonstrates that the captors inflicted maximum pain on each of the victims. As members of the Armed Forces, they were well aware of the possibility of continued torture and the potential for an excruciatingly painful death.  In addition, the  Kabala Direct Victims were held in a moving vehicle by their captors and had no way of knowing how long they would be held or where they were being taken.  These circumstances would have contributed to the victims' fear and apprehension.  The pain and suffering award must take into account all of these circumstances.

The baseline amount of $5 million that is applied in analyzing injury cases is a reasonable starting point.  That amount has been applied to injuries that are far less serious than those experienced by the Karbala Direct Victims.  (I recognize that there is a distinction because the pain and suffering award in cases of injured survivors of terrorist attacks is intended to account for the expectation that the injuries will continue to affect the victim for some period of time.)  *See*, *e.g.*, *Cohen II*, 268 F. Supp. 3d at 25 ($5 million to victim of bus bombing "because injuries to her ears, which are frequently infected, continue to impact her daily life. She was hospitalized for nine days after the attack and still bears daily reminders of it in the form of scars on her face, legs, and arms.").  While one could argue that the amount of damages for pain and suffering should be lower in the case of the Karbala Direct Victims because the duration of pain and suffering was relatively

short, the award must take into consideration the brutality of the abuse (gunshot wounds designed to inflict maximum pain) and the fact that each victim was confronted with his captors and experience terror and fear during the entire period of time between abduction and death.  Taking into account the "baseline" along with the range of damages provided in other cases, I recommend a pain and suffering award of $5.5 million for the estates of each of Jacob Fritz, Bryan Chism and Shawn Falter.  This amount recognizes the extreme circumstances surrounding the deaths and that the nature of the injuries causing pain and suffering in this case, while severe, are not as extreme as the injuries in the cases that have awarded significantly higher amounts – such as *Foley*, 281 F. Supp. 3d at 157 or *Gates*, 580 F. Supp. 2d at 72-74.

### B.  Estate of Ahmed Al-Taie

The Plaintiffs have requested a pain and suffering award for the estate of Ahmed Al-Taie of $10.74 million – equal to the sum of $10,000 for each day that they estimate Al-Taie was held captive.  The amount of $10,000 per day has been adopted by several courts in cases involving lengthy captivity; Congress also adopted this amount in the Justice for United States Victims of State Sponsored Terrorism Act (34 U.S.C. § 20144).  *See Hekmati v. Islamic Republic of Iran,* 278 F. Supp. 3d 145, 163-64 (D.D.C. 2017) ($16.02 million for 1602 days of abusive captivity at $10,000 per day); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 70 (D.D.C. 2015) ($1.68 million for 168 days of imprisonment); *Stansell v. Republic of Cuba,* 217 F. Supp. 3d 320, 346 (D.D.C. 2016) ($19.67 million for 1,967 days held hostage); *Kilburn*, 699 F. Supp. 2d at 156-57 ($5.03 million for 503 days as hostage); *Massie*, 592 F. Supp. 2d at 77 ($3.35 million for 335 days of imprisonment); *Price III*, 384 F. Supp. 2d at 134-35 ($1.05 million for 105 days of captivity); *Sutherland v. Islamic Republic of Iran,* 151 F. Supp. 2d 27, 51 (D.D.C. 2001) ($23.54 million for 2,354 days of captivity); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 113 (D.D.

2000) ($24.54 million for 2,454 days of captivity).

The evidence indicates that Al-Taie was held captive for a substantial period of time – two or three years - before his death and further indicates that he was subjected to abuse during that time.  The evidence at trial established that Ahmed was murdered by AAH in approximately late 2009.  Declaration of ███████, Ex. 76 ████████████████, Evidentiary Hearing, April 13, 2018, Sealed Proceedings 15:11-16:8; *accord* Testimony of C. Mallak, Evidentiary Hearing, April 13, 2018, (Dkt. 54) at 37-38  (concluding based on forensic evidence that Ahmed Al-Taie was killed between February 22, 2009 and February 22, 2011).  The Plaintiffs assert that it is reasonable – indeed conservative – to assume that Ahmed was held in captivity until the end of September 2009.  Based on this assumption, Plaintiffs estimate that Ahmed was held in captivity from at least October 23, 2006 – October 1, 2009, totaling approximately 1,074 days.

