UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NOALA FRITZ, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>ISLAMIC REPUBLIC OF IRAN, *et al.*,<br><br>*Defendants*. | Civil Action No. 15-456 (RDM) |

## MEMORANDUM OPINION

Following the submission of the special master's report and recommendations regarding damages, Dkt. 90, Plaintiffs have now moved for the Court to approve the special master's damages award and to enter partial final judgment under Federal Rule of Civil Procedure 54(b) with regard to the U.S.-national plaintiffs. For the reasons stated below, the Court adopts the damages recommendations provided by the special master, subject to the modifications discussed below. In addition, the Court awards punitive damages in favor of Al-Taie's estate and U.S.-national family members. Finally, the Court concludes that there is no just reason to delay entry of final judgment with regard to the U.S.-national plaintiffs and will, accordingly, enter partial final judgment.

### I. BACKGROUND

In January 2007, First Lieutenant Jacob Fritz, Specialist Johnathan Bryan Chism, and Private First Class Shawn Falter were abducted from the Provincial Joint Coordination Center in Karbala, Iraq, and, shortly thereafter, murdered by their captors. In October 2006, Staff Sergeant

1

Ahmed Al-Taie was abducted while in Baghdad, held hostage, and ultimately murdered. Plaintiffs, the estates and family members of the four direct victims, brought this action against the Islamic Republic of Iran and the Islamic Revolutionary Guard Corps (collectively, "Iran"), alleging that the terrorist organization that carried out these brutal acts, Asaib Ahl al-Haq ("AAH"), could not have done so without material support from Iran. To establish subject matter jurisdiction, Plaintiffs invoked the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"). 28 U.S.C. § 1605A(a). Plaintiffs—all except one of whom are U.S. nationals—relied on another provision in the statute, § 1605A(c), to supply a federal cause of action, alleging that Iran provided "material support" to AAH, which in turn engaged in acts of extrajudicial killing, hostage taking, and torture. 28 U.S.C. § 1605A(c).

On August 2, 2018, this Court made findings of fact and conclusions of law relating to these claims. In summary, the Court concluded that (1) Iran provided AAH with "significant support—in the form of training, supplies, intelligence, and funding—as part of its larger strategy to destabilize Iraq and [to] drive the United States from the Middle East," Dkt. 89 at 6 (Memorandum Opinion); (2) AAH "took Fritz, Chism, and Falter hostage, and brutally beat and murdered them," *id.*; (3) "AAH held Al-Taie hostage, brutally beat and murdered him," *id.* at 7; and (4) AAH could "not have committed any of these acts without Iran's support," *id.* at 8. The Court further concluded that Iran's role in these events was sufficient to support the Court's subject matter jurisdiction under 28 U.S.C. § 1605A(a). *See id.* at 39. However, because the FSIA's cause of action, 28 U.S.C. § 1605A(c), applies only to "a national of the United States," "a member of the armed forces," "an employee [or contractor] of the [U.S.] Government . . . acting within the scope of the employee's employment," or "the legal representative of" any

2

such person, the Court found that only the U.S.-national plaintiffs had established their right to relief under the FSIA.  *See* Dkt. 89 at 56.  The Court, accordingly, granted Plaintiffs' motion for default judgment against Iran with respect to the U.S. nationals, but the motion denied without prejudice with respect to the claims of Bashar Al-Taie, concluding that he had yet to establish his right to relief under D.C. law.  *Id.* at 58.

Having granted Plaintiffs' motion for default judgment against Iran with regard to liability, the Court referred the case to a special master, Deborah Greenspan, to prepare proposed findings of fact and recommendations for damages.  *See* Dkt. 88 (Order Appointing Special Master).  The special master has now filed her report.  *See* Dkt. 90 (Special Master Report).  In compiling her report and drafting her recommendations, the special master relied on sworn testimony, video depositions, medical records and autopsies, and expert reports, all of which have been filed with this Court.  *See* Dkt. 69–83.  The report lays out the effects that the abductions and murders of the four servicemen have had on the family members of the direct victims, and carefully analyzes these effects under the applicable framework for state-sponsored terrorism cases.  The Court thanks the special master for her thorough and thoughtful analysis, which she completed on an expedited schedule.