Ahmed's death was particularly painful.  According to Dr. Mallak, because the 12 nerves of the face do not emanate from the spinal cord, Ahmed would have been able to see, hear and be able to feel his face after being shot through the neck until his death. Testimony of C. Mallak, Evidentiary Hearing, April 13, 2018 (Dkt. 54), 38:18-39:8.

Based on the testimony, it is reasonable to calculate damages on the assumption – as Plaintiffs suggest – that Ahmed was held captive for 1,074 days.  Given the evidence of physical pain and suffering and the obvious mental pain and suffering that Ahmed would have experienced, the case law that applies a damages figure of $10,000 per day of captivity is reasonable and applicable.  Accordingly, I recommend an award of $10,740,000 for the estate of Ahmed Al-Taie for the pain and suffering he experienced as a captive.

## III.       NON-ECONOMIC DAMAGES: SOLATIUM FOR FAMILY MEMBERS

Section 1605A(c) expressly provides for solatium damages.  Such damages may be awarded to immediate family members of the victims.  Solatium damages provide compensation for mental anguish, grief, and loss of society and comfort.  *See Valore*, 700 F. Supp. 2d at 85 ("Under the FSIA, a solatium claim is indistinguishable from an IIED claim.  Solatium is awarded to compensate the the [sic] mental anguish, bereavement, and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent's society and comfort.") (internal citations, quotation marks, and alterations omitted)).

Courts in this Circuit have previously "adopted the strict meaning of 'immediately family,' defined as one's spouse, parents, siblings, and children." *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 28 (D.D.C. 2009) ("*Heiser II*") (citing *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 36 n.8 (D.D.C. 2001), *aff'd sub nom. Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003)). That meaning does include, however, immediate family members of half blood, as "[s]iblings of half-blood to the servicemen in this case are presumed to recover as a full-blood sibling would[.]" *Peterson II*, 515 F. Supp. 2d at 52.  *See also Valore*, 700 F. Supp. 2d at 79 (quoting *Peterson II*, 515 F. Supp. 2d at 52); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 75, 79 (D.D.C. 2010) (half-blood siblings are presumed to recover as would a full blood sibling); *accord Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 27 (D.D.C. 2014) ("Half-blood siblings are presumed to recover at the same level as full-blood siblings would, unless the evidence indicates that such individuals did not have a close relationship with the victim") (internal citation omitted).

In general, there is a presumption that immediate family members suffer grief and emotional injury as a result of a terrorist attack on another family member. *See Kaplan v. Hezbollah,* 213 F. Supp. 3d 27, 38 (D.D.C. 2016) ("The guidelines emerging from prior decisions begin with the 'presumption' that family members in direct lineal relationship 'suffer compensable mental anguish and testimony proving a close relationship will usually be sufficient to sustain an award of solatium damages.'") (quoting *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015)) (internal alterations omitted); *Roth*, 78 F. Supp. 3d at 403 ("Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish.  As for siblings, testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages.") (citations omitted).

A close relative need not be present at the attack in order to be eligible for solatium damages.  *See Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 84 (D.D.C. 2017) ("*Cohen I*") ("Solatium claims are typically brought by family members who were not present or injured themselves."); *id*. at 85 ("because of the appalling and extreme nature of terrorist attacks, courts in this district have generally held that a defendant is liable to the victim's family even if they were not physically present during the attack as long as there is some evidence of that they suffered mental anguish and trauma as a result of it") (citing *Braun*, *v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 81-83 (D.D.C. 2017); *Ben–Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 56–57 (D.D.C. 2008)).