Plaintiffs now request that the Court approve the special master's proposed damage awards and enter partial final judgment under Federal Rule of Civil Procedure 54(b) with regard to the U.S.-national plaintiffs.  As explained below, the Court adopts the proposed findings and recommendations of the special master, subject to the modifications discussed below.  In addition, the Court will award punitive damages to the estate of Staff Sergeant Ahmed Al-Taie and his U.S.-national family members.  In total, the Court awards the U.S.-national plaintiffs

$193,044,753 in compensatory damages and awards the estate and family of Staff Sergeant Al-Taie $55,903,936 in punitive damages.

## II. ANALYSIS

In its prior Memorandum Opinion, the Court concluded that the U.S.-national plaintiffs had "demonstrat[ed] that they are entitled to relief under § 1605A(c)." Dkt. 89 at 58. The only remaining questions, therefore, are what type of damages Plaintiffs are entitled to recover and in what amounts. Below, the Court resolves common questions regarding the award of damages. The damages awarded to each individual plaintiff are listed in the separate Order that accompanies this Memorandum Opinion.

**A.     Damages**

Having reviewed the special master's damages calculation, the Court concludes the following: (1) the estates of the direct victims are entitled to economic damages; (2) all of the U.S.-national plaintiffs are entitled to non-economic damages for of pain and suffering and/or solatium; (3) an award of prejudgment interest is appropriate for both economic and non-economic damages, and; (4) the estate and U.S.-national family members of Staff Sergeant Al-Taie are entitled to punitive damages for Iran's conduct that post-dates the enactment of the FSIA's cause of action in 2008. *See* 28 U.S.C. § 1605A(c).

   1.     *Economic Damages*

As other district courts have noted, "[s]ection 1605A explicitly provides that foreign state-sponsors of terrorism are liable to victims for economic losses stemming from injuries or death sustained as a result of the foreign state's conduct." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 48 (D.D.C. 2016) (citing 28 U.S.C. § 1605A(c)). Traditionally, plaintiffs may

prove economic losses by the submission of a forensic economist's expert report. *See Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010). When evaluating an expert's report, the Court must consider the "reasonableness and foundation of the assumptions relied upon by the expert." *Roth*, 78 F. Supp. 3d at 402 (citing *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012)).

Plaintiffs have submitted expert economic loss reports for each of the direct victims, prepared by Dr. James Markham, a senior economist at the Center for Forensic Economic Studies ("CFES"), and Chad Staller, President and Senior Economist at CFES. *See* Dkt. 71-10 (economic loss report for Jacob Fritz); Dkt. 74-9 (economic loss report for Bryan Chism); Dkt. 77-17 (economic loss report for Shawn Falter); Dkt. 80-10 (economic loss report for Ahmed Al-Taie). The special master notes that "Dr. Markham's and Mr. Staller's experience and expertise in the field of forensic economics are well-documented," Dkt. 90 at 33, and that both "have testified as experts in state and federal courts nationwide," including this Court. *See*, *e.g.*, *Roth*, 78 F. Supp. 3d at 404–05; *Osongo v. Republic of Sudan*, 60 F. Supp. 3d 144, 149 (D.D.C. 2014), *aff'd in part, rev'd in part on other grounds sub nom Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017)). After finding that the CFES calculations were "reasonable," "consistent with generally accepted practices," and "appl[ied] appropriate assumptions based on reasonable and well-documented sources," the special master recommends that the Court adopt their proposed economic loss calculations, including their proposal for an increased award for the estate of Ahmed Al-Taie based on its loss of Al-Taie's household services in assisting with his parents' needs. *See* Dkt. 90 at 34. The Court adopts these recommendations and will award economic

loss damages to Plaintiffs in the amounts set forth in CFES reports.  *See id.*; *see also* Dkt. 94 (listing awards).