Accordingly a plaintiff who provides credible testimony about the effect on him or her of the attack on a family member is eligible for an award of solatium damages – provided that the relationship is sufficiently close.  *See Moradi*, 77 F. Supp. 3d at 72-73 (declaration that victim's detention and torture caused claimant significant "mental anguish" and her and victim to become

estranged supported awarding solatium damages consistent with framework of *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) ("*Heiser I*")).

### A.      Solatium Damages for Step-Parents and Step-Siblings

The concept of immediate family may include step-parents and step-siblings, provided that these individuals functioned as family members equivalent to biological parents or siblings.  *See Bettis*, 315 F.3d  a t  337 (noting that non-family members have  been recognized as "immediate family members" for solatium damages when they "were members of the victim's household, and they were viewed as the functional equivalents of immediate family members."); *Valore*, 700 F. Supp. 2d at 79-80 (finding non-adoptive step-father entitled to damages where the step-father considered victim to be his son and vice versa, and where the victim and step-father acted as a natural family); *Heiser II*, 659 F. Supp. 2d at 29 (recognizing non-adoptive step-fathers as functionally the same as biological fathers where they lived in the same household while the victims were minors and the step-fathers treated the children as their own sons financially, emotionally and socially.).

### 1.      Determining the Amount of Solatium Damages:  General Approach and Factors

In evaluating the appropriate amount of compensatory damages for family members, I am again guided by prior decisions.  There is a significant body of case law in this Circuit addressing solatium damages in cases seeking compensation for death caused by terrorist attacks.  In *Heiser I*, the court conducted a survey of other decisions of the District Court for the District of Columbia and found that "courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse[,] approximately $5 million to a parent whose child was killed[,] and approximately $2.5 million to a plaintiff whose sibling was killed."  466 F. Supp. 2d

at 269 (footnotes omitted).  These amounts, however, should be viewed as guideposts – and they are neither mandatory nor applicable in all cases.  *See Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affairs, et al.*, 892 F.3d 348, 361-62 (D.C. Cir. 2018). Courts typically have awarded higher amounts where there are more extreme circumstances – such as where a family member is under medical care for depression or where the testimony makes clear that the family member continues to experience and feel the loss and change or where the family member is aware that the victim suffered horribly while captive.  *See*, *e.g.*, *Valore,* 700 F. Supp. 2d at 85–86; *Stethem*, 201 F. Supp. 2d at 90-91 (courts have acknowledged that anguish is exacerbated when family members live with the knowledge of the suffering of their loved ones.)[7]  As expressed by the court in *Oveissi v. Islamic Republic of Iran*, the solatium award is determined based on multiple factors – including "evidence establishing an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing."  768 F. Supp. 2d 16, 26-27 (D.D.C. 2011) ("*Oveissi I*").[8]  The award is thus

---

[7] Plaintiffs have proposed that the *Heiser* amounts should be revised to account for inflation. I have not conducted this mathematical exercise.  As the case law indicates, each award is based on the specific relevant facts and circumstances.  It is, however, appropriate to note that the *Heiser* survey was compiled over 12 years ago – in 2006.

[8] *Accord*, *Stethem*, 201 F. Supp. 2d at 89-90 (citing *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 30-31 (D.D.C. 1998):  In calculating damages for loss of solatium in the case of a deceased family member, this district court has considered a variety of factors to include: (1) whether the decedent's death was sudden and unexpected; (2) whether the death was attributable to negligence or malice; (3) whether the claimants have sought medical treatment for depression and related disorders resulting from the decedent's death; (4) the nature (i.e., closeness) of the relationship between the claimant and the decedent; and (5) the duration of the claimants' mental anguish in excess of that which would have been experienced following the decedent's natural death.

based on the facts of each case and must take into consideration the multiple relevant factors and the evidence provided.

Here, each Family Member has provided compelling testimony about their close relationship with the Direct Victims. Accordingly, each of the Family Member Victims is entitled to solatium damages. Following is a discussion of my recommendations regarding solatium damages and the basis for each proposed award.