      2.    *Non-Economic Damages*

          a.    <u>Pain and Suffering of Direct Victims</u>

The estates of the direct victims can also recover for the pain and suffering endured by Fritz, Chism, Falter, and Al-Taie.  As the special master observes, although "it is difficult to place a dollar value on pain and suffering in any situation," *id.* at 35, the Court must nonetheless "ensure that individuals with similar injuries receive similar awards."  *Valore*, 700 F. Supp. 2d at 84 (quoting *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007) ("*Peterson II*")).  In assessing pain and suffering damages, the special master bases her recommendations, Dkt. 90 at 35, on "certain guideposts":  First, numerous decisions from this Court have adopted a general procedure for the calculation of damages that begins with the baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages.  *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 37–38 (D.D.C. 2012); *see also Cohen v. Islamic Republic of Iran*, 268 F. Supp. 3d 19, 24 (D.D.C. 2017) ("*Cohen II*")).  Second, previous decisions have provided compensation for the extreme fear and distress a victim experiences knowing his death is imminent.  *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 81–82 (D.D.C. 2011) ("Courts have been influenced not only by the length of time that the victim endured physical suffering, but by the victim's mental anguish stemming from the knowledge that death was imminent."); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 157 (D.D.C. 2010) (awarding "additional compensation in the amount of $1,000,000 for the portion of his life that he spent facing certain

6

death alone"); *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002) (awarding $500,000 to the estate of the executed victim "for the pain and suffering he endured prior to being singled out for execution" and an additional $1 million for "the several minutes of anguish and pain [the victim] endured as and immediately after being shot by [a terrorist] and thrown from the [air]plane"). Third, prior decisions have considered "the duration of the pain and suffering, the nature and extent of the injuries, the fear and terror experienced by the victim, and the circumstances surrounding the death." Dkt. 90 at 37; *see also id.* (collecting cases and damages awards).

Against this backdrop, the special master recommends that the estates of Jacob Fritz, Bryan Chism and Shawn Falter should each receive $5.5 million each. Recognizing that there are offsetting reasons to depart upward and downward from the baseline assumption of $5 million, the Court will award each of these estates $5.0 million for pain and suffering. In its prior Memorandum Opinion, the Court concluded that the "evidence support[ed] the inference that all three men were kicked or otherwise beaten in the head while handcuffed and—significantly—while already suffering from severe gunshot wounds." Dkt. 89 at 47. Although the "beatings [of Fritz, Chism, and Falter] did not take place over an extended period of time," those beatings "were severe, and given the state of the soldiers," caused extreme pain and suffering. Dkt. 89 at 47. On the other hand, the $5 million baseline award often incorporates an element of future pain and suffering, which survivors of attacks must bear. *See Wultz*, 864 F. Supp. 2d at 37–38. In addition, in her report, the special master acknowledged that "one could argue that the amount of damages for pain and suffering should be lower in the case of the Karbala Direct Victims because the duration of pain and suffering was relatively short." Dkt. 90

7

at 38–39. Weighing the brutality of the injuries against the short time period, the Court concludes that an award of the baseline $5 million is appropriate for each of the Karbala victims. Indeed, this is the award that Plaintiffs themselves had requested in their submission to the special master. *See* Dkt. 70 at 8–12.

With respect to Al-Taie, the special master suggests awarding $10,740,000 in pain and suffering to Al-Taie's estate, based on $10,000 per day for an estimated period of 1,074 days. The Court adopts the special master's recommendation for an award of $10,000 for each day that Al-Taie was in captivity but reduces the award slightly to account for the time that Al-Taie was not in AAH's custody. "Courts in this district . . . typically set damages for prolonged and abusive captivity at $10,000 per day for the pain and suffering that victims experienced while imprisoned." *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 163–64 (D.D.C. 2017) (internal quotations omitted). Congress took a similar approach, moreover, for purposes of calculating payments to individuals held hostage in Tehran between 1979 and 1981. *See* 34 U.S.C. § 20144. Applying this benchmark, the special master recommends that the Court award the estate of Al-Taie $10,000 per day for the period of his captivity.

This case, however, comes with a wrinkle: The Court does not know precisely how long Al-Taie was held before his murder. The Court concludes, however, that the special master's recommendation of a 1,074-day period of captivity is reasonable. Al-Taie was abducted in October 2006. *See* Dkt. 89 at 33. According to Dr. Mallak, the forensic evidence of Al-Taie's remains indicate that he was murdered sometime between February 2009 and February 2011. *See* Dkt. 54 at 38–39 (Mallak). The 1,074-day time period for calculating damages estimates that his death occurred on October 1, 2009. This approximation, which the plaintiffs proposed,

8

is a fair— or, in the words of the special master, a "conservative"—estimate of his total time in captivity.