### 2. Family of Jacob Fritz

The testimony establishes that Jacob Fritz had a close relationship with his parents and siblings. The testimony further establishes that both parents and both siblings have suffered a tremendous loss and that the death of Jacob created a void in their lives and has had a significant effect on each of them. The testimony indicates that Jacob's father, Lyle, suffered adverse health effects stemming from his grief and that the three remaining family members continue to experience grief and loss. Ethan Fritz, who was only 14 when his brother died has been particularly affected both by the loss and by the manner in which he learned of his brother's death. Accordingly, based on the record, which establishes devastating grief and loss – continuing to this day – more than 10 years after the event – and taking into consideration awards in other cases, I recommend solatium awards of $6 million each for Noala Fritz and, the Estate of Lyle Fritz. I recommend a solatium award for Daniel Fritz in the amount of $3 million and a solatium award of $3.5 million for Ethan Fritz to account for the additional anguish he experienced for the circumstances under which he learned of his brother's death.

### 2. Family of Johnathan Bryan Chism

The testimony establishes the close relationship between Bryan and his parents Elizabeth and Danny and his sister Julie. Elizabeth's testimony demonstrates that she suffers ongoing

depression and grief – at times requiring medication.   Danny's testimony demonstrates that he suffers from ongoing grief and depression and that his life has been profoundly affected by the loss of his son.   The testimony of Julie Chism corroborates the devastating ongoing impact Bryan's death has had on her parents.   Julie Chism continues to suffer from the loss of her brother:   she has been diagnosed with PTSD and she attributes her failed marriage in part to her grief over Bryan's death.   She testified that she misses Bryan daily.   Accordingly, I recommend solatium awards for Elizabeth and Danny Chism in the amount of $6 million and a solatium award in the amount of $3.5 million for Julie Chism.   The proposed award for Julie Chism reflects the circumstances under which she learned of her brother's death (when she was stationed in the same hospital to which his body was transported) and the documented severe ongoing distress. *See*, *e.g.*, *Spencer*, 71 F. Supp. 3d at 29-30 (upward departure warranted when parents were erroneously told that son was killed, when he was not, which was legally attributable to the underlying acts of terror); *Estate of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 43-44 (D.D.C. 2012) (upward departure to $3 million warranted when sister of victim suffered "nervous breakdown" following brother's death and was prescribed medication for a year).

Vanessa Chism is Bryan's step-mother.   The testimony establishes that Bryan and Vanessa lived in the same household for portions of a three-year period.   Bryan was still a minor when he first met Vanessa but was over 18 for a period of the time he lived in the same household.   The testimony makes clear that Vanessa treated Bryan as, and considered Bryan to be, one of her sons. The testimony indicates that Bryan confided in Vanessa and sought her advice.   The record thus establishes that Bryan's relationship to Vanessa was functionally equivalent to that of "son." Accordingly, Vanessa is entitled to solatium damages.   Plaintiffs have proposed an award that is approximately 25 percent of the amount that they propose for other parents of the Karbala Direct

Victims. While it is not clear that the duration of the relationship should matter, there is a suggestion in the case law that the age at which the relationship commenced could be a relevant factor. *See Heiser II*, 659 F. Supp. 2d at 29 (noting that the children were still minors at the time they lived in the household of the step-parents.) It would not be unreasonable to award a higher amount to Vanessa, but in light of Vanessa's testimony – which indicates that while she feels a loss, the focus of her concern is the effect that Bryan's death has had on her husband – I find the Plaintiffs' proposed damages amount to be reasonable and appropriate. Accordingly I recommend a solatium award for Vanessa Chism of $1.5 million.