The Court notes, however, that although 1,074 days is a reasonable estimate of Al-Taie's *total* captivity, Al-Taie was not in AAH's custody from the offset. Instead, he was abducted by other members of Jaysh al-Mahdi on October 23, 2006, and then, upon the realization that Al-Taie was an American soldier, transferred to AAH's custody sometime in "early November 2006." Dkt. 89 at 34; *see also* Dkt. 53 at 8–12. The Court, accordingly, will discount the special master's recommendation by ten days, or $100,000, to account for the time period that Al-Taie was not in AAH's custody. Therefore, the Court will award pain and suffering damages in the total amount of $10,640,000 to the estate of Al-Taie.

        b.        <u>Solatium for Family Members</u>

The state-sponsored terrorism exception to the FSIA expressly contemplates the award of solatium damages to the close relatives of terrorism victims. *See* 28 U.S.C. § 1605A(c). An award of solatium is intended to compensate for the "the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009). As the special master notes, there exists a "'presumption' that family members in direct lineal relationship 'suffer compensable mental anguish and testimony proving a close relationship will usually be sufficient to sustain an award of solatium damages.'" *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 38 (D.D.C. 2016) (quoting *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015)) (internal alterations omitted). "Solatium claims are typically brought by family members who

were not present or injured themselves." *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 84 (D.D.C. 2017) ("*Cohen I*"). The size of the award is based on multiple factors, including "evidence establishing an especially close relationship between the plaintiff and decedent," "medical proof of severe pain, grief or suffering on behalf of the claimant," and the particular "circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26–27 (D.D.C. 2011) ("*Oveissi I*"). In *Heiser I*, the court surveyed other decisions and concluded that "courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse[,] approximately $5 million to a parent whose child was killed[,] and approximately $2.5 million to a plaintiff whose sibling was killed." 466 F. Supp. 2d at 269 (footnotes omitted). These amounts, however, are merely guideposts, and courts should deviate depending on the circumstances. *See Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affairs*, 892 F.3d 348, 361–62 (D.C. Cir. 2018).

The family members in this case have presented compelling evidence concerning their relationships to the direct victims. The deaths of Jacob Fritz, Bryan Chism, Shawn Falter, and Ahmed Al-Taie, and the manner in which they occurred, have wrought profound harm to each of these families—emotional, physical, and financial. Each family member has presented to the Court and the special master testimony demonstrating his or her close relationship to the direct victim and the irreparable loss he or she continues to bear. The special master has considered the individual circumstances of each of the plaintiffs and has recommended an amount for each. Given the comprehensive evidence of devastating individualized grief and loss in the record, *see*

Dkt. 90 at 6–31, the Court adopts the special master's recommendations regarding each of the family members of the direct victims.

This includes the special master's recommendation to award damages to plaintiffs who were half or step-siblings or step-parents of the direct victims. As the record shows, the abductions, torture, and murders of Fritz, Chism, Falter, and Al-Taie inflicted extraordinary suffering on all of their family members, whether those family members were brothers and sisters, mothers and fathers, or—in the cases of Falter and Chism—half-siblings, step-siblings, or step-parents. The Court acknowledges that the elements of a solatium claim are "indistinguishable from an IIED claim," *Valore*, 700 F. Supp. 2d at 85, and, as such, are traditionally limited to a victim's "immediate family." *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 335 (D.C. Cir. 2003). Although decisions in this circuit have "adopted the strict meaning of 'immediate family,' defined as one's spouse, parents, siblings, and children," *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 28 (D.D.C. 2009) ("*Heiser II*") (internal citations omitted), the D.C. Circuit has recognized that "immediate family members" may include "members of the victim's household" who are "viewed as the functional equivalents of immediate family members." *Bettis*, 315 F.3d at 337. Accordingly, "[s]iblings of half-blood . . . are presumed to recover as a full-blood sibling would," *Peterson II*, 515 F. Supp. 2d at 52, and step-siblings have recovered as immediate family members when they were "treated like a brother [or sister]" or the "functional equivalent of a brother [or sister]." *Valore*, 700 F. Supp. 2d at 80; *see also Heiser II*, 659 F. Supp. 2d at 29 (awarding compensation to non-adoptive step-father and step-son of victim when they "lived in the same household" as the victim and victim treated step-father "like he was his biological" parent and provided for step-sons "financially,