### 3.      Family of Shawn Falter

Solatium Damages for Shawn Falter's Father and Step-Mother. The evidence shows that Shawn Falter's father, Russell J. Falter, was profoundly affected by the loss of his son. Russell's own testimony and that of several other family members detailed his self-destructive behavior and his deep depression as a result of Shawn's death. Russell continues to suffer from the loss. Linda Falter is Shawn's step-mother. Linda Falter functioned as Shawn's mother – fulfilling all aspects of such a relationship – from the time Shawn was approximately four years old until his death. Linda Falter is entitled to solatium damages under the standards set forth in the relevant case law. Linda Falter testified about the devastating effects of Shawn's death and her long standing grief. I recommend solatium damages for Linda Falter and Russell J. Falter in the amount of $6 million each.

Solatium Damages for Shawn Falter's Half-Siblings. Shawn lived in the same household with all of his half-siblings for at least some period of time. When they were not in the same household, they saw each other regularly and participated in typical family events. They functioned together as a cohesive family. Shawn was considered the 'little brother' by his half-

siblings and each of them cared for and helped Shawn as he grew up in various ways.  The evidence fully supports an award of solatium damages for Marjorie Falter, Russell C. Falter, John Sackett and Jason Sackett.  Marjorie, Russell C., John and Jason each testified to their familial relationship with Shawn when he was a child and to the depression, loss and grief each experienced and continue to experience as a result of Shawn's death.  I recommend solatium damages awards for each of Marjorie Falter, Russell C. Falter, John Sackett and Jason Sackett in the amount of $3 million.

Solatium Damages for Shawn Falter's Step-Siblings.  Each of Shawn Falter's four step-siblings - Marsha Novak, David Lucas, Timothy Lucas and Andrew Lucas – testified about their familial relationship with Shawn and the effect of his death.  Marsha Novak, David Lucas and Timothy Lucas all lived in the same household with Shawn Falter for some period of time.  Andrew Lucas was an adult when his mother married Russell Falter.  Andrew testified that when he was home on leaver, he cared for Shawn and treated him as his little brother.  The testimony of each of the step-siblings and of other family members establishes that Shawn Falter had a normal sibling relationship with each of his step-siblings.  The testimony shows that Shawn was particularly close to David Lucas – who was relatively close in age to Shawn.  Each of the step-siblings has testified to the loss, grief, anger and depression they felt and continue to experience as a result of Shawn's death.  The testimony establishes the type of sibling relationship that is sufficient to permit an award of solatium damages.  Accordingly, I recommend a solatium award for each of Marsha Novak, David Lucas, Timothy Lucas and Andrew Lucas in the amount of $3 million.

### 4.   Recommended Approach for Solatium Award for Family of Ahmed Al-Taie

The Al-Taie family waited for over five years to learn the fate of their son and brother.  The anguish of not knowing Ahmed's fate, of waiting every day for news, of seeking out information and pleading with the terrorists for mercy is indescribable.  Courts have recognized the extreme suffering experienced by close family members in situations of long term captivity.  *See, e.g.*, *Foley*, 281 F. Supp. 3d at 155-56 and Report of Special Master RE: Staff Sergeant Keith Matthew Maupin, *Foley* Dkt 82 at 25-26 (solatium award of $7 million for parents of U.S. service member abducted and held for four years where the special master had found that the pain and suffering was exacerbated by the fact that the parents did not know their son's fate.)  The testimony of the Al-Taie family demonstrates their close relationship with Ahmed and the extreme and continuing grief they have experienced as a result of his death and more significantly, the manner of his death.  I recommend a solatium award of $8 million for Nawal and Kousey Al-Taie (which is comparable to the award in *Foley* taking into account the longer period of captivity in the case of Ahmed Al-Taie) and $4.5 million for Hathal Al-Taie (which is a comparable adjustment of the baseline amount for solatium awards for siblings.).