11

emotionally, [and] socially"). Here, every non-biological or half-family member has shown that he or she was sufficiently close to the direct victim to meet the "functional equivalent" test. *See* Dkt. 90 at 46 (documenting how Vanessa Chism, Bryan's step-mother, "treated Bryan as, and considered Bryan to be, one of her sons."); *id.* at 47 (documenting how Linda Falter, Shawn's step-mother, "functioned as Shawn's mother—fulfilling all aspects of such a relationship—from the time Shawn was approximately four years old until his death."); *id.* at 47–48 (documenting how Shawn Falter "lived in the same household" as all but one of his half- and step-siblings, and that one step-sibling, an adult, "cared for Shawn" when on leave and "treated him as his little brother.").[1] The Court, accordingly, will adopt the special master's recommendation to award solatium damages to each of these plaintiffs as well.

3. *Prejudgment Interest*

Plaintiffs have also requested, and the special master has calculated, an award of prejudgment interest. "The decision to award prejudgment interest, as well as how to compute that interest, rests within the discretion of the court, subject to equitable considerations." *Baker*, 775 F. Supp. 2d at 86. "The purpose of such awards is to compensate the plaintiff for any delay

---

[1] This is not to say that every half-sibling or step-sibling, no matter how much older or younger than the victim and no matter their relationship, will always be entitled to recover as a full sibling would. In many cases, an individual like Andrew Lucas, Shawn Falter's half-brother who did not meet Shawn until Andrew was in his early twenties and did not live in the same household for extended periods of time, will not be able to show that he or she is the "functional equivalent" of a full sibling. Here, however, the Court concludes that Andrew Lucas has demonstrated that his relationship with Shawn was sufficiently close to entitle Andrew to the solatium award of a full sibling. Andrew had known Shawn since Shawn was "four of five" years old, Dkt. 77-16 at 4; saw Shawn "probably more" than Andrew saw "any of [his] blood relatives," *id.* at 5; and picked Shawn up from school, assisted with his homework, and attended his sporting events, *id.* at 6. Andrew was also profoundly affected by Shawn's death and was personally involved in the aftermath.

12

in payment resulting from the litigation." *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997). Accordingly, "[p]rejudgment interest is an element of complete compensation." *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 59 (D.D.C. 2012) ("*Oveissi II*") (quoting *West Virginia v. United States*, 479 U.S. 305, 311–12 (1987)). Decisions from this Court are divided, however, as to the applicability of prejudgment interest to non-economic awards to the family members of terror victims. Several decisions have reasoned that, because awards for pain and suffering and solatium are "designed to be fully compensatory" in and of themselves, prejudgment interest is "not appropriate and will be denied." *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012), *aff'd*, 554 F. App'x 16 (D.C. Cir. 2014); *see also Roth*, 78 F. Supp. 3d at 404; *Thuneibat*, 167 F. Supp. 3d at 48. Other decisions, however, "have awarded prejudgment interest in cases where plaintiffs were delayed in recovering compensation for their injuries—including, specifically, where such injuries were the result of targeted attacks perpetrated by foreign defendants," *Pugh v. Socialist People's Libyan Arab Jamahiriya,* 530 F. Supp. 2d 216, 263 (D.D.C. 2008), and have concluded that prejudgment interest is appropriate in FSIA cases because "[d]enying prejudgment interest on these damages would allow defendants to profit from the use of the money [in the time between the attacks and the litigation]." *Estate of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 184 n.1 (D.D.C. 2013); *see also Baker*, 775 F. Supp. 2d at 86; *Belkin*, 667 F. Supp. 2d at 24.

The Court concludes that prejudgment interest is appropriate in this case. An award of solatium is a payment that treats the loss of a close family member as a harm that arises at the moment of the tort. "Awards for pain and suffering and solatium are calculated without reference to the time elapsed since the attacks." *Khaliq v. Republic of Sudan*, 33 F. Supp. 3d 29,

13

35 (D.D.C. 2014), *aff'd sub nom. Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017). A solatium award is therefore best viewed as fixed at the time of the loss. As a result, Plaintiffs were theoretically entitled to the full amount of their solatium awards in 2006 (when Al-Taie was abducted) and 2007 (when Fritz, Chism, and Falter were abducted and killed), and thus prejudgment interest is appropriate to account for the time that they have not had access to that full amount. The Court, accordingly, will award prejudgment interest on the past economic loss of the direct victims as well as the non-economic pain and suffering and solatium damages suffered by the victims' estates and families.[2]