## IV.   PREJUDGMENT INTEREST

Plaintiffs have requested an award of prejudgment interest on each of the awards, and the complaint in this case specifically seeks prejudgment interest.  Amended Compl. (Dkt 9) at 22, 24, 25, 27, 28, 29, 30, 31, 32.  It is within the Court's discretion to award prejudgment interest from the date of the attack until the date of final judgment.  *Baker*, 775 F. Supp. 2d at 86.  "The decision to award prejudgment interest, as well as how to compute that interest, rests within the discretion of the court, subject to equitable considerations."  *Id.*  "Courts in this Circuit have awarded

prejudgment interest in cases where plaintiffs were delayed in recovering compensation for their injuries—including, specifically, where such injuries were the result of targeted attacks perpetrated by foreign defendants." *Id.* (quoting *Pugh*, 530 F. Supp. 2d at 263). The purpose of prejudgment interest is to provide full compensation – recognizing the loss of the time value of money where compensation is delayed.  It also has the effect of ensuring that the defendant does not profit from the delay in compensation.

Several decisions in this Circuit have held that prejudgment interest is appropriate on pain and suffering and solatium awards.  *See Wamai*, 60 F. Supp. 3d at 98; *Khaliq v. Republic of Sudan,* 33 F. Supp. 3d 29, 34 (D.D.C. 2014); *Amduso v. Republic of Sudan,* 61 F. Supp. 3d 42, 53  (D.D.C. 2014); *Osongo*, 60 F. Supp. 3d at 153; *Mwila v. Islamic Republic of Iran*, 33 F. Supp. 3d 36, 46 (D.D.C. 2014); *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 261 (D.D.C. 2014); *Baker*, 775 F. Supp. 2d at 86; *Belkin*, 667 F. Supp. 2d at 24.  As the court in *Wamai* reasoned:

> Awards for pain and suffering and solatium are calculated without reference to the time elapsed since the attacks. Because plaintiffs were unable to bring their claims immediately after the attacks, they lost use of the money to which they were entitled upon incurring their injuries. Denying prejudgment interest on these damages would allow defendants to profit from the use of the money over the last fifteen years. Awarding prejudgment interest, on the other hand, reimburses plaintiffs for the time value of money, treating the awards as if they were awarded promptly and invested by plaintiffs.

60 F. Supp. 3d at 98.  *See also Baker*, 775 F. Supp. 2d at 86 ("Prejudgment interest is entirely appropriate in this case, and necessary to fully compensate the victims for the injuries they sustained as a result of Syria's material support of ANO. Such awards compensate the victims for any delay due to litigation, and prevent Syria from profiting from its terrorist attacks."); *Estate of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 184 n.1 (D.D.C. 2013) ($5 million baseline award for pain and suffering calibrated to compensate for their "physical injuries and emotional

distress without considering the length of time elapsed since the attack; the Court would use a $5 million baseline without adding interest had this litigation taken place in the months after the attacks. But plaintiffs were unable to bring their claims immediately after the attacks, and have hence lost use of the money to which they were entitled upon incurring their injuries. Denying prejudgment interest on these damages would allow defendants to profit from the use of the money over the last three decades.").

Several of these decisions awarding such prejudgment interest have found that interest at the prime rate is appropriate. *See Wamai,* 60 F. Supp. 3d at 98; *Khaliq,* 33 F. Supp. 3d at 34; *Owens,* 71 F. Supp. 3d at 262. As explained by the court in *Amduso* in calculating interest using the prime rate for each year:

> The D.C. Circuit has explained that the prime rate—the rate banks charge for short-term unsecured loans to creditworthy customers—is the most appropriate measure of prejudgment interest. Although the prime rate, applied over a period of several years, can be measured in different ways, the D.C. Circuit has approved an award of prejudgment interest at the prime rate for each year between the accident and the entry of judgment. Using the prime rate for each year is more precise than, for example, using the average rate over the entire period.

61 F. Supp. 3d at 53 (citing *Forman v. Korean Air Lines Co.,* 84 F.3d 446, 450 (D.C. Cir. 1996)) (internal citations and quotation marks omitted). *But see Belkin*, 667 F. Supp. 2d at 24 (awarding prejudgment interest on solatium claim computed at a rate of six percent per annum on a simple interest basis from date of incident to present); *Reed*, 845 F. Supp. 2d at 215 (prejudgment interest computed at a rate of six percent per annum on a simple interest basis).