    4.    *Punitive Damages*

In addition to the awards discussed above, Plaintiffs have also sought punitive damages. *See* Dkt. 9 (Am. Compl. ¶¶ 128–30); Dkt. 91 at 3–7. In its current form, the FSIA expressly contemplates the award of punitive damages. *See* 28 U.S.C. § 1605A(c). Punitive damages, however, were not available under the statute until a federal cause of action was added in 2008. In *Owens v. Republic of Sudan*, the D.C. Circuit held that 28 U.S.C. § 1605A "authorize[d] a quantum of liability—punitive damages—to which foreign sovereigns were previously immune." 864 F.3d 751, 815 (D.C. Cir. 2017). But, relying on *Landgraf v. USI Film Products*, 511 U.S.

---

[2] "The D.C. Circuit has explained that the prime rate—the rate banks charge for short-term unsecured loans to creditworthy customers—is the most appropriate measure of prejudgment interest." *Khaliq*, 33 F. Supp. 3d at 35 (citing *Forman v. Korean Air Lines Co., Ltd.*, 84 F.3d 446, 450–51 (D.C. Cir. 1996)). Applying this rule, the special master has calculated prejudgment interest at the average annual prime rate in each year from the date of the respective attacks (January 20, 2007 for the Karbala attack and October 23, 2006 for the abduction of Al-Taie). The Court adopts the special master's recommended totals, subject to the modifications discussed above.

244 (1994), the Court of Appeals also held that § 1605A could not authorize new liability for prior events unless the statute contained "a clear statement authorizing punitive damages for past conduct." *Owens*, 864 F.3d at 816. Concluding that the "FSIA contains no such statement," the D.C. Circuit held that plaintiffs prevailing under § 1605A may recover punitive damages only for the post-enactment conduct of a foreign sovereign. *Id.* at 816–17.

Congress enacted FSIA's cause of action on January 28, 2008, as part of the National Defense Authorization Act (NDAA), Pub. L. No. 110-181, § 1083, 122 Stat. 338–44 (2008) (codified at 28 U.S.C. § 1605A(c)). Because the Karbala attacks occurred in 2007, and because this Court is bound by *Owens*, the families of Fritz, Falter, and Chism have withdrawn their request for punitive damages. *See* Dkt. 92 at 2. Ahmed Al-Taie, however, was not murdered until sometime between February 2009 and February 2011, well after the enactment of the 2008 NDAA. Thus, Plaintiffs may recover punitive damages for the injuries he and his family sustained after January 28, 2008.

Punitive damages "serve to punish and deter the actions for which they awarded." *Valore*, 700 F. Supp. 2d at 87. The Court has no difficulty concluding that AAH's treatment of Al-Taie, with the material support of Iran, warrants punitive damages in this case. As the Court described in its previous Memorandum Opinion, Al-Taie "suffered severe and persistent pain" while in captivity and "was beaten on a daily basis" before being executed. Dkt. 89 at 35. The purpose of this abuse was to "terrorize and intimidate" other American soldiers. *Id.* at 36 (internal alterations omitted).

Pursuant to this Court's order on August 1, 2018, *see* Dkt. 87, the special master did not consider, and did not calculate, an appropriate award of punitive damages for Iran's material

15

support of AAH's abuse of Al-Taie. "In determining the proper punitive damages award, courts evaluate four factors: (1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Valore*, 700 F. Supp. 2d at 87 (quoting *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008)). Recently, several decisions from this Court have calculated the total compensatory damages awarded regarding a victim, and then multiplied that award "by a factor between one and five." *Cohen II*, 268 F. Supp. 3d 19 at 28; *see also id.* (listing cases and awards). In light of these decisions, the Court concludes that a multiplier of two is appropriate in this case. Given that Al-Taie suffered abuse that both pre-dated and post-dated the enactment of the FSIA's cause of action, the Court will exclude punitive damages incurred for conduct pre-dating the enactment of 28 U.S.C. § 1605A(c). Using its previous benchmark of 1,074 days of captivity beginning on October 23, 2006 and only applying the multiplier to conduct that occurred between January 28, 2008 (the 2008 NDAA's enactment) and October 1, 2009 (the approximated death of Al-Taie), the Court concludes that a punitive damages award in the amount of $55,903,936 is appropriate.[3] Consistent with other decisions in