I note, for the Court's consideration, that some courts have declined to issue such prejudgment interest on pain and suffering or solatium awards. *See Wultz*, 864 F. Supp. 2d at 42-43 (delays in case were not significant and "in determining the solatium, pain and suffering, and economic loss awards in this case, the Court has attempted to fully compensate plaintiffs' through

today's date" and thus finds no equitable grounds for awarding prejudgment interest; "Whether to award prejudgment interest is a question that rests within this Court's discretion, subject to equitable considerations.… Because this Court has applied the framework in *Heiser* to its calculation of solatium damages, prejudgment interest is not appropriate for these awards."); *Estate of Brown*, 872 F. Supp. 2d at 45 (stating "[w]hen this Court applies the *Heiser* and *Peterson II* damages framework, it does not typically award prejudgment interest" and denying request for prejudgment interest in case awarding pain and suffering and solatium damages where significant portion of delay was caused by plaintiffs' failure to timely submit necessary documents to the special master); *Wyatt v. Syrian Arab Republic,* 908 F. Supp. 2d 216, 232 ("In this case, pain and suffering and solatium damages are both designed to be fully compensatory.  Prejudgment interest is not appropriate and will be denied.").

For example, in *Thuneibat*, the court stated that "nonpecuniary damages, such as solatium damages, do not typically require prejudgment interest because they are 'designed to be fully compensatory.'" 167 F. Supp. 3d at 54 (citations omitted).  The court noted that while some courts have awarded prejudgment interest on nonpecuniary awards, noting the loss of the use of money had the plaintiffs been able to bring the suit closer to the triggering event, there was no evidence that the delay between when the 2005 terrorist attacks occurred and 2012 (when the instant suit was filed) "was due to any nefarious interference by the defendants or anyone else" and, therefore, "the solatium damages awarded are complete and prejudgment interest is not necessary to make the plaintiffs whole."  *Id.* at 54-55.  *See also Roth*, 78 F. Supp. 3d at 407 ("the Court does not award prejudgment interest on solatium damage awards that are based on the *Heiser* framework."); *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 59 (D.D.C. 2012) ("*Oveissi II*") ("when this Court applies the *Heiser* damages framework—as it did in the underlying solatium award

here—it has consistently refused to award prejudgment interest.") (citations omitted); *Oveissi I*, 768 F. Supp. 2d at 30 n.12 (declining to award prejudgment interest on solatium damages).

I have provided a calculation of prejudgment interest in the chart set forth below for the following components of damages:  (1) the "past" economic loss of each of the Direct Victims (there is no prejudgment interest on the future economic loss – which is an amount that is expressed in present value); (2) the solatium damages for each of the Family Members; and (3) the pain and suffering amounts proposed for each of the Direct Victims.   The calculation applies the prime rate for each year (or portion of year) between the date of the abductions and the end of August 2018. Should the date of final judgment occur in the future, it is possible to extend the computations to account for the additional period of time.

I have calculated prejudgment interest at the average annual prime rate in each year from the date of the respective attacks (January 20, 2007 for the Karbala Direct Victims and October 23, 2006 for Baghdad Direct Victim) through August 2018.  *See* Bd. of Governors of the Fed. Reserve Sys. Historical Data, *available at* https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15 (last visited August 11, 2018).   The annual prime rate for 2018 is not available at this point, so the rate applied is the current rate.   The rates applied are as follows:

2006   7.96%
2007   8.05
2008   5.09
2009   3.25
2010   3.25
2011   3.25
2012   3.25
2013   3.25
2014   3.25
2015   3.26
2016   3.51

2017   4.1
2018   5

Consistent with *Amduso*, 61 F. Supp. 3d at 53-54, a multiplier must be used to account for the change in rates over time. To calculate the multiplier, I multiplied $1.00 by the prime rate in 2006 (for the Baghdad Direct Victim) or 2007 (for the Karbala Direct Victims), and then multiplied the resulting product by the percentage of the days of the year remaining for such year as of the date of the respective attacks. I then added that product to $1.00. Next, I multiplied that amount by the prime rate the following year and added that amount. Continuing this iterative process through August 2018 yields a multiplier of 1.58 for the Karbala Direct Victims and 1.61 for the Baghdad Direct Victim.