---

[3] This is double the amount of compensatory damages that Al-Taie's family members would recover if Al-Taie's mistreatment, captivity, and murder had begun on the date of §1605A(c)'s enactment (January 28, 2008), rather than October 23, 2006. The Court calculates this amount as follows: The total amount of compensatory damages the Court will award to Al-Taie's estate and family is $32,461,968. Of that award, only Al-Taie's estate's pain and suffering award of $10,640,000 was contingent on the duration of his captivity; the pain and suffering and solatium damages of his family, and the economic loss caused by his execution, are all based on the nature of his abuse and the manner of his death, rather than his length of confinement. Those amounts, therefore, would be identical had Al-Taie's captivity begun on January 28, 2008, rather than October 23, 2006. Accordingly, the only amount the Court must discount is Al-Taie's pain and suffering award. 613 days elapsed between January 28, 2008 and October 1, 2009, the approximate date of Al-Taie's death. Accordingly, the Court applies the $10,000 per-day pain

this circuit, the award of punitive damages will be apportioned among the estate and family of Al-Taie "relative to their individual compensatory awards." *Cohen II*, 268 F. Supp. 3d at 28.

**B.      Federal Rule of Civil Procedure 54(b)**

Plaintiffs move for entry of partial final judgment with respect to the claims of the U.S.- national plaintiffs. *See* Dkt. 91 at 7. Because the remaining non-U.S.-national plaintiff's claims are distinct from those of the U.S. nationals, and because the ability of the U.S.-national plaintiffs to receive timely payment from the fund created by the Justice for United States Victims of State Sponsored Terrorism Act, 34 U.S.C. § 20144, is dependent on the entry of final judgment, the Court concludes there is no just reason to delay entry of final judgment with respect to the claims of those plaintiffs.

When an action contains multiple claims or multiple parties, a "court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b); *see also Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501 (D.C. Cir. 2018). "The decision for certification [of partial final judgment] must constitute a 'judgment' in the sense that it determines a claim for relief," and it also must be "an ultimate disposition of an individual claim entered in the course of a multiple claims action." *Bldg. Indus. Ass'n of Superior Cal. v.*

---

and suffering award to 613 days instead of 1,064, meaning that for the purposes of calculating punitive damages, Al-Taie's pain and suffering award would be $6,130,000 rather than $10,640,000. Al-Taie's family members would have thus recovered total compensatory damages of $27,951,968 rather than $32,461,968 had Al-Taie's mistreatment begun on the date of §1605A(c)'s enactment. The punitive damages award, therefore, is $27,951,968 multiplied by a factor of two.

*Babbitt*, 161 F.3d 740, 744 (D.C. Cir. 1998). In addition, the Court must "expressly determine[] that there is no just reason for delay," Fed. R. Civ. P. 54(b), considering "such factors as whether the claims under review were separable from the others remaining to be adjudicated and whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals." *Bldg. Indus. Ass'n*, 161 F.3d at 744 (quoting *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980)).

As discussed in the Court's Memorandum Opinion, the Court found Iran liable under 28 U.S.C. § 1605A with respect to the claims of the U.S.-national plaintiffs. *See* Dkt. 89 at 58. The resolution of the U.S.-national plaintiffs' damages award thus fully resolves their claims for relief. The state law claims of Bashar Al-Taie, the only non-U.S. national in the case, however, remain pending before this Court. *See id.* at 66. As a result, the Court cannot enter final judgment with regard to all plaintiffs at this time.

Absent entry of final judgment, however, the U.S.-national plaintiffs will be prejudiced in their ability to receive prompt payment of all or some of their compensatory damages awarded from the fund Victims of State Sponsored Terrorism fund, administered by the Department of Justice. *See* 34 U.S.C. § 20144(c)(2). Given these circumstances, the Court concludes that entry of partial final judgment with respect to the U.S.-national plaintiffs is appropriate under Federal Rule of Civil Procedure 54(b).

## CONCLUSION

The Court will enter a separate order awarding damages to Plaintiffs as described above and will enter partial final judgment with regard to the U.S.-national plaintiffs.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: August 20, 2018