## SUMMARY OF RECOMMENDATIONS

| | Pain and Suffering – Physical Injuries and Emotional/Psychological Distress Damages / Solatium Damages | Prejudgment Interest on Pain and Suffering / Solatium Damages | Economic Loss | Prejudgment Interest on Past Economic Loss | Total Without Prejudgment Interest | Total With Prejudgment Interest |
|---|---|---|---|---|---|---|
| *Estate of Jacob Fritz* | $5,500,000 | $3,163,996 | $2,594,660 | $309,000 | $8,094,660 | $11,567,657 |
| **Noala Fritz** | $6,000,000 | $3,451,632 | | | $6,000,000 | $9,451,632 |
| **Estate of Lyle Fritz** | $6,000,000 | $3,451,632 | | | $6,000,000 | $9,451,632 |
| **Daniel Fritz** | $3,000,000 | $1,725,816 | | | $3,000,000 | $4,725,816 |
| **Ethan Fritz** | $3,500,000 | $2,013,452 | | | $3,500,000 | $5,513,452 |
| *Estate of Johnathan Bryan Chism* | $5,500,000 | $3,163,996 | $1,059,404 | $134,147 | $6,559,412 | $9,857,555 |
| **Elizabeth Chism** | $6,000,000 | $3,451,632 | | | $6,000,000 | $9,451,632 |
| **Danny Chism** | $6,000,000 | $3,451,632 | | | $6,000,000 | $9,451,632 |
| **Vanessa Chism** | $1,500,000 | $862,908 | | | $1,500,000 | $2,362,908 |
| **Julie Chism** | $3,500,000 | $2,013,452 | | | $3,500,000 | $5,513,452 |
| *Estate of Shawn Falter* | $5,500,000 | $3,163,996 | $951,882 | $130,133 | $6,451,882 | $9,746,012 |
| **Russell J. Falter** | $6,000,000 | $3,451,632 | | | $6,000,000 | $9,451,632 |
| **Linda Falter** | $6,000,000 | $3,451,632 | | | $6,000,000 | $9,451,632 |
| **Marjorie Falter** | $3,000,000 | $1,725,816 | | | $3,000,000 | $4,725,816 |
| **Russell C. Falter** | $3,000,000 | $1,725,816 | | | $3,000,000 | $4,725,816 |
| **John Sackett** | $3,000,000 | $1,725,816 | | | $3,000,000 | $4,725,816 |
| **Jason Sackett** | $3,000,000 | $1,725,816 | | | $3,000,000 | $4,725,816 |
| **Marsha Novak** | $3,000,000 | $1,725,816 | | | $3,000,000 | $4,725,816 |
| **David Lucas** | $3,000,000 | $1,725,816 | | | $3,000,000 | $4,725,816 |
| **Tim Lucas** | $3,000,000 | $1,725,816 | | | $3,000,000 | $4,725,816 |
| **Andrew Lucas** | $3,000,000 | $1,725,816 | | | $3,000,000 | $4,725,816 |
| *Estate of Ahmed Al-Taie* | $10,740,000 | $6,503,398 | $1,513,717 | $286,301 | $12,061,968 | $18,851,667 |
| **Kousay Al-Taie** | $8,000,000 | $4,844,244 | | | $8,000,000 | $12,844,244 |
| **Nawal Al-Taie** | $8,000,000 | $4,844,244 | | | $8,000,000 | $12,844,244 |
| **Hathal Taie** | $4,500,000 | $2,724,887 | | | $4,500,000 | $7,224,887 |

Respectfully submitted


By:  /s/ Deborah E. Greenspan
Deborah E. Greenspan, Esq.
Special Master

Dated:          August 13, 2